No. 23-13182

# In the United States Court of Appeals for the Eleventh Circuit

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY
LITIGATION

BRIAN STOLTZ, ET AL.,
*Plaintiffs-Appellants,*

*v.*

GLENMARK PHARMACEUTICALS, INC. USA, ET AL.,
*Defendants-Appellees.*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA, NO. 20-MD-2924
THE HONORABLE ROBIN LEE ROSENBERG*

## BRIEF FOR BRAND DEFENDANTS-APPELLEES

PAUL ALESSIO MEZZINA
JOSHUA N. MITCHELL
KING & SPALDING, LLP
    *1700 Pennsylvania Avenue,
    N.W., Suite 900
    Washington, DC 20006
    (202) 626-8972*

*Counsel for Boehringer
Ingelheim Pharmaceuticals, Inc.,
Boehringer Ingelheim
Corporation, and Boehringer
Ingelheim USA Corporation*

JOSEPH G. PETROSINELLI
AMY MASON SAHARIA
ANNE E. SHOWALTER
LIBBY A. BAIRD
WILLIAMS & CONNOLLY LLP
    *680 Maine Avenue, S.W.
    Washington, DC 20024
    (202) 434-5000
    asaharia@wc.com*

*Counsel for Pfizer Inc.*

*Additional Counsel on Inside Cover*

MADISON KITCHENS
KING & SPALDING, LLP
   *1180 Peachtree Street, N.E.*
   *Suite 1600*
   *Atlanta, GA 30309*
   *(404) 572-2712*

MATTHEW V.H. NOLLER
KING & SPALDING, LLP
   *50 California Street, Suite 3300*
   *San Francisco, CA 94111*
   *(415) 318-1200*

*Counsel for Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Corporation, and Boehringer Ingelheim USA Corporation*

JAY P. LEFKOWITZ
KIRKLAND & ELLIS, LLP
   *601 Lexington Avenue*
   *New York, NY 10022*
   *(212) 446-4800*

COLE CARTER
KIRKLAND & ELLIS, LLP
   *333 West Wolf Point Plaza*
   *Chicago, IL 60654*
   *(312) 862-1951*

*Counsel for GlaxoSmithKline LLC, GlaxoSmithKline Holdings (Americas) Inc., and GlaxoSmithKline PLC*

ILANA H. EISENSTEIN
RACHEL A.H. HORTON
M. DAVID JOSEFOVITS
DLA PIPER LLP (US)
  1650 Market Street, Suite 5000
  Philadelphia, PA 19103
  (215) 656-3300

SAMANTHA L. CHAIFETZ
DLA PIPER LLP (US)
  500 Eighth Street, N.W.
  Washington, DC 20004
  (202) 799-4082

DANIEL S. PARISER
SALLY L. PEI
ARNOLD & PORTER
KAYE SCHOLER LLP
  601 Massachusetts Avenue,
  N.W.
  Washington, DC 20001
  (202) 942-5000

Counsel for Sanofi-Aventis U.S.
LLC, Sanofi US Services, Inc., and
Chattem, Inc.

STEVEN REITENOUR
BOWMAN & BROOKE LLP
  150 South 5th Street, #3000
  Minneapolis, MN 55402
  (612) 672-3244

Counsel for Patheon
Manufacturing Services LLC

## CORPORATE DISCLOSURE STATEMENT AND CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Brand Defendants-Appellees hereby certify on behalf of Brand Defendants that the jointly filed Certificate of Interested Persons remains correct, other than the following additions: Boehringer Ingelheim Auslandsbeteiligungs GmbH – parent company of Defendant Boehringer Ingelheim USA Corporation; Libby A. Baird as Counsel for Defendant-Appellee Pfizer Inc.; Joshua N. Mitchell and Matthew V.H. Noller as Counsel for Defendants-Appellees Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Corporation, and Boehringer Ingelheim USA Corporation; M. David Josefovits, Counsel for Defendants-Appellees Sanofi-Aventis U.S. LLC, Sanofi US Services, Inc., and Chattem, Inc.; Daniel S. Pariser as Counsel for Defendants-Appellees Sanofi-Aventis U.S. LLC, Sanofi US Services, Inc., and Chattem, Inc.; and Steven Reitenour as Counsel for Defendant-Appellee Patheon Manufacturing Services LLC.

July 25, 2024

*/s/ Amy Mason Saharia*
AMY MASON SAHARIA

/s/ Paul Alessio Mezzina
PAUL ALESSIO MEZZINA

/s/ Jay P. Lefkowitz
JAY P. LEFKOWITZ

/s/ Ilana H. Eisenstein
ILANA H. EISENSTEIN

/s/ Steven Reitenour
STEVEN REITENOUR

## STATEMENT REGARDING ORAL ARGUMENT

Brand Defendants-Appellees do not oppose Plaintiffs-Appellees' request for oral argument. *See* 11th Cir. R. 28-1(c). The consolidated appeals arise from years-long MDL proceedings, which involve numerous groups of defendants and thousands of cases. Oral argument will assist the Court in reviewing the voluminous record and in deciding the issues raised on appeal.

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................... 1

JURISDICTIONAL STATEMENT ........................................ 5

STATEMENT OF THE ISSUES ............................................ 6

STATEMENT OF THE CASE ................................................ 7

I.    Factual Background ...................................................... 7

      A.    FDA Approves Zantac as Safe and Effective ......................... 7

      B.    An Online Pharmacy's Citizen Petition Precipitates Additional Testing ........................... 9

      C.    Medical, Scientific, and Regulatory Communities Determine That Ranitidine Use Does Not Cause Cancer .................................. 12

II.   Procedural History ...................................................... 18

      A.    The MDL's Formation and Preliminary Proceedings .......... 18

      B.    Plaintiffs' General-Causation Experts ................................. 21

      C.    The District Court's Rule 702 Ruling ................................... 25

      D.    Final Judgments ................................................................ 33

SUMMARY OF ARGUMENT ................................................ 34

STANDARD OF REVIEW .................................................... 40

ARGUMENT .......................................................................... 41

I.    THE DISTRICT COURT HAD SUBJECT-MATTER JURISDICTION .............................................................. 41

II.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING PLAINTIFFS' GENERAL-CAUSATION EXPERTS .................................. 53

      A.    Plaintiffs' Disparagement of the District Judge's Thoroughness Is Unfounded and Improper ......................... 55

      B.    Plaintiffs Were Required To Prove General Causation ....... 58

C.   Plaintiffs Lack Reliable Primary Evidence of General Causation ................................................................ 64

1.  Plaintiffs' Experts Did Not Reliably Analyze Epidemiology Evidence .................................... 65

a.  The experts' conclusions that ranitidine use causes cancer lack general acceptance ............................ 65

b.  The experts did not reliably apply scientific methodologies ........................................ 70

i.  Bias and confounding........................................ 74

ii.  Statistical significance. ..................................... 84

iii.  Non-ranitidine studies. .................................... 94

2.  No Expert Provided Reliable Primary Evidence of Dose-Response Relationship ........................... 100

3.  No Expert Reliably Analyzed the Background Risk of Developing Any of the Designated Cancers .................. 109

D.   No Expert Satisfied Rule 702's Reliability Requirement ... 112

E.   The Court Correctly Granted Summary Judgment Due to Plaintiffs' Failure To Present General-Causation Evidence ............................................................. 116

III.  THE DISTRICT COURT CORRECTLY APPLIED ITS RULE 702 ORDER TO ALL CASES ...................................... 117

IV.  PLAINTIFFS' CLAIMS ARE PREEMPTED BY FEDERAL LAW ............................................................. 123

A.   Plaintiffs Abandoned Preemption Arguments as to Brand Defendants .............................................. 123

B.   Plaintiffs' Design-Defect and Failure-To-Warn-Through-FDA Claims Are Preempted by Federal Law ...... 125

1.  The District Court Correctly Held That the MPIC's Post-Approval Design-Defect Claims Conflicted with Federal Law ............................................. 126

2. The District Court Correctly Held That Plaintiffs' Failure-To-Warn-Through-FDA Claims Were Preempted .................................................. 132

V. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' "INNOVATOR LIABILITY" CLAIMS ................. 135

A. Innovator-Liability Claims in All Jurisdictions Other Than California and Massachusetts Fail on the Merits .... 135

1. The Court Should Not Certify the Innovator-Liability Question ........................................................ 135

2. The District Court Correctly Concluded That No Jurisdictions Other Than California and Massachusetts Recognized or Would Recognize Innovator Liability .... 140

B. The District Court Correctly Dismissed Innovator-Liability Claims Brought in California and Massachusetts for Lack of Personal Jurisdiction ............... 147

CONCLUSION ..................................................................... 154

# TABLE OF CITATIONS

## CASES

Page

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
773 N.E.2d 496 (N.Y. 2002) ............................................................ 139

\**Allison v. McGhan Med. Corp.*,
184 F.3d 1300 (11th Cir. 1999)....................................... 40, 41, 68, 70

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ................................................ 56, 74, 112

*Anselmo v. Sanofi-Aventis, Inc. USA*,
2014 WL 8849464 (Kan. Dist. Ct. Oct. 13, 2014) ............................ 146

*Barcal v. EMD Serono, Inc.*,
2016 WL 1086028 (N.D. Ala. Mar. 21, 2016) ................................... 127

*Bell v. Publix Super Mkts., Inc.*,
982 F.3d 468 (7th Cir. 2020)................................... 43, 44, 48, 49, 72

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*,
402 U.S. 313 (1971).......................................................................... 120

*Bobo v. Tenn. Valley Auth.*, 855 F.3d 1294 (11th Cir. 2017) ............... 144

*Brazil v. Janssen Rsch. & Dev. LLC*,
196 F. Supp. 3d 1351 (N.D. Ga. 2016).............................................. 127

*Buckman Co. v. Pls.' Legal Comm.*,
531 U.S. 341 (2001)..................................................... 38, 126, 132, 133

*Burst v. Shell Oil Co.*, 2015 WL 3755953 (E.D. La. June 16, 2015),
*aff'd*, 650 F. Appx. 170 (5th Cir. 2016) .............................................. 60

*C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827 (7th Cir. 2015)............ 56

*Carney v. Adams*, 592 U.S. 53 (2020) ......................................................... 51

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........................................... 41

\**Chapman v. Proctor & Gamble Distrib., LLC*,
766 F.3d 1296 (11th Cir. 2014).......................28, 35, 59, 60, 62, 64, 68
101, 108, 109, 110, 117

*City of Miami v. Bank of Am. Corp.*,
800 F.3d 1262 (11th Cir. 2015)......................................................... 142

*Conley v. Boyle Drug Co.*, 570 So.2d 275 (Fla. 1990)........................... 144

*Cordero v. Transamerica Annuity Service Corp.*,
34 F.4th 994 (11th Cir. 2022) (per curiam) ..................................... 138

*Culliver v. BP Expl. & Prod., Inc.*,
2024 WL 1478659 (N.D. Fla. Apr. 3, 2024) ....................................... 57

Cases—cont'd:

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .................................... 32, 54, 58, 85, 91, 112, 117
*Del Valle v. Trivago GmbH*, 56 F.4th 1265 (11th Cir. 2022),
  *cert. denied*, 144 S. Ct. 90 (2023) ...................................................... 150
*Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146 (11th Cir. 2011) .... 141
*Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266 (5th Cir. 1976) .... 139
*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
  592 U.S. 351 (2021) .......................................... 148, 150, 151, 153, 154
*Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*,
  377 F.3d 1164 (11th Cir. 2004) ......................................................... 124
*Gelboim v. Bank of Am. Corp.*, 574 U.S. 405 (2015) ................. 34, 42, 43
*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) .................................... 57, 68, 72, 86, 95, 103, 112
*Greenbriar, Ltd. v. City of Alabaster*,
  881 F.2d 1570 (11th Cir. 1989) ......................................................... 124
*Guarino v. Wyeth, LLC*,
  719 F.3d 1245 (11th Cir. 2013) .................... 39, 141, 143, 144, 145 146
*Gustavsen v. Alcon Labs., Inc.*, 903 F.3d 1 (1st Cir. 2018) ................... 127
*Hall v. Hall*, 584 U.S. 59 (2018) ............................................................ 43
*Hammonds v. Comm'r, Dep't of Corrs.*,
  822 F.3d 1201 (11th Cir. 2016) (per curiam) .................................... 139
*Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010) ...... 54
*Home Depot USA, Inc. v. Lafarge N. Am., Inc.*,
  59 F.4th 55 (3d Cir. 2023) ......................................................... 121, 123
*In re 21st Century Oncology Customer Data Sec. Breach Litig.*,
  380 F. Supp. 3d 1243 (M.D. Fla. 2019) ............................................... 43
*In re Abilify Prods. Liab. Litig.*,
  299 F. Supp. 3d 1291 (N.D. Fla. 2018) ....................................... 57, 108
*In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*,
  2024 WL 180834 (S.D.N.Y. Jan. 17, 2024) ........................................ 121
*In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*,
  — F. Supp. 3d —, 2023 WL 8711617 (S.D.N.Y. Dec. 18, 2023) ........ 86
*In re Complaint of McLinn*, 744 F.2d 677 (9th Cir. 1984) .................... 137
*In re CP Ships Ltd. Sec. Litig.*, 578 F.3d 1306 (11th Cir. 2009) ............. 49

Cases—cont'd:

*In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.,
  756 F.3d 917 (6th Cir. 2014)..................................... 126, 131, 143, 146
In re Deepwater Horizon BELO Cases,
  2022 WL 104243 (11th Cir. Jan. 11 2022) (per curiam) ................. 117
In re Deepwater Horizon Belo Cases,
  2022 WL 17721595 (N.D. Fla. Dec. 15, 2022) ................................... 57
In re Incretin-Based Therapies Prods. Liab. Litig.,
  2022 WL 898595 (9th Cir. Mar. 28, 2022).................................. 55, 117
*In re Lipitor Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II),
  892 F.3d 624 (4th Cir. 2018).......... 55, 63, 73, 81, 90, 91, 104, 121, 122
In re McLean, 794 F.3d 1313 (11th Cir. 2015)..................................... 122
In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No.
  II), 982 F.3d 113 (2d Cir. 2020) (per curiam) ...................... 55, 66, 117
*In re Onglyza & Kombiglyze Prods. Liab. Litig.,
  93 F.4th 339 (6th Cir. 2024) .............................. 55, 72, 73, 81, 91, 104
In re Paraquat Prods. Liab. Litig.,
  — F. Supp. 3d —, 2024 WL 1659687 (S.D. Ill. Apr. 17, 2024)........... 57
In re Refrigerant Compressors Antitrust Litig.,
  731 F.3d 586 (6th Cir. 2013)............................................................. 43
In re Zantac (Ranitidine) Litig.,
  2024 WL 2812168 (Del. Super. Ct. May 31, 2024)............................. 32
*In re Zantac (Ranitidine) Prods. Liab. Litig. (Cartee),
  2022 WL 16729151 (11th Cir. Nov. 7, 2022)
  (per curiam)........................................................................ 19, 50, 51
*In re Zoloft Prods. Liab. Litig.,
  858 F.3d 787 (3d Cir. 2017) ...........................22, 55, 72, 73, 85, 90, 94,
                                              107, 113, 114, 115, 117
Ingram v. CSX Transp., Inc., 146 F.3d 858 (11th Cir. 1998) ................ 52
Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945) ............................. 148
Keister v. Bell, 879 F.3d 1282 (11th Cir. 2018)..................................... 72
Knepfle v. J-Tech Corp., 48 F.4th 1282 (11th Cir. 2022)................. 40, 54
Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)....................... 40, 90
Lashley v. Pfizer, Inc., 750 F.3d 470 (5th Cir. 2014) (per curiam) ....... 146
Louisville & Nashville R.R. v. Schmidt, 177 U.S. 230 (1900) ...... 122, 123
Lust v. Merrell Dow Pharm., Inc., 89 F.3d 594 (9th Cir. 1996).............. 70

Cases—cont'd:

*Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084 (11th Cir. 2021) ........ 41
*Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329 (11th Cir. 2021)... 141
\*McClain v. Metabolife International, Inc.*,
   401 F.3d 1233 (11th Cir. 2005)................26, 34, 58, 59, 60, 61, 62, 63,
                                     67, 79, 80, 100, 107, 108, 109
*McCorvey v. Baxter Healthcare Corp.*,
   298 F.3d 1253 (11th Cir. 2002) ......................................................... 40
*McNair v. Johnson & Johnson*, 694 F. Appx. 115 (4th Cir. 2017) ....... 147
*Milward v. Acuity Specialty Prods. Grp., Inc.*,
   639 F.3d 11 (1st Cir. 2011) ................................................................ 69
\*Mink v. Smith & Nephew, Inc.*,
   860 F.3d 1319 (11th Cir. 2017).......................... 38, 125, 132, 133, 134
*Moretti v. Wyeth, Inc.*, 579 F. Appx. 563 (9th Cir. 2014) ..................... 146
*Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010)....................... 49
\*Mutual Pharm. Co. v. Bartlett*,
   570 U.S. 472 (2013).....................38, 126, 127, 129, 130, 131, 145, 146
*Perkins v. Clark Equip. Co.*, 823 F.2d 207 (8th Cir. 1987).................. 137
*Perry v. Schumacher Grp.*, 891 F.3d 954 (11th Cir. 2018) ..................... 46
*PLIVA, Inc. v. Dement*, 780 S.E.2d 735 (Ga. Ct. App. 2015) ............... 146
\*PLIVA, Inc. v. Mensing*,
   564 U.S. 604 (2011)...................................126, 129, 131, 134, 145, 146
*Preston v. Janssen Pharms., Inc.*,
   2018 WL 5017045 (N.Y. Sup. Ct. Oct. 12, 2018) .............................. 146
*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
   326 F.3d 1333 (11th Cir. 2003) .................................................. 68, 69
*Rhynes v. Branick Mfg. Corp.*, 629 F.2d 409 (5th Cir. 1980) ....... 141, 142
*Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194 (11th Cir. 2002)... 12, 103
*Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249 (2d Cir. 2005)............. 55
*Ruiz v. SharkNinja Operating LLC*,
   2024 WL 640859 (M.D. Fla. Feb. 6, 2024).......................................... 57
*Santiago v. Lykes Bros. S.S. Co.*, 986 F.2d 423 (11th Cir. 1993) ........... 40
*Sapuppo v. Allstate Floridian Ins. Co.*,
   739 F.3d 678 (11th Cir. 2014)................................................... 53, 124
*Schrock v. Wyeth, Inc.*, 727 F.3d 1273 (10th Cir. 2013)............... 142, 146

Cases—cont'd:

*Searcy v. R.J. Reynolds Tobacco Co.*,
    902 F.3d 1342 (11th Cir. 2018) ....................................... 124
*Smith v. Eli Lilly & Co.*, 560 N.E.2d 324 (Ill. 1990) ............................ 143
*State Auto Prop. & Cas. Ins. Co. v. Hargis*,
    785 F.3d 189 (6th Cir. 2015) ............................................ 137
*Stengel v. Medtronic Inc.*,
    704 F.3d 1224 (9th Cir. 2013) (en banc) .................................. 134, 135
*Stirling v. Novartis Pharm. Corp.*,
    2019 WL 6456186 (Idaho Dist. Ct. Sept. 25, 2019) .......................... 146
*Sykes v. Cook Inc.*, 72 F.4th 195 (7th Cir. 2023) .................................... 44
*Thompson v. Paul*, 547 F.3d 1055 (9th Cir. 2008) .............................. 137
*Ungar v. Sarafite*, 376 U.S. 575 (1964) ................................................ 122
*United States v. Dennis*, 26 F.4th 922 (11th Cir. 2022) ........................... 41
*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004)... 40, 54, 55, 111
*United States v. Love*,
    449 F.3d 1154 (11th Cir. 2006) (per curiam) ........................... 118, 120
*Utts v. Bristol-Myers Squibb Co.*,
    226 F. Supp. 3d 166 (S.D.N.Y. 2016) ................................... 127
*Wells v. SmithKline Beecham Corp.*, 601 F.3d 375 (5th Cir. 2010) ........ 86
*Whaley v. Merck & Co.*,
    2022 WL 1153151 (S.D. Cal. Apr. 12, 2022) ............................ 152, 153
*Whiteside v. GEICO Indemnity Co.*, 977 F.3d 1014 (11th Cir. 2020)... 138
*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ......... 152
*Wyeth, Inc. v. Weeks*, 2013 WL 135753 (Ala. Jan. 11, 2013),
    *aff'd on reh'g*, 159 So.3d 649 (Ala. 2014), *superseded by statute* ...... 145
*Yates v. Ortho-McNeil-Janssen Pharms., Inc.*,
    808 F.3d 281 (6th Cir. 2015) ........................................... 127
*York v. Lunkes*, 545 N.E.2d 478 (Ill. App. Ct. 1989) ............................ 143

## STATUTES, REGULATIONS, AND RULES

Food, Drug, and Cosmetic Act (FDCA),
    Pub. L. No. 75-717, 52 Stat. 1040
    (codified at 21 U.S.C. § 301 *et seq.*)............6, 20, 38, 125, 130, 132, 133

Page

Statutes, Regulations, and Rules—cont'd:

21 U.S.C.
    § 337 .................................................................. 126, 132, 133
    § 352 ................................................................... 128, 131
    § 355 ................................................................... 130
28 U.S.C.
    § 1291 ................................................................... 5
    § 1332 ................................................................... 5
21 C.F.R.
    § 314.70 ................................................................ 127
    § 314.80 ................................................................ 133
    § 314.81 ................................................................ 133
Fed. R. App. P. 28 .................................................. 124, 125
Fed. R. Civ. P.
    20 ........................................................................ 47
    41 ........................................................................ 46
Fed. R. Evid. 702 ............................. 2, 3, 4, 5, 6, 7, 13, 20, 25, 26, 28, 30,
    32, 34, 37, 39, 52, 53, 54, 57, 58, 65,
    66, 68, 80, 85, 102, 110, 111, 112,
    117, 118, 119, 121, 123, 135
Advisory Committee Note to 2000 amend. to Fed. R. Evid. 702 ...... 28, 66
Ala. Code § 6-5-530 ................................................ 145

## OTHER AUTHORITIES

Eduardo De Stefani et al., *Dietary Nitrosamines, Heterocyclic Amines, and Risk of Gastric Cancer: A Case-Control Study in Uruguay*, 30 Nutrition & Cancer 158 (1998) ..................................... 97
FDA, Zantac Prescribing Information (Apr. 2009), https://tinyurl.com/yja97xkt .................................................. 8
Fed. Jud. Ctr., Manual for Complex Litigation (Fourth) § 40.52 (2004) ................................................................ 44
Fed. Jud. Ctr., Reference Manual on Scientific Evidence (3d ed. 2011) ........................................ 12, 17, 22, 23, 74, 75, 84, 85, 98
*In re: Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, No. 2:11-md-2226 (E.D. Ky. Apr. 24, 2012), ECF No. 1723 ............. 140

Other Authorities—cont'd:

*In re Eliquis Prods. Liab. Litig.*, No. 17-md-2754 (S.D.N.Y.),
ECF Nos. 45 (May 9, 2017), 120 (Oct. 13, 2017), 124 (Oct. 26,
2017), 169 (Feb. 2, 2018) ................................................................... 122

*In re Mirena IUD Prods. Liab. Litig.*,
No. 13-md-2434 (S.D.N.Y. Nov. 14, 2016), ECF No. 3279 .............. 122

*In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*,
MDL No. 19-2875, (D.N.J. Nov. 1, 2021), ECF 1707 ......................... 61

Kyung-In Joung et al., *Association Between Ranitidine Use with
Potential NDMA Impurities and Risk of Cancer in Korea*,
12 Sci. Reps. 10 (2022) ........................................................................ 15

Hyejung Kang et al., *Effects of Ranitidine and Nizatidine on the
Risk of Gastrointestinal Cancer*,
13 Frontiers in Oncology 1 (2023) ........................................................ 15

Order, *Gross v. GlaxoSmithKline LLC*,
No. 2023-L-469 (Cook Cnty. Cir. Ct. June 3, 2024) ........................ 143

Order, *Williams v. GlaxoSmithKline LLC*,
No. 2023-L-4599 (Cook Cnty. Cir. Ct. May 17, 2024) ..................... 143

Order, *In Re: Zantac Litig.*,
No. 1364 (Pa. Ct. Comm. Pleas May 9, 2023) ................................. 146

Resp. in Opp'n to Defs.' Mot. To Dismiss,
*Cordero v. Transamerica Annuity Serv. Corp.*,
2020 WL 4746251 (S.D. Fla. June 29, 2020) ................................... 139

*Scorecard: Innovator Liability in Generic Drug Cases*,
Drug & Device Law (Nov. 12, 2009),
https://tinyurl.com/2p8x3xbc ............................................................ 147

World Health Org.: Int'l Agency for Rsch. on Cancer, *IARC
Monographs on the Identification of Carcinogenic Hazards to
Humans: Preamble* (2019), https://tinyurl.com/vc6bu2f4 ............. 9, 62

World Health Org.: Int'l Agency for Rsch. on Cancer, *List of
Classifications* (July 5, 2024), https://tinyurl.com/rdhyp533... 9, 62, 98

U.S. Amicus Brief, *Mutual Pharm. Co. v. Bartlett*,
2013 WL 314460 (U.S. Jan. 22, 2013) ..................................... 130, 131

Seng Chan You et al., *Ranitidine Use and Incident Cancer in a
Multinational Cohort*,
11 JAMA Pharmacy & Clinical Pharmacology 11 (2023) .................. 15

# INTRODUCTION[1]

This appeal arises from a multi-district litigation (MDL) in which Plaintiffs claim that ranitidine, the active ingredient in the heartburn medication Zantac, degrades into N-nitrosodimethylamine (NDMA) and causes cancer.  No regulatory agency, medical authority, or expert outside of litigation has endorsed that conclusion.  To the contrary, after reviewing epidemiological studies conducted across the world, the U.S. Food and Drug Administration (FDA) explained that researchers have "found no association between ranitidine and overall or specific cancer risk."  MDL.Dkt.6187-1:9.[2]

After over two years of proceedings and voluminous expert discovery, the district court concluded—in a meticulous 341-page

[1] This brief addresses appeals arising from the master personal-injury complaint (MPIC) docketed in *Krause* (No. 23-13283), *Stoltz* (No. 23-13182), *Neely* (No. 23-13155), and *Townsend* (No. 23-11080), as well as arguments that Plaintiffs incorporated by reference from their brief in *Chandler* (No. 21-12618).  Brand Defendants address in a separate brief the appeals from the economic-loss and medical-monitoring cases docketed in *Adams* (No. 23-12742).  Brand Defendants also address separately the appeals in *Harrell* (No. 23-12664) and *Base* (No. 23-12584).

[2] "MDL.Dkt." refers to the district court docket number.  The page numbers (which follow the colon) are those within the docket entry as assigned by the district court ECF system.

decision—that Plaintiffs' experts' opinions that ranitidine use can cause cancer rested on unreliable methodologies and were an exercise in outcome-driven cherry-picking. The court found that Plaintiffs' experts failed to employ "internally consistent, objective, science-based standards for the evenhanded evaluation of data." MDL.Dkt.6120:7. Acting within its broad discretion, the court thus excluded their opinions under Federal Rule of Evidence 702. Plaintiffs provide no reason for this Court to disturb the district court's judgments.

As an initial matter, Plaintiffs claim they should have been allowed to skip the general-causation inquiry because NDMA, a substance found in food, water, and air, is supposedly a known carcinogen. The district court correctly rejected that bizarre claim, because the scientific community does not generally recognize (indeed, does not recognize at all) the actual substance at issue, ranitidine, as carcinogenic.

On the merits of general causation, the court acted well within its discretion in concluding that Plaintiffs' experts did not reliably employ their asserted methodologies. The court correctly found that Plaintiffs' experts "systemically utilized unreliable methodologies with … a lack of substantiation for analytical leaps." MDL.Dkt.6120:7. As one example,

ten human epidemiological studies designed to assess whether there is a relationship between ranitidine use and cancer found no such relationship. Plaintiffs' experts, however, relied heavily on studies examining exposure to NDMA in rubber factories and from consuming food. The district court properly exercised its discretion to exclude experts who inconsistently and selectively used such studies to justify their litigation-driven conclusions.

Under Plaintiffs' conception of Rule 702, the district court was barred from assessing whether their experts reliably relied on particular studies; so long as their experts *invoked* a reliable methodology for assessing causation, Plaintiffs claim, the experts necessarily survive Rule 702 scrutiny. The Rule provides expressly the opposite: an expert must utilize a reliable methodology *and* reliably apply it. The district court's careful Rule 702 Order exemplifies the gatekeeping analysis that this Court's precedents require. The district court's diligence is to be commended, not disparaged.

Plaintiffs contend that the district court violated due process by applying its Rule 702 Order to cases filed later in the MDL. But the court gave Plaintiffs the show-cause process they requested and entered

summary judgment in later-filed cases only after no Plaintiff expressed a desire to proffer different expert evidence. Plaintiffs received more than adequate process.

Plaintiffs also challenge the district court's earlier rulings dismissing certain claims as preempted and dismissing Plaintiffs' "innovator-liability" claims (*i.e.*, claims against brand-name manufacturers alleging injury from generic products). If this Court affirms the Rule 702 Order, it need not reach the merits of these issues. In any case, the district court correctly concluded that federal law preempts Plaintiffs' design-defect and failure-to-warn-through-FDA claims. The court likewise correctly dismissed Plaintiffs' innovator-liability claims. Plaintiffs' request for state-specific certification on this issue is forfeited; it would also be an unprecedented burden on state high courts and inject substantial delay. And the court properly dismissed Plaintiffs' claims under California and Massachusetts law—the only jurisdictions recognizing innovator liability—for lack of personal jurisdiction because the claims do not relate to Brand Defendants' contacts in those jurisdictions.

Finally, in a last-ditch effort to avoid the district court's rulings, Plaintiffs argue for the first time on appeal (contrary to what they told this Court two years ago) that the district court lacked subject-matter jurisdiction, purportedly because the individual cases in the MDL were merged, destroying complete diversity. But, as is common in MDLs, each Plaintiff incorporated relevant claims from a master complaint into his or her individual short-form complaint, preserving each case's individual identity. No diversity-destroying merger occurred. Plaintiffs' transparent effort to evade the district court's Rule 702 Order is meritless.

This Court should affirm the judgments below in all respects.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332 because in each individual action, the amount in controversy exceeds $75,000 and all properly joined parties are completely diverse. As explained further below, *see infra* Part I, Plaintiffs' assertion that the cases were merged, and thus diversity destroyed, is incorrect, Krause.Br.xxiv. This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the district court entered final judgments.

## STATEMENT OF THE ISSUES

1.      Whether diversity jurisdiction existed because the individual cases that were coordinated for MDL pretrial proceedings remained jurisdictionally separate and were not merged.

2.      Whether the district court acted within its wide discretion in excluding the opinions of Plaintiffs' general-causation experts as unreliable under Rule 702 and thus properly entered summary judgment in Defendants' favor.

3.      Whether the district court properly applied its Rule 702 Order to later-filed cases after giving Plaintiffs in those cases an opportunity to serve their own general-causation expert evidence.

4.      If the Court disagrees with the district court's Rule 702 Order, whether the district court correctly found federal preemption bars (a) Plaintiffs' design-defect claims because federal law prohibits new-drug-application (NDA) holders from unilaterally changing a medication's design and (b) Plaintiffs' failure-to-warn-through-FDA claims because private lawsuits cannot enforce the Food, Drug, and Cosmetic Act (FDCA).

5. Whether the district court properly dismissed Plaintiffs' innovator-liability claims. Specifically:

a. If the Court disagrees with the district court's Rule 702 Order, whether the court correctly dismissed claims under the laws of thirty-five jurisdictions, and whether this Court should certify the innovator-liability issue to the high courts of thirty-two jurisdictions.

b. Whether the court properly dismissed claims under California and Massachusetts law for lack of personal jurisdiction.

## STATEMENT OF THE CASE

## I. Factual Background

### A. FDA Approves Zantac as Safe and Effective

For more than 35 years, Zantac was sold as a federally approved, safe, and effective medication to treat the millions of Americans who suffer from painful gastroesophageal conditions such as heartburn and ulcers. MDL.Dkt.6120:8. Ranitidine hydrochloride—the active ingredient in Zantac—is a histamine-2 receptor antagonist, or "H2-blocker." MDL.Dkt.6120:8. H2-blockers reduce stomach acid by blocking histamine receptors in the stomach. MDL.Dkt.6120:8. Brand Defendants—GlaxoSmithKline LLC (GSK), Pfizer Inc., Boehringer

Ingelheim Corporation, and Sanofi-Aventis U.S. LLC—each manufactured and/or sold Zantac.[3]

FDA approved Zantac on multiple occasions after extensive testing and review. FDA first approved prescription Zantac to treat ulcers in 1983. MDL.Dkt.6120:8. It later approved Zantac's use for additional stomach and esophageal conditions.[4] In 1995, after more than a decade of safe and effective prescription use, FDA authorized over-the-counter Zantac. MDL.Dkt.6120:8. Beginning in 1997, multiple companies began selling generic versions of both prescription and over-the-counter ranitidine. MDL.Dkt.6120:9. In the decades since Zantac was made available to patients, no regulatory agency or scientific body has ever

---

[3] FDA approved GSK's application to sell prescription Zantac in 1983 and over-the-counter Zantac in 1995. In 1998, GSK transferred the rights to over-the-counter Zantac to a Pfizer predecessor while retaining the rights to prescription Zantac. MDL.Dkt.6120:8-9. In 2006, Pfizer transferred the right to over-the-counter Zantac to Boehringer Ingelheim, which in turn transferred it to Sanofi in 2017. MDL.Dkt.6120:9. This brief refers to these four appellees as "Brand Defendants." (Patheon Manufacturing Services LLC and its predecessors contracted with several Brand Defendants to manufacture and package finished Zantac, but Patheon is not a Brand Defendant. MDL.Dkt.3887:11-12.) "Defendants" refers to all defendants in the litigation.

[4] *See, e.g.*, FDA, Zantac Prescribing Information 8 (Apr. 2009), https://tinyurl.com/yja97xkt.

concluded that Zantac or ranitidine causes or increases the risk of any cancer.

## B. An Online Pharmacy's Citizen Petition Precipitates Additional Testing

In September 2019, a private online pharmacy called Valisure submitted a citizen petition to FDA, claiming to have detected "extremely high levels" of NDMA in ranitidine samples. MDL.Dkt.6188-20:2. NDMA is a common substance prevalent in food, water, and air. It is not an established human carcinogen. Because some studies performed in animals at high doses of exposure suggest that NDMA is carcinogenic in rodents, however, some regulatory bodies have classified NDMA as a "probable human carcinogen."[5]

FDA recognizes that daily ingestion of certain levels of NDMA is safe and has set a precautionary guideline for pharmaceutical products of 96 nanograms (ng) per day. MDL.Dkt.6120:4. That guideline is

---

[5] *See, e.g.*, World Health Org.: Int'l Agency for Rsch. on Cancer, *List of Classifications* (July 5, 2024), https://tinyurl.com/rdhyp533 (IARC Classifications) (classifying NDMA as "Group 2A" agent); World Health Org.: Int'l Agency for Rsch. on Cancer, *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: Preamble* 35 (2019), https://tinyurl.com/vc6bu2f4 (explaining "Group 2A" classification); MDL.Dkt.5946-19:39 (collecting animal studies in which NDMA was administered to animals "at high doses").

designed to be conservative, extrapolated from rodent tests, and, as FDA has explained, "should not be regarded as a realistic indication of the actual risk" to humans. MDL.Dkt.6188-6:8-9; MDL.Dkt.6188-2:44-45. Even that conservatively designed guideline represents a theoretical increase of only one additional case of cancer for every 100,000 individuals who consume that amount of NDMA every day for 70 years. MDL.Dkt.6120:5; MDL.Dkt.6188-6:8-9.

In the ranitidine samples it tested, Valisure reported NDMA levels far exceeding FDA's exposure guidance, up to 3,000,000ng per tablet. MDL.Dkt.3887:45-46. After careful review, however, FDA determined that Valisure's testing methods were methodologically flawed and unreliable. *See* MDL.Dkt.6154-11:11. Specifically, FDA determined that Valisure's testing method was inappropriate because it subjected the samples to temperatures up to 266° Fahrenheit, MDL.Dkt.6120:3, which "contributed to or caused the levels of NDMA to be artificially high." MDL.Dkt.6154-11:11.

FDA performed its own testing of finished ranitidine products and the ranitidine molecule used in those products. FDA's tests, using validated methods, revealed "low levels" of NDMA at amounts much

lower than Valisure's, and many of the batches revealed NDMA amounts *below* FDA's 96ng guideline.  MDL.Dkt.6188-15:2; MDL.Dkt.6188-13:2-4.  FDA determined that "the levels of NDMA in ranitidine … are similar to the levels" that a person would consume by eating "grilled or smoked meats."  MDL.Dkt.6188-13:2.  The agency reported to the public: "Although NDMA may cause harm in large amounts, the levels the FDA is finding in ranitidine from preliminary tests barely exceed amounts you might expect to find in common foods."  MDL.Dkt.6188-8:2.  GSK and Sanofi, which at the time held the rights to prescription and over-the-counter Zantac respectively, performed testing that similarly revealed levels mostly below FDA's conservative guideline.  MDL.Dkts.6188-30,6188-35.

Nevertheless, as a precautionary measure, in fall 2019, GSK and Sanofi voluntarily recalled their ranitidine products pending further investigation.  MDL.Dkts.6188-31,6188-36.[6]  In April 2020, after additional testing confirmed that NDMA levels in some samples exceeded

---

[6] GSK's voluntary recall was with respect to global markets.  GSK had not sold over-the-counter Zantac in the United States since 1998 and stopped selling prescription Zantac in the United States in 2017.

FDA's 96ng guideline, FDA requested that manufacturers withdraw any remaining ranitidine products from the market.  MDL.Dkt.6188-15:2.

## C. Medical, Scientific, and Regulatory Communities Determine That Ranitidine Use Does Not Cause Cancer

1.  After ranitidine's withdrawal, researchers worldwide conducted epidemiological studies to evaluate whether ranitidine use can increase the risk of cancer.  Epidemiological studies evaluate the "incidence, distribution, and etiology of disease in human populations." Fed. Jud. Ctr., Reference Manual on Scientific Evidence 551 (3d ed. 2011) (Reference Manual).  Because epidemiology "concerns itself with finding the causal nexus between external factors and disease," it "is generally considered to be the best evidence of causation in toxic tort actions." *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002).

Many large-scale studies have now been performed, and the body of peer-reviewed, ranitidine-specific epidemiological literature is extensive. The initial briefing below focused on ten studies that were available at the time—conducted by different researchers from different institutions—analyzing data from nearly seven million patients around the world.  *See* MDL.Dkt.6120:171-76; *see also* MDL.Dkt.5736:110 (chart collecting studies).  None of those studies found an association, much less

a causal relationship, between ranitidine use and *any* type of cancer when comparing ranitidine users to similarly situated individuals (*i.e.*, individuals taking other H2-blocker medications who likely had comparable underlying risk factors for cancer).[7] This type of analysis is commonly called an active-comparator analysis. The study authors concluded:

- "We found no evidence that exposure to NDMA through ranitidine increases the risk of cancer." MDL.Dkt.6187-29:2 (Yoon) (gastric, liver, and bladder cancers).[8]

- "[T]his large nationwide study with complete ascertainment of bladder and kidney cancers provided little evidence of any substantially increased risk of bladder or kidney cancer in

_____

[7] Only one study has reported an association between ranitidine use and any form of cancer when using an H2-blocker active comparator: the 2022 Wang study, which was published after the Rule 702 hearing but which the district court considered via supplemental briefing. *See infra* pp.25-26. Wang found no association between ranitidine use and many cancers but reported a statistically significant association with liver cancer. *See* MDL.Dkt.6061-6:13. As discussed below, the court found Plaintiffs' experts' reliance on Wang inconsistent with their treatment of other active-comparator studies and thus evidence of unreliable application of their methodology. *See infra* pp.80-81.

[8] The cancers listed are those studied that are relevant to this appeal.

ranitidine exposed individuals." MDL.Dkt.6187-20:7 (Nørgaard) (bladder cancer).

- "[W]e found no evidence of an increased risk of cancer in people receiving ranitidine … compared with people receiving other H2 blockers overall … ." MDL.Dkt.6187-7:11 (Iwagami) (gastric cancer).

- "[T]here was little evidence of difference in bladder cancer risk when directly comparing ranitidine users with users of nonranitidine [H2-blockers]." MDL.Dkt.6185-31:7 (Cardwell) (bladder cancer).

- "[W]e consistently observed H[azard] R[atio]s and risk differences close to unity [*i.e.*, no increased risk] when use of ranitidine was compared with use of either other [H2-blockers] or PPIs [proton-pump inhibitors]." MDL.Dkt.6185-28:6 (Adami) (gastric, esophageal, liver, and pancreatic cancers).

- "Use of ranitidine was not associated with an increased odds of developing gastrointestinal malignancies compared to omeprazole [Prilosec, a proton-pump inhibitor] or famotidine [Pepcid, an H2-

blocker] use." MDL.Dkt.6187-12:2 (Kim Y) (gastric, esophageal, liver, and pancreatic cancers).

- "There is no demonstrable association between ranitidine use and future gastric cancer among individuals with HP [Helicobacter pylori] on long-term acid suppression." MDL.Dkt.6187-13:2 (Kumar) (gastric cancer).

Several authors concluded that ranitidine users should find the results "reassuring." *E.g.*, MDL.Dkt.6187-20:2 (Nørgaard); MDL.Dkt.6185-28:2 (Adami).[9]

Two studies compared ranitidine users only to the general population, and not to users of other acid suppressants. As the district court observed, these types of analyses (non-active-comparator analyses)

---

[9] More recent studies (which were not before the district court) reinforce this consensus. *See, e.g.*, Kyung-In Joung et al., *Association Between Ranitidine Use with Potential NDMA Impurities and Risk of Cancer in Korea*, 12 Sci. Reps. 10 (2022) ("no association was found between ranitidine" and overall cancer risk); Hyejung Kang et al., *Effects of Ranitidine and Nizatidine on the Risk of Gastrointestinal Cancer*, 13 Frontiers in Oncology 1-2 (2023) ("Our study … did not find evidence" of increased cancer risk.); Seng Chan You et al., *Ranitidine Use and Incident Cancer in a Multinational Cohort*, 11 JAMA Pharmacy & Clinical Pharmacology 11 (2023) (finding "no statistically significant evidence that exposure to [ranitidine] was associated with increased risk of cancer," which "may provide reassurance to previous ranitidine users").

are less reliable in assessing causation because the populations they are comparing are not equivalent: ranitidine users are, "at least on average, less healthy than a population of people who do *not* need to consume acid suppressants." MDL.Dkt.6120:191. In particular, ranitidine users are more likely than the general population to have physical conditions, diets, or other habits that themselves cause or contribute to cancer. *See* MDL.Dkt.6171-9:107-08; MDL.Dkt.6179-6:27-28; MDL.Dkt.6185-22:46,53-54. Thus, non-active-comparator analyses are more likely to identify a spurious association between ranitidine use and cancer.

Even with these limitations, one of these two studies found no association between ranitidine use and gastric cancer. MDL.Dkt.6187-11:8 (Kim S). The other study found a statistically significant increase in risk of pancreatic cancer when comparing ranitidine users to non-users. In that study, however, the incidence of cancer decreased with greater exposure to ranitidine. As the study authors explained, "there was little evidence of an exposure-response relationship"—a result that is contrary to a causal association. MDL.Dkt.6187-18:4-5 (McDowell). Although Plaintiffs highlight (at 51) this study's reporting of an increased risk, they (like their experts) omit the study authors' statement that "the

association between ranitidine and pancreatic cancer is yet to be determined."  MDL.Dkt.6187-18:8 (McDowell).

2.     FDA undertook its own analysis and found no evidence of a link between ranitidine use and any cancer.  First, FDA researchers conducted a randomized controlled clinical trial—the "gold standard" for assessing causal relationships in humans, Reference Manual 555—to assess whether participants who ingested ranitidine had higher levels of NDMA in their urine.  MDL.Dkt.6187-1:2 (Florian).  In other words, the study considered endogenous formation—*i.e.*, whether ranitidine converts to NDMA in the human body.  MDL.Dkt.6187-1:2; MDL.Dkt.6120:131.  FDA researchers published their conclusion in the Journal of the American Medical Association in 2021:  "The findings do not support that ranitidine is converted to NDMA in a general, healthy population."  MDL.Dkt.6187-1:2.[10]

In that same publication, FDA researchers also analyzed the available epidemiological data.  They concluded that "[w]hen considering

_____

[10] *See also* MDL.Dkt.6188-16:2 ("The combined findings from [FDA Center for Drug Evaluation and Research's] in vivo clinical trial and in vitro experiments do not support the conclusion that ranitidine is converted to NDMA in humans.").

all cancer types … no consistent signals emerged across studies, and studies with comparison to active controls found no association between ranitidine and overall or specific cancer risk." MDL.Dkt.6187-1:9.

Similarly, in 2020, the European Medicines Agency concluded "[b]ased on a comprehensive review of epidemiological and post marketing data currently available … there is no evidence of a causal association between ranitidine therapy and the development of cancer in patients." MDL.Dkt.6188-3:19.

## II. Procedural History

### A. The MDL's Formation and Preliminary Proceedings

The same day the Valisure citizen petition became public, and even as FDA's investigation continued, plaintiffs around the country began filing lawsuits alleging that ranitidine causes myriad types of cancer. In February 2020, the Judicial Panel on Multidistrict Litigation created this MDL, centralizing in the Southern District of Florida for pretrial purposes all federal lawsuits alleging personal injury or economic damages from the purchase or use of ranitidine. MDL.Dkt.1; *see also* MDL.Dkt.422. Judge Robin Rosenberg presided over the MDL.

Plaintiffs' leadership counsel filed three "master complaints" covering the claims in this litigation. MDL.Dkt.1496. Each individual

Plaintiff also filed in his or her member case a short-form complaint incorporating relevant portions of the master complaints. *See* MDL.Dkt.1496. As is normal practice in MDLs, the "operative complaint" for each Plaintiff was the master complaint combined with the short-form complaint. *In re Zantac (Ranitidine) Prods. Liab. Litig. (Cartee)*, 2022 WL 16729151, at *5 (11th Cir. Nov. 7, 2022) (per curiam). Each Plaintiff's individual case had to meet the requirements of diversity jurisdiction. MDL.Dkt.1496.

As relevant here, the operative master personal-injury complaint (MPIC) asserted claims against Brand Defendants for failure to warn, failure to test, negligence, fraud, and other torts. MDL.Dkt.3887 (second amended master personal-injury complaint); *see also* MDL.Dkt.2759 (first amended complaint); MDL.Dkt.6120:13-14. An earlier complaint also asserted the same or similar claims against manufacturers of generic ranitidine, retailers, distributors, and repackagers. MDL.Dkt.887.

During the pleadings stage, Judge Rosenberg dismissed certain claims against Brand Defendants. The court granted Brand Defendants' motion to dismiss negligent-misrepresentation claims by users of generic ranitidine. MDL.Dkt.2516:1. As the court explained, the vast majority

of States had not recognized Plaintiffs' novel theory of "innovator liability"—*i.e.*, the idea that a *brand-name* manufacturer can be liable for failing to warn of alleged defects in *generic* drug products that it did not make or sell. MDL.Dkt.2516:5. California and Massachusetts were the exceptions, as those States recognize an "innovator liability" cause of action. MDL.Dkt.2516:7. But with respect to claims arising under those States' laws, the court determined that it lacked personal jurisdiction over Brand Defendants. MDL.Dkt.3719:25. The court also dismissed as preempted by federal law Plaintiffs' design-defect claims to the extent they challenged Zantac's formulation, which cannot be changed without FDA approval, and dismissed Plaintiffs' failure-to-warn-through-the-FDA claims as improper attempts to privately enforce the FDCA. MDL.Dkt.3715.[11]

All of Plaintiffs' claims against Brand Defendants required expert proof of general causation (*i.e.*, that ranitidine use could cause cancer in humans). The parties thus agreed, and the court ordered, that discovery should proceed on all topics, to be followed by Rule 702 motions

---

[11] The court dismissed claims against the generic manufacturers, retailers, and distributors on federal-preemption grounds. MDL.Dkts.2512,2513.

addressing general-causation expert opinions. MDL.Dkt.6120:14; *see also* MDL.Dkt.875. Plaintiffs' leadership counsel initially disclosed their intent to proffer general-causation experts for ten types of cancer, MDL.Dkt.2533, but later reduced that list to five when their experts could not opine that a causal association exists between ranitidine use and half the cancers on the initial list. MDL.Dkt.5147.[12] The parties and court referred to the five cancers for which Plaintiffs disclosed expert causation opinions—bladder, esophageal, gastric, liver, and pancreatic— as "designated cancers," and all other cancers alleged in various individual complaints as "non-designated cancers." MDL.Dkt.6120:14-15.

## B.    Plaintiffs' General-Causation Experts

Plaintiffs disclosed five experts who opined that ranitidine use can cause the five designated cancers and several other experts who opined about detection of NDMA allegedly in or formed by ranitidine.

---

[12] *See, e.g.*, MDL.Dkt.6185-5:9 (Salmon); MDL.Dkt.6179-6:8 (Moorman); MDL.Dkt.6171-9:18 (McTiernan) (concluding that "evidence was not sufficient to support an opinion that the use of ranitidine can cause breast, prostate, kidney, lung or colorectal cancer").

Two of Plaintiffs' general-causation experts—Drs. McTiernan and Moorman—are epidemiologists who based their opinions principally on epidemiological data. Three other experts, while not epidemiologists, also purported to render opinions on epidemiological data: Drs. Salmon, Le, and Michaels. All five experts purported to use two methodologies: (1) the weight-of-the-evidence method, which involves reviewing scientific literature and assigning studies a relative weight to "infer to the best explanation," and/or (2) the Bradford Hill criteria, *i.e.*, "metrics that epidemiologists use to distinguish a causal connection from a mere association."[13] *In re Zoloft Prods. Liab. Litig.*, 858 F.3d 787, 795 (3d Cir. 2017) (alteration adopted) (citation omitted).

When addressing the ten ranitidine epidemiological studies described above, Plaintiffs' experts minimized data from "active comparator" analyses—those that compared ranitidine users with users of similar medications. MDL.Dkt.6120:182-83; *infra* pp.74-84. The experts instead focused on the analyses in those studies comparing

---

[13] The criteria are temporality, strength of association, dose-response relationship, replication, biological plausibility, alternative explanations for the findings, cessation, specificity, and consistency with relevant knowledge. MDL.Dkt.6120:168; *see also* Reference Manual 599-600.

ranitidine users to the general population. As to those analyses, they assigned considerable weight to results indicating a positive statistical association, even when that association was not statistically significant— *i.e.*, when it could be attributed to chance. Reference Manual 572-73. In contrast, the experts did not apply that same method to results showing a *negative* association (*i.e.*, that ranitidine use was associated with a decreased risk of cancer); they disregarded those negative results purportedly because the results were not statistically significant. *Infra* pp.84-94.

Plaintiffs' experts also relied heavily on literature studying exposure to NDMA untethered to ranitidine: (1) dietary studies focusing on NDMA-rich foods, (2) occupational studies on inhaled exposure to NDMA in rubber factories, and (3) studies of NDMA in animal populations. *See* MDL.Dkt.6120:179,201-02,220n.119; MDL.Dkt.6185-15:148-49; MDL.Dkt.6185-22:63-64. (Plaintiffs' brief on appeal calls these studies "NDMA studies." *See, e.g.*, Krause.Br.67-68,71.) Dr. McTiernan, for instance, described the dietary studies as "highly relevant," MDL.Dkt.6171-9:17, whereas she opined the ranitidine studies had elements "preclud[ing] them from being … informative,"

MDL.Dkt.6171-9:39.  Dr. Moorman likewise assigned the non-ranitidine occupational studies "considerable weight," MDL.Dkt.6179-6:230, and used as many or more NDMA dietary studies than all other studies combined in her analyses for each cancer, *see* MDL.Dkt.6179-6:90-95,120-23,144-47,174-76,201-05.  The experts failed to explain with reliable scientific principles how their conclusions about ranitidine could be extrapolated from data on dietary and occupational exposure to NDMA.  *Infra* pp.94-100.

Plaintiffs also offered expert opinions on the amount of NDMA in or formed by ranitidine.  These experts attempted to measure both how much NDMA is formed in ranitidine during production or storage ("exogenous formation") and how much (if any) NDMA is formed in the human body upon consumption of ranitidine ("endogenous formation").  MDL.Dkt.6120:36-37.  Dr. Najafi, a chemist who (with his company Emery Pharma) previously contributed data to the Valisure citizen petition, conducted laboratory tests purporting to measure the amount of NDMA formed by exposing ranitidine medications and ranitidine itself to certain environmental conditions.  MDL.Dkt.6120:40,42.  Other experts offered opinions based on Dr. Najafi's test results.  *E.g.*,

MDL.Dkt.6120:121-22 (Davis); MDL.Dkt.6152-15:224-25 (Salmon). (As discussed below, on appeal Plaintiffs do not challenge the district court's exclusion of Dr. Najafi's opinions.) Drs. Panigrahy, Marletta, and Melnick provided opinions on NDMA formation in the human body based on their evaluation of scientific literature. *See* MDL.Dkt.6120:124,134.

## C. The District Court's Rule 702 Ruling

Brand Defendants moved to exclude all of the above experts under Rule 702 and moved for summary judgment for failure of proof of general causation.[14] In September 2022, the district court held a two-day hearing on Brand Defendants' motions. The parties agreed that no live witnesses would be called and instead relied on the extensive reports and thousands of pages of expert deposition testimony, which Judge Rosenberg reviewed before the hearings.

Shortly after the hearings, Plaintiffs requested leave to file supplemental expert reports to address a new study that had been published: Wang 2022. MDL.Dkt.6041. Wang found no statistically significant associations between ranitidine and four of the designated

---

[14] Brand Defendants did not move to exclude an additional expert, Dr. Zeiger, as he did not offer any opinion on causation with respect to ranitidine. *Infra* n.23.

cancers when comparing ranitidine users to users of other H2-blockers, but it reported a statistically significant association between ranitidine and liver cancer. *Supra* n.7; MDL.Dkt.6061-6:11. The parties supplemented their expert reports, re-deposed certain experts, and filed supplemental briefing. MDL.Dkt.6056.

In December 2022, after considering hundreds of pages of briefing, thousands of pages of exhibits, and days of oral argument, Judge Rosenberg issued a meticulous 341-page order granting Brand Defendants' motions and excluding Plaintiffs' general-causation experts under Rule 702. The court held that Plaintiffs' experts applied their methodologies in an unreliable, inconsistent, and results-driven way.

1. First, Judge Rosenberg rejected Plaintiffs' argument under *McClain v. Metabolife International, Inc.*, 401 F.3d 1233 (11th Cir. 2005), that general causation should be presumed because NDMA is a known carcinogen. MDL.Dkt.6120:28-29. The court held that because the product at issue is ranitidine, the proper inquiry was not whether NDMA can cause cancer but whether *ranitidine* can; because ranitidine is not generally recognized as a human carcinogen, Plaintiffs had to prove general causation. MDL.Dkt.6120:28-29,34-35.

2.    Relatedly, the court concluded that none of Plaintiffs' experts provided reliable opinions on how much NDMA was in ranitidine tablets. MDL.Dkt.6120:35-159.  The court determined that Dr. Najafi's testing methodologies (*supra* pp.24-25) were unreliable.    He used an unvalidated, novel methodology (that may itself have formed NDMA) to conclude that ranitidine contains NDMA at levels that far exceeded levels measured by FDA, foreign regulatory agencies, and Dr. Najafi's own pre-litigation testing.  MDL.Dkt.6120:53-55,88.  The court further concluded that the experts' endogenous formation opinions (*supra* pp.24-25) were unreliable because the experts failed to explain sufficiently how they weighed various studies and how *in vitro* studies (*i.e.*, studies conducted in petri dishes) could be reliably extrapolated to humans. MDL.Dkt.6120:126-59.

Because none of the experts' estimates of the amount of NDMA in ranitidine tablets were reliable, the court determined that Plaintiffs' experts could rely only on the amounts determined in testing by FDA or Defendants.  MDL.Dkt.6120:159.

Plaintiffs do not challenge these rulings and have abandoned all these expert opinions on appeal.[15]

3.     Judge Rosenberg then analyzed Plaintiffs' experts' "primary" evidence of general causation—epidemiology, dose-response relationship, and background risk—explaining that Plaintiffs' experts must have reliable evidence in at least one of these categories.  MDL.Dkt.6120:159-60; *see Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014).  Plaintiffs' arguments on appeal concern the court's analyses of these three forms of primary evidence.

**Epidemiology.**  Regarding epidemiology, Judge Rosenberg noted the uncontroverted fact that there was no general acceptance in the scientific community (indeed, no acceptance at all) that ranitidine can cause cancer; as reflected in the Advisory Committee Note to Rule 702, that is one factor favoring exclusion.  MDL.Dkt.6120:170-79; *see infra* pp.65-70.

---

[15] Plaintiffs have abandoned the opinions of Drs. Najafi, Davis, and Marletta in their entirety, as well as the opinions of any other experts "to the extent that they rely upon Dr. Najafi's testing or the external testing for the endogenous formation of NDMA."  MDL.Dkt.6120:158.

The court next found that Plaintiffs' experts' applications of the weight-of-the-evidence and Bradford Hill methodologies were inconsistent, results-driven, and unreliable. Plaintiffs' experts failed to account for confounding, a core epidemiological principle, by favoring data comparing ranitidine users to the general population instead of the active-comparator data that often was included in the same study. *See* MDL.Dkt.6120:198; *supra* pp.12-15. The experts, moreover, relied selectively on statistically insignificant results when those results *favored* the experts' causation opinions, but not when the results *undermined* those opinions (*i.e.*, showed negative associations). MDL.Dkt.6120:199-201. And finally, the experts heavily favored studies on dietary and occupational exposure to NDMA over studies on ranitidine, despite the unsubstantiated analytical leaps that approach required. MDL.Dkt.6120:202-27.

**Dose-response relationship.** The court also addressed dose-response relationship (the analysis of "how changes in the amount, intensity, or duration of exposure to an agent affects the risk of disease") and the corollary concept of "threshold dose" (the minimum amount of ranitidine consumption necessary to produce an adverse effect).

MDL.Dkt.6120:300-01,313-18. The court determined that Plaintiffs' experts' methods for evaluating dose-response relationship were unreliable for reasons similar to those already discussed—*e.g.*, they cherry-picked results from studies they believed supported their opinions and relied heavily on data from the non-ranitidine dietary and occupational studies. MDL.Dkt.6120:299-321. Only one expert (Dr. Salmon) even offered an opinion on threshold dose. MDL.Dkt.6120:301,313-18. The court found that Dr. Salmon's threshold-dose opinion was unreliable because, among other reasons, it extrapolated from non-ranitidine NDMA studies and relied on Dr. Najafi's testing (which Plaintiffs have abandoned on appeal). MDL.Dkt.6120:302-09.

**Background risk.** The court addressed background risk—*i.e.*, the risk of contracting the disease without any exposure to the allegedly harmful substance—and found that Plaintiffs' experts offered no opinion on this subject. MDL.Dkt.6120:319-21.

Because the court found Plaintiffs' experts had not presented reliable primary evidence of general causation, it excluded those experts' opinions under Rule 702. MDL.Dkt.6120:321.

4.     Although the court could have stopped there, it also carefully evaluated Plaintiffs' experts' methods for evaluating *secondary* evidence—*i.e.*, evidence that could have bolstered reliable primary evidence.   MDL.Dkt.6120:321-22.   The court considered the experts' reliance on animal studies, which examined a connection between NDMA and liver cancer in rodents, monkeys, ducks, frogs, trout, and guppies.  It reasoned that Plaintiffs' experts had failed to explain how the animal studies' findings could be reliably extrapolated to humans, how the dosage of NDMA administered to animals compared to the amount of NDMA (if any) consumed by humans through ranitidine, or how those studies' findings about one type of cancer in animals could be extrapolated to multiple other cancer types in humans. MDL.Dkt.6120:323-33.  For these reasons, the court concluded that the animal studies lacked sufficient relevance, or "fit."  MDL.Dkt.6120:322-33.

Plaintiffs do not challenge on appeal the court's holdings as to secondary evidence.

5. Having excluded Plaintiffs' general-causation experts, the court granted Brand Defendants' motion for summary judgment as to Plaintiffs alleging designated cancers.[16] MDL.Dkt.6120.

6. The court then requested briefing on whether to apply its Rule 702 and summary-judgment rulings to all designated-cancer Plaintiffs, regardless of when they filed their complaints. MDL.Dkts.6303,6444. In response, Plaintiffs' leadership indicated they did not intend to proffer new experts or make new arguments for the existing experts with respect to any newly filed cases. *See* MDL.Dkt.6540:10. The court also gave individual Plaintiffs until May 5, 2023, to show cause why the summary-judgment ruling should not apply to their cases. MDL.Dkt.6444:16. None did.

The court thus entered an order granting summary judgment against all Plaintiffs who had filed complaints before May 5, 2023. MDL.Dkt.6622. The court also determined that there was no reason why the Rule 702 ruling could not apply to cases filed on or after that date.

---

[16] A Delaware trial court more recently reached a different conclusion, considering almost all different experts, based on what the court viewed as "the differences in Delaware law" from what it perceived as this Court's "Floridian" *Daubert* standard. *See In re Zantac (Ranitidine) Litig.*, 2024 WL 2812168, at *7 (Del. Super. Ct. May 31, 2024).

MDL.Dkt.6642.  The court therefore entered another show-cause order giving any new individual Plaintiff two weeks to explain why summary judgment should not be entered in his or her case.  MDL.Dkt.6642.  No new Plaintiff provided such an explanation or otherwise indicated intent to proffer new general-causation expert opinions or arguments.

### D.   Final Judgments

Because Plaintiffs' expert opinions addressed only the five designated cancers, the district court gave Plaintiffs alleging non-designated cancers two months to decide whether to pursue their cases and proffer general-causation experts, followed by another two months to produce expert reports.  MDL.Dkt.6271.  These Plaintiffs failed to produce expert reports, and the court granted Brand Defendants' motion to dismiss their claims.  MDL.Dkt.6766.

With all personal-injury claims resolved in Brand Defendants' favor, the court began entering final judgments in individual cases in September 2023.  MDL.Dkt.6974.  The court took this case-by-case approach to finality to ensure that each individual judgment was limited to the proper, diverse Defendants.  MDL.Dkt.6974:8-10.

Plaintiffs appealed. This Court consolidated the personal-injury appeals, which are the subject of this brief, for briefing and argument. *See* Dkt.355-1,CA11#21-12618; *see also supra* n.1.

## SUMMARY OF ARGUMENT

I. This Court should reject Plaintiffs' new argument that the district court lacked diversity jurisdiction. When cases are "consolidated for MDL pretrial proceedings," the default rule is that individual cases "retain their separate identities" for purposes of diversity jurisdiction. *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015). The district court followed routine MDL practice, and neither the court nor the parties intended to merge Plaintiffs' individual cases into one jurisdiction-destroying "action." Even if this Court agreed with Plaintiffs, it could—without disturbing the district court's final summary-judgment rulings—de-merge the cases to restore jurisdiction.

II. The district court did not abuse its wide discretion in excluding Plaintiffs' general-causation experts' opinions as unreliable under Rule 702.

The court properly held that Plaintiffs must proffer expert general-causation evidence under *McClain*. Ranitidine is not generally

34

recognized by the medical community as toxic and thus the ordinary general-causation inquiry is necessary. Plaintiffs argue that the court should have instead considered whether *NDMA* is a generally recognized toxin; NDMA, however, is not the substance at issue and in any event is not an established human carcinogen like cigarette smoke or asbestos.

The court did not abuse its discretion in determining that Plaintiffs' experts did not proffer reliable opinions applying any of the three "primary methods" for proving general medical causation, which "[a] general causation expert must rely on … for his or her opinion to be considered reliable." MDL.Dkt.6120:159; *Chapman*, 766 F.3d at 1308.

*First*, Plaintiffs' experts failed to reliably apply their purported methodologies to the epidemiology evidence. The district court properly recognized that no scientist or governmental body agrees with Plaintiffs' experts that ranitidine causes cancer and that this lack of general acceptance suggests the unreliability of the experts' methods. Plaintiffs' experts purported to use the "weight-of-the-evidence" method and/or the Bradford Hill criteria, but the court properly found that they applied these methodologies in a results-driven way by unreliably rejecting studies that controlled for bias and confounding, emphasizing

statistically insignificant findings (except when not helpful to them), and favoring non-ranitidine dietary and occupational studies over on-point ranitidine literature.

*Second*, Plaintiffs' experts did not provide reliable evidence of a dose-response relationship between ranitidine and cancer or the threshold dose at which a dose-response relationship begins. Plaintiffs focused below on Dr. Salmon's dose-related opinions. The court did not abuse its discretion in finding that Dr. Salmon unreliably extrapolated from dissimilar animal studies, used inapposite dietary and occupational studies as crucial inputs for this analysis, ignored unfavorable results, and employed skewed data to opine on a dose-response relationship. Moreover, Dr. Salmon's opinions relied heavily on Dr. Najafi's testing data, which the court excluded (a ruling Plaintiffs do not challenge on appeal).

*Third*, Plaintiffs' experts failed to account for the background risk of developing cancer without exposure to ranitidine, as demonstrated by the experts' disfavoring active-comparator analyses, which can control for potential confounding related to the inherent cancer risk of patients requiring antacid therapies. MDL.Dkt.6120:191.

Because Plaintiffs failed to proffer reliable primary evidence of general causation, the district court correctly granted Defendants summary judgment.

III. The district court then properly applied its Rule 702 Order to all cases, including those filed after the court's order. Plaintiffs claim that the court denied later-filing Plaintiffs due process, but the court implemented the very show-cause process that Plaintiffs requested. That process ensured that each Plaintiff had the opportunity to introduce his or her own expert general-causation evidence. But no Plaintiff did so.

IV. If this Court affirms the district court's Rule 702 holding, it need not address Plaintiffs' preemption arguments. Should the Court reach the issue, however, it should affirm the district court's dismissal on preemption grounds of (1) the design-defect claims in the MPIC, MDL.Dkt.2532:10,36, and (2) the failure-to-warn-through-FDA claims in the amended master personal-injury complaint (AMPIC), MDL.Dkt.3715:49.

As a threshold matter, Plaintiffs' opening brief presents no specific arguments challenging the district court's preemption orders as to Brand Defendants and any challenge to those orders is thus forfeited. Their

passing incorporation-by-reference of preemption arguments pertaining to *Generic Defendants* does not suffice.

Even if this Court reached the narrow preemption issues referenced in Plaintiffs' incorporated generics brief (*see* Krause.Br.27), the district court correctly held that federal impossibility preemption barred Plaintiffs' design-defect claims because federal law prohibits NDA-holders from unilaterally making changes to a medication's design. MDL.Dkt.2532:24; *Mutual Pharm. Co. v. Bartlett*, 570 U.S. 472, 490 (2013). The U.S. Supreme Court, moreover, has rejected Plaintiffs' theory that they could nevertheless pursue a design-defect claim by alleging that Zantac should not have been sold because it was purportedly "misbranded" due to an undisclosed cancer risk.

The district court also faithfully applied this Court's precedents establishing that federal law impliedly preempts private efforts to enforce the FDCA, foreclosing Plaintiffs' failure-to-warn-through-FDA claims. MDL.Dkt.3715:41-49; *see Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1329-30 (11th Cir. 2017); *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 348-53 (2001).

V.   The district court correctly dismissed Plaintiffs' "innovator-liability" claims.  Plaintiffs' principal request—which the Court need not address if it affirms the Rule 702 Order—is that the Court certify the innovator-liability question to *thirty-two* state supreme courts.   But below, Plaintiffs urged the district court to decide the state-law questions itself.   Forfeiture aside, certification to so many state courts would unjustifiably and significantly delay the proceedings.

Plaintiffs are also wrong that the district court applied an "illicit federal common law" presumption that state supreme courts would reject liability when no clear precedent supports it.   The court correctly predicted that state courts would adhere to traditional tort principles and join the "overwhelming national consensus" against innovator liability. *Guarino v. Wyeth, LLC*, 719 F.3d 1245, 1252 (11th Cir. 2013).

The Court should also affirm the district court's dismissal of the innovator-liability claims governed by California or Massachusetts law for lack of personal jurisdiction.   Claims concerning warning labels of *generic* ranitidine products purchased in California and Massachusetts do not "relate to" Brand Defendants' efforts to market *branded* Zantac products in those States.

## STANDARD OF REVIEW

This Court reviews "for abuse of discretion the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion." *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004). Because it is "axiomatic that a district court enjoys 'considerable leeway' in making these determinations," this Court's review is "very limited." *Id.* at 1258-59 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999), and *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002)). This Court "must 'defer to the judge's decision … unless it is manifestly erroneous.'" *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1296 (11th Cir. 2022) (citation omitted). The district court has "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142. "This deferential standard is not relaxed even [where] a ruling on the admissibility of expert evidence" is "outcome-determinative." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). A district court's procedural decisions are likewise reviewed for abuse of discretion. *See Santiago v. Lykes Bros. S.S. Co.*, 986 F.2d 423, 427 (11th Cir. 1993).

This Court reviews de novo a grant of summary judgment. *Allison*, 184 F.3d at 1306. Summary judgment is proper where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

This Court reviews legal and constitutional questions, and a district court's grant of a motion to dismiss, de novo. *United States v. Dennis*, 26 F.4th 922, 926 (11th Cir. 2022); *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1091-92 (11th Cir. 2021).

## ARGUMENT

## I. THE DISTRICT COURT HAD SUBJECT-MATTER JURISDICTION

Until Plaintiffs' opening briefs on appeal, all parties and the district court agreed that Plaintiffs' individual cases retained separate identities for purposes of diversity jurisdiction. As Plaintiffs argued just two years ago in this Court, "every indication confirms that the Plaintiffs did not join in a single action." Dkt.265:11,CA11#21-12618 (capitalization omitted).

After losing on the merits, Plaintiffs flip-flopped. But they still do not claim anyone *intended* to merge Plaintiffs' individual cases into a

single action.  Instead, they claim the cases were merged *by accident*, contrary to the best efforts and stated intent of the parties and the court. And they blame this supposed accident on a procedural mechanism that is common in MDL practice—the use of a master complaint and accompanying short-form complaints.  Not only would Plaintiffs' new position improperly erase years of district court rulings in this MDL, it would also disrupt the management of MDLs around the country.

The Court should reject Plaintiffs' eleventh-hour argument.  As the district court repeatedly recognized, Plaintiffs' cases were not merged into a single action, but retained their individual jurisdictional identities. Even if a merger had occurred, this Court could (and should) vacate that merger without affecting any other aspect of the decisions below.

## A.    No Jurisdiction-Destroying Merger Took Place

"Cases consolidated for MDL pretrial proceedings ordinarily retain their separate identities" and are not merged into a "monolithic multidistrict 'action.'" *Gelboim*, 574 U.S. at 413.  MDL coordination has long been understood "not as completely merging the constituent cases into one, but instead as enabling more efficient case management while preserving the distinct identities of the cases and the rights of the

separate parties in them." *Hall v. Hall*, 584 U.S. 59, 67 (2018). Consequently, "[t]he default rule" is that actions in an MDL remain jurisdictionally separate. *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 489 (7th Cir. 2020).

Of course, the parties and district court may choose to combine previously separate lawsuits through a "master complaint" that "supersede[s] prior individual pleadings." *Gelboim*, 574 U.S. at 413 n.3. But master complaints do not automatically merge the cases into a single action. Instead, the question is whether the parties and court "meant" to produce that result. *Id.* (quoting *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 590 (6th Cir. 2013)). Courts have consistently held that a master or consolidated complaint "may be treated as a substantive complaint replacing the individual complaints only where the [p]arties consent to such treatment." *In re 21st Century Oncology Customer Data Sec. Breach Litig.*, 380 F. Supp. 3d 1243, 1259 (M.D. Fla. 2019) (collecting cases); *see Bell*, 982 F.3d at 490; MDL.Dkt.4595:21.

Here, all the evidence points to one conclusion: the parties and district court never intended or consented to merge all Plaintiffs'

individual cases into a single, monolithic "action" that would have destroyed diversity jurisdiction.

*First*, this MDL did not use a master complaint that "superseded the individual pleadings." *Bell*, 982 F.3d at 491. Instead, it followed the common practice of using *both* a master *and* short-form complaints. *See, e.g.*, Fed. Jud. Ctr., Manual for Complex Litigation (Fourth) § 40.52 (2004). The short-form complaints allowed each Plaintiff to selectively incorporate allegations from the MPIC into that Plaintiff's individual action and to supplement them with his or her own allegations. *See* MDL.Dkt.1496:3 ("For *each action* directly filed in or transferred to" the MDL, "the [MPIC] *together with the Short-Form Complaint* shall be deemed the operative complaint." (emphases added)). Each short-form complaint was filed not on the MDL docket, but on the docket for that Plaintiff's "member (*i.e.*, individual) case." MDL.Dkt.1496:3-6. Brand Defendants are not aware of, nor have Plaintiffs cited, any case where such use of master and short-form complaints destroyed diversity jurisdiction. *Cf. Sykes v. Cook Inc.*, 72 F.4th 195, 208-09 (7th Cir. 2023)

(where MDL used master and short-form complaints, court evaluated diversity jurisdiction separately for each plaintiff's action).[17]

*Second*, Plaintiffs stated explicitly in the MPIC that they did *not* consent to merge their individual cases into a single action. Every iteration of the MPIC recognized that it "is not intended to consolidate for any purpose the separate claims of the individual Plaintiffs in this MDL." MDL.Dkt.887:2; MDL.Dkt.2759:2; MDL.Dkt.3887:2. Consistent with that statement, the MPIC did not name any Plaintiffs or identify which defendants any given plaintiff was suing. Instead, the short-form complaints filed in each Plaintiff's individual action identify the parties to that particular action for diversity purposes. *See* MDL.Dkt.887:43 ("In *each of the actions* there is complete diversity …." (emphasis added)).

*Third*, the district court's pretrial orders likewise treated each Plaintiff as having a separate, individual action. Pretrial Order (PTO) 11 allowed direct filing of cases into the MDL and stated that each such

---

[17] Plaintiffs quote—out of context—Brand Defendants' reference to the MPIC as the "operative pleading." Chandler.Br.21 (citation omitted). But Brand Defendants were clear that "[f]or every personal-injury plaintiff, the 'operative Complaint' is 'the [MPIC] *together with the Short Form Complaint.*'" Dkt.233:32,CA11#21-12618 (emphasis added) (quoting MDL.Dkt.1496:3).

complaint would be "filed as a new civil action." MDL.Dkt.422:1. Each

Plaintiff paid a separate filing fee and received a unique case number.

PTO 31 expressly contemplated that each Plaintiff's short-form

complaint would be evaluated separately for purposes of diversity

jurisdiction. *See* MDL.Dkt.1496:5-6 (prohibiting filing of "multi-plaintiff

complaints" and requiring leave of court to amend a short-form complaint

if "the effect of the amendment would be to destroy diversity" in that

plaintiff's case).[18] And PTO 39 provided that a Plaintiff could voluntarily

dismiss his or her "individual case" under Rule 41(a)(1) because, under

this Court's precedent, that rule "is the appropriate procedural vehicle

for voluntarily dismissing *an entire action.*" MDL.Dkt.1497:2-3&n.2

(emphasis added) (citing *Perry v. Schumacher Grp.*, 891 F.3d 954, 957-58

(11th Cir. 2018)).

*Fourth*, as Plaintiffs have previously acknowledged, if they had

attempted to merge all their individual actions into one single action,

they would have been unable to satisfy the standard for permissive

joinder. *See* Dkt.265:11-12,17,CA11#21-12618 (conceding that no

---

[18] Consistent with PTO 31, the district court ruled on several motions to remand *individual* personal-injury cases in the MDL for lack of diversity. *See, e.g.*, MDL.Dkts.2824,2825,5166,5357.

plaintiff could have "assert[ed] in good faith that an all-encompassing personal-injury action would satisfy Rule 20" because "no one can seriously maintain that *all* personal-injury plaintiffs in the MDL bring claims that arise from the same 'transaction, occurrence, or series of transactions or occurrences'" (quoting Fed. R. Civ. P. 20(a)(1))). Plaintiffs make no attempt to reconcile their new position with Rule 20.

Contrary to Plaintiffs' assertion, Defendants and the district court have not "said all along" that the cases were jurisdictionally merged. Chandler.Br.21. Just the opposite. Brand Defendants argued that there was a "limited" merger solely for purposes of determining when each individual case could receive a final, appealable judgment. Dkt.78:7,CA11#21-10305. But they stressed that it is "abundantly clear that the parties and the court intended the individual personal-injury actions to retain their separate identities for purposes of subject-matter jurisdiction." Dkt.78:7,CA11#21-10305; *see* Dkt.246:6,CA11#21-12618 (arguing that cases were merged "only for 'pretrial proceedings' like motions to dismiss," not "for all purposes," and that limited merger did not "destroy diversity").

The district court found the parties' actions were consistent with such a *limited* merger—one having "no effect" on subject-matter jurisdiction—but ultimately concluded the parties did not consent to even a limited merger, much less a total merger. MDL.Dkt.4595:18-19,22 (citation omitted). Plaintiffs criticize the limited-merger theory and insist merger is all-or-nothing. Chandler.Br.21n.6. But if so, that would only confirm there was no merger at all, since everyone agrees the parties and the district court did not intend or consent to merge the cases for all purposes.

The parties and the court avoided "the dangers of ambiguity" by "decid[ing] explicitly, from the beginning, the legal status of" the master complaint, *Bell*, 982 F.3d at 490, and adhering to that shared understanding through years of litigation. The court even adopted a laborious process for entering final judgments in thousands of individual cases, which would have been unnecessary if those cases had been merged into a single action. *See* MDL.Dkts.6230,6303,6622,6787,6875, 6974. As Plaintiffs themselves argued before, "[t]he Court should agree with the district court's ruling, the district court clerk's behavior, the

PTOs, the pleadings, and common sense by concluding that no case has been merged." Dkt.265:18,CA11#21-12618.

This history also makes Plaintiffs' about-face particularly inappropriate. Parties should not be able to "spring[] traps by treating a consolidated complaint" in an MDL one way in district court and another way on appeal. *Bell*, 982 F.3d at 490. That is especially true because whether the parties intended a jurisdictional merger is a question of fact, and courts regularly hold parties to their admissions of "facts which show jurisdiction." *In re CP Ships Ltd. Sec. Litig.*, 578 F.3d 1306, 1311 (11th Cir. 2009) (citation omitted), *abrogated in part on other grounds*, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). This Court should reject Plaintiffs' attempt to undo their loss below.

### B. Plaintiffs' Attempt To Manufacture a Jurisdictional Defect Fails

Plaintiffs claim they "changed their view" on the jurisdictional question for two reasons: (1) this Court's decision dismissing certain appeals in individual MDL cases for lack of appellate jurisdiction, and (2) the district court's subsequent management of the MDL. Chandler.Br.20. Neither suggests Plaintiffs' cases were merged into a single, monolithic action.

*First*, Plaintiffs point to *Cartee*. There, this Court held that the district court's rulings on the MPIC did not automatically result in final judgment being entered in a Plaintiff's individual case; rather, the district court needed to decide how its general MPIC rulings applied to each individual action. 2022 WL 16729151, at *4-5. The district court later agreed that "if an individual case [was] to be dismissed or to receive final judgment" based on the court's rulings on the MPIC, a party had to move for that relief and the court had to issue a "case-specific adjudication" of that Plaintiff's short-form complaint. MDL.Dkt.6303:8-9&n.5.

Far from supporting Plaintiffs' new position, *Cartee* refutes it. This Court made clear that even though the district court had dismissed the MPIC, Cartee's individual case was "still alive and pending" and would remain so until the district court entered a "final ruling against *his operative complaint*—the combination of the MPIC and his [short-form complaint]—to put the last nail in the coffin of *his action*." 2022 WL 16729151, at *5 (emphases added). This reasoning confirms that Plaintiffs' actions retained their separate, individual identities.

Straining to twist *Cartee* in their favor, Plaintiffs apparently argue that if their cases were not merged into a single action, the district court's rulings on the MPIC were forbidden advisory opinions because those rulings did not automatically (*i.e.*, without further order of the district court) dispose of any claims in Plaintiffs' individual actions. *See* Chandler.Br.20. That is a non sequitur. An advisory opinion is one issued in the absence of "a genuine, live dispute between adverse parties." *Carney v. Adams*, 592 U.S. 53, 58 (2020). Plaintiffs' actions presented live disputes, and the court's rulings on the MPIC were an important step toward resolving those disputes. There is no requirement that every order resolve a claim without the need for further action. In the context of a complex MDL, it is entirely proper for a district court to address allegations in a master complaint and then follow an orderly process for applying its rulings to individual actions incorporating those allegations.

*Second*, Plaintiffs argue that after this Court decided *Cartee*, the district court "treated the cases as merged." Chandler.Br.21-22. But their examples prove the opposite. They argue that the court declined to enter judgment in Cartee's case based on its rulings on the MPIC, *see* Chandler.Br.22, but that only confirms that the court viewed Cartee's

individual case as separate. *See* MDL.Dkt.6317:1,4 (district court stating that it had "never … ruled on the legal sufficiency of Mr. Cartee's Short Form Complaint" and declining "to give Mr. Cartee's individual case special treatment"). Plaintiffs also argue that the district court applied its Rule 702 Order to Plaintiffs with later-filed actions without giving those Plaintiffs an opportunity to "proffer different expert witnesses." Chandler.Br.23-24. That is wrong; as explained below, the district court's show-cause process afforded precisely that opportunity, and no Plaintiff sought to take advantage of it. *See infra* Part III.

## C. In the Alternative, This Court Could Repair Any Jurisdictional Defect

Even if this Court were to conclude that Plaintiffs' cases were inadvertently merged into a single action, it should "retroactively restore subject matter jurisdiction" by de-merging the cases. *Ingram v. CSX Transp., Inc.*, 146 F.3d 858, 862-63 (11th Cir. 1998) ("retroactively restor[ing] complete diversity" by vacating a "diversity-destroying joinder"). De-merger would not affect the outcome of the MDL or this Court's jurisdiction over the pending appeals, because the district court's show-cause process ensured that its Rule 702 and summary-judgment

rulings applied to each Plaintiff's individual case, and the district court entered a separate final, appealable judgment in each individual case.

Such de-merger, if necessary, would comport with what the parties and the district court intended all along. Plaintiffs have previously acknowledged that this Court has the power to "sever each case on appeal to cure [a] jurisdictional defect." Dkt.265:9n.1,CA11#21-12618. Plaintiffs have not backtracked from that position, and any attempt to do so in their reply brief would be "too late." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014). There is no conceivable reason why this Court should allow a purported accidental merger to erase years of work by the parties and the district court.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING PLAINTIFFS' GENERAL-CAUSATION EXPERTS

The district court did not abuse its discretion in determining that Plaintiffs must proffer reliable evidence of general causation and that Plaintiffs' experts' opinions that ranitidine use can cause various cancers are unreliable. Under Rule 702, the proponent of expert testimony must show by a preponderance of the evidence that (1) the expert is qualified, (2) "the testimony is based on sufficient facts or data," (3) "the testimony

is the product of reliable principles and methods," (4) the opinion "reflects a reliable application of the principles and methods to the facts of the case," and (5) the testimony is relevant and helpful to the jury. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 597 (1993); *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1193-94 (11th Cir. 2010). In *Daubert*, the Supreme Court provided four factors relevant to the reliability of expert testimony: (1) whether the theory undergirding the opinions can be and has been tested; (2) whether it has been subject to peer review; (3) the known or expected rate of error; and (4) whether the theory or methodology is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *Frazier*, 387 F.3d at 1262.

Recognizing the danger that unreliable expert testimony can mislead juries, this Court has described the *Daubert* inquiry as "rigorous" and instructed that "[t]he importance of [the district court's] gatekeeping requirement cannot be overstated." *Frazier*, 387 F.3d at 1260; *see also Knepfle*, 48 F.4th at 1294 ("reliability … requires a more thorough inquiry"). Given the level of scrutiny that district courts are expected to exercise in conducting this "'exacting analysis' of the *foundations* of

expert opinions," this Court's review is "very limited." *Frazier*, 387 F.3d at 1259-60 (citations omitted). Where the district court has diligently performed its obligation, especially in complex products-liability MDLs like this one, courts of appeals routinely affirm. *See, e.g.*, *In re Onglyza & Kombiglyze Prods. Liab. Litig.*, 93 F.4th 339, 342 (6th Cir. 2024); *In re Incretin-Based Therapies Prods. Liab. Litig.*, 2022 WL 898595, at *1 (9th Cir. Mar. 28, 2022); *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 121 (2d Cir. 2020) (per curiam); *In re Lipitor Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 892 F.3d 624, 642 (4th Cir. 2018); *Zoloft*, 858 F.3d at 789; *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005).

## A. Plaintiffs' Disparagement of the District Judge's Thoroughness Is Unfounded and Improper

Notwithstanding Judge Rosenberg's scrupulous approach in rendering a highly detailed opinion, Plaintiffs repeatedly disparage her motivations. *See, e.g.*, Krause.Br.8-9,68,74,116. Plaintiffs even claim that Judge Rosenberg intentionally attempted to "stymie appellate review." Krause.Br.74.

Plaintiffs' personal attacks on a distinguished federal district judge have no place in an appellate brief.[19]  Judge Rosenberg's 341-page opinion—issued following multiple days of hearings on 603 pages of briefing, in an MDL involving ten general-causation experts and dozens of scientific studies—reflects exactly the type of rigor this Court's cases require.  It is not an abuse of discretion, nor does it "impinge upon the jury's function," for a court to conduct an "extremely thorough review of the scientific literature on which [the] experts relied." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 269 (2d Cir. 2002) (cited at Krause.Br.53); *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th

---

[19] Plaintiffs suggest that Judge Rosenberg committed an "embarrassing error[]" by faulting Plaintiffs' experts for relying on the Cardwell study based on a news article quoting Cardwell as saying that "further studies should be performed."  Krause.Br.8-9&n.3 (quoting MDL.Dkt.6120:299).  There was no error.  Judge Rosenberg said that Cardwell's statement in the article was "consistent with the conclusion in the text of [Cardwell's] study" and that she reached her conclusions "without relying on the article."  MDL.Dkt.6120:299.  As the court recognized, the study itself stated that "[f]urther studies are necessary to attempt to replicate [its] finding."  MDL.Dkt.6185-31:2 (Cardwell).

In the same footnote, Plaintiffs claim the court's opinion contains an error about "salt."  However, "salt" is a term of art in chemistry.  Plaintiffs' footnote confuses everyday table salt with the broader chemical category of salt, which encompasses sodium nitrite.  The court was correct to label sodium nitrite a salt.

Cir. 2015) (district court's "in-depth review of the relevant studies" "follows the same path blazed by the Supreme Court in *Joiner*" (citation omitted)). That is what judges *should* do, especially in a large MDL like this one; many judges in this circuit have done the same, in opinions both admitting and excluding expert testimony. *See, e.g.*, *In re Abilify Prods. Liab. Litig.*, 299 F. Supp. 3d 1291 (N.D. Fla. 2018). And diligent district judges regularly make alternative holdings for efficiency and completeness. The length of the court's ruling reflects the multitude of reasons why Plaintiffs' experts' opinions are unreliable. Rather than "impede this Court's review," Krause.Br.68 (capitalization omitted), the breadth and depth of the court's opinion aid it.

It is thus unsurprising that multiple product-liability MDL courts have cited Judge Rosenberg's opinion approvingly. *See, e.g.*, *In re Paraquat Prods. Liab. Litig.*, — F. Supp. 3d —, 2024 WL 1659687 (S.D. Ill. Apr. 17, 2024); *In re Deepwater Horizon Belo Cases*, 2022 WL 17721595 (N.D. Fla. Dec. 15, 2022). So have other Rule 702 decisions. *See, e.g.*, *Culliver v. BP Expl. & Prod., Inc.*, 2024 WL 1478659 (N.D. Fla. Apr. 3, 2024); *Ruiz v. SharkNinja Operating LLC*, 2024 WL 640859 (M.D.

Fla. Feb. 6, 2024).  As discussed below, this Court should affirm the Rule 702 Order and the accompanying grant of summary judgment.

## B.   Plaintiffs Were Required To Prove General Causation

Plaintiffs assert that, under *McClain v. Metabolife International, Inc.*, 401 F.3d 1233 (11th Cir. 2005), their general-causation experts should have "sail[ed] through *Daubert* without further analysis." Krause.Br.37.  No law supports that assertion.

Under *McClain*, courts must conduct a rigorous Rule 702 inquiry on medical-causation opinions unless "the medical community generally recognizes the toxicity of the drug," as with toxins like "asbestos" and "cigarette smoke."  401 F.3d at 1239.  Such toxic tort cases are known as *McClain* "Category 1" cases.  But where, as here, "the medical community does not generally recognize the agent as both toxic and causing the injury plaintiff alleges," the case falls under *McClain* "Category 2," in which courts must rigorously assess expert evidence for both general and specific causation.  *Id.*

The district court correctly held that this case falls under *McClain* Category 2 because ranitidine is not generally recognized (or even recognized at all) as causing cancer in humans.  MDL.Dkt.6120:28-29.

Plaintiffs concede (at 31) "that ranitidine is not generally recognized as a carcinogen." Instead, they argue (at 31-32) that this is a Category 1 case because (1) the substance at issue is *NDMA*, not ranitidine, and (2) NDMA is generally recognized as carcinogenic. Plaintiffs are wrong on both fronts.

1. The court properly focused the causation inquiry on the product at issue, ranitidine. Plaintiffs did not ingest NDMA molecules by themselves; they ingested ranitidine, a medication that was on the market for more than 35 years. This litigation accordingly is about whether ingesting ranitidine (including any NDMA it may, or may not, have contained) can cause humans to develop various cancers. No court in this Circuit has ever held that a pharmaceutical product falls in *McClain* Category 1.

As the district court understood, *Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296 (11th Cir. 2014), defeats Plaintiffs' position. MDL.Dkt.6120:28. There, the plaintiff alleged that zinc in a denture adhesive (Fixodent) caused her neurological condition (myelopathy). *Chapman*, 766 F.3d at 1300. After the court excluded the plaintiff's general-causation experts, she argued on appeal that the court

"should have analyzed this case under *McClain* category one, because there is a general consensus in the medical community that ingestion of zinc" causes myelopathy. *Id.* at 1301, 1304. But this Court held that "the district judge properly determined that *Fixodent*, containing zinc, was in *McClain* category two," because it was not generally recognized that Fixodent causes harm. *Id.* at 1304 (emphasis added); *see also id.* (plaintiff "fail[ed] to show that the zinc compound *in Fixodent* is in *McClain* category one" (emphasis added)).

Plaintiffs are thus wrong (at 34) that in *Chapman* this Court framed the *McClain* question "as about zinc, rather than Fixodent." Just as Fixodent (not zinc, the allegedly harmful component) was the substance at issue in *Chapman*, ranitidine (not NDMA) is the substance at issue here. *See Burst v. Shell Oil Co.*, 2015 WL 3755953, at *9 (E.D. La. June 16, 2015) (where plaintiff "allegedly sustained exposure to gasoline containing benzene, not pure benzene," the issue "is whether exposure to gasoline containing benzene can cause [leukemia], not whether exposure to benzene generally can cause [leukemia]"), *aff'd*, 650 F. Appx. 170 (5th Cir. 2016).

No one—not even Plaintiffs—contends that "medical doctors routinely and widely recognize" ranitidine as a toxic substance. *See McClain*, 401 F.3d at 1239 n.5. FDA researchers explained that the body of existing, reliably designed studies "found no association between ranitidine and overall or specific cancer risk." MDL.Dkt.6187-1:9. The European Medicines Agency reached the same conclusion. MDL.Dkt.6188-3:19. As the district court recognized, Plaintiffs' dearth of general-causation evidence "underscores the necessity for undertaking such an inquiry in the first place." MDL.Dkt.6120:29. This observation was not, as Plaintiffs suggest (at 36), an "order-of-operations error," but instead a common-sense observation that the lack of scientific evidence that using ranitidine can cause cancer aligned with the court's determination that ranitidine was not generally recognized as toxic and thus belongs in *McClain* Category 2.[20]

---

[20] The *Valsartan* case in the District of New Jersey—for which Plaintiffs (at 13) rely on a hearing transcript because no written opinion exists—is not persuasive. Plaintiffs admit (at 32) that the *Valsartan* court was "not bound by" this Court's precedents, including *McClain*. In any event, *Valsartan* involves different drugs, and the alleged amount of NDMA in Valsartan (which allegedly resulted from a manufacturing defect) dwarfed the "low levels" that FDA's testing revealed in ranitidine. *Supra* pp.10-11; *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, MDL No. 19-2875, ECF 1707, at 35 (D.N.J. Nov. 1, 2021) (complaint

2.     Even if Plaintiffs were right (they are not) that NDMA is the substance at issue, this would still be a Category 2 case.  No regulatory agency or major health organization has determined that NDMA is a known human carcinogen.     MDL.Dkt.6185-15:150,153.     The International Agency for Research on Cancer (IARC) classifies NDMA as "probably carcinogenic to humans," a classification reserved for substances for which there is "[l]imited evidence of carcinogenicity in humans."[21]  That is in contrast to *McClain* Category 1 substances like cigarette smoke and asbestos, for example, which IARC and others classify as *known* human carcinogens.[22]  MDL.Dkt.6120:9,217; *McClain*, 401 F.3d at 1239; *Chapman*, 766 F.3d at 1303.

Plaintiffs' position would lead to absurd results.  NDMA exists in "air, water, and food."  MDL.Dkt.6120:28.  It cannot be the case that a plaintiff can skip a general-causation analysis merely by alleging that

---

alleging FDA's testing showed NDMA levels ranging from 300ng to 177,000ng, *i.e.*, "between 3.1 and 177 times" FDA's 96ng guideline).

[21] World Health Org., *IARC Monographs*, *supra* n.5, at 35 (emphasis omitted); *supra* n.5.

[22] IARC Classifications, *supra* n.5 (classifying "Tobacco smoking," "Tobacco smoke, second-hand" & "Asbestos" as "Group 1" agents, meaning "Carcinogenic to humans").

she consumed an item containing trace amounts of NDMA. Krause.Br.35; *see* MDL.Dkt.6120:28-29. Otherwise, there would be no general-causation inquiry needed in a lawsuit alleging that drinking water or eating everyday foods causes cancer.

Plaintiffs misapprehend the *McClain* inquiry by suggesting (at 35) that the issue of how much NDMA is toxic is irrelevant because specific causation accounts for that issue. *McClain*'s purpose is to further judicial economy and efficiency—but only where doing so does not skip over disputed issues. *See* 401 F.3d at 1239 n.5. Given that the danger *any* substance poses depends on the amounts in which it is present, bright-line rules based on the mere fact of a substance's toxicity at *some* level of exposure do not further judicial economy.[23] "[D]ose matters." *Lipitor*, 892 F.3d at 639 (citation omitted); *see, e.g.*, *McClain*, 401 F.3d at 1239 n.5 (noting that "the ingestion of sufficient amounts of arsenic causes death"). That is why the district court's general-causation inquiry

---

[23] For this reason, Plaintiffs' reliance on the ipse dixit of their expert Dr. Zeiger—that NDMA "is generally accepted by the scientific and regulatory communities in the US and internationally as genotoxic and carcinogenic"—is beside the point. Krause.Br.31. Moreover, Dr. Zeiger had nothing to say about whether *ranitidine* is carcinogenic. *Supra* n.14.

focused on *the levels* of NDMA found through reliable testing of finished ranitidine products.

What distinguishes Category 1 cases from Category 2 cases is that in Category 1, general causation can be presumed because the medical and scientific communities recognize the specific substance as causing the specific injury alleged. *Chapman*, 766 F.3d at 1303. In that instance, where there is no room for real disagreement over general causation, resources are better spent assessing specific-causation issues. But where—as here—there is no general scientific or medical consensus about a connection between the substance and the alleged injuries, allowing Plaintiffs to skip over a central element of their burden of proof would be a false economy that this Court would have to correct.

### C. Plaintiffs Lack Reliable Primary Evidence of General Causation

This Court has recognized three "primary methods" for proving general medical causation: (1) "epidemiological evidence," (2) evidence of the "dose-response" relationship, and (3) evidence of the "background risk of disease." *Chapman*, 766 F.3d at 1308. These types of evidence, which overlap each other to some extent, are "indispensable to proving the effect of an ingested substance." *Id.* Without reliable primary evidence, a

plaintiff cannot prove general causation. Secondary evidence like animal studies, plausible explanations of a mechanistic connection between the substance and the injury, and hypotheses about such a connection do not suffice. *Id.* The district court did not abuse its discretion in holding that Plaintiffs failed to proffer reliable opinions showing general causation under any of the three primary methods.

### 1. Plaintiffs' Experts Did Not Reliably Analyze Epidemiology Evidence

#### a. The experts' conclusions that ranitidine use causes cancer lack general acceptance

The broader scientific community has not endorsed Plaintiffs' experts' conclusions that ranitidine use can cause cancer—a fact that, as the district court recognized, signals the unreliability of the experts' methodologies. A recurring theme throughout Plaintiffs' brief (*see, e.g.*, Krause.Br.36-37,40,49-50) is that the district court improperly considered their experts' conclusions. But whether an expert's conclusions are generally accepted in the scientific community, while not dispositive, bears on whether the opinions are reliable under Rule 702.

As the rule commentary explains, "when an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not

reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. A district court is thus "well within its discretion to consider whether plaintiffs' experts' conclusions [are] generally accepted by the scientific community." *Mirena*, 982 F.3d at 124. The district court properly determined that the lack of general acceptance of Plaintiffs' experts' conclusions was relevant to the court's consideration of whether the experts' methodologies were reliable. MDL.Dkt.6120:177-78.

The scientific community at large has not accepted Plaintiffs' experts' conclusions about ranitidine and cancer. As the court found after meticulously reviewing the then-existing ten peer-reviewed epidemiological studies and government research, there is "no published study or governmental finding that agrees with the Plaintiffs' experts … that ranitidine causes cancer of any kind." MDL.Dkt.6120:171&n.85,177. Nor was there even "widespread acceptance in the scientific community of an observable, statistically significant *association* between ranitidine and cancer"—a "far lower bar

than causation." MDL.Dkt.6120:178 (emphasis added); *see supra* pp.12-18.

The court rightly rejected Plaintiffs' argument that it was required to ignore the lack of general acceptance of conclusions because courts may focus only on methodologies.[24]   MDL.Dkt.6120:170.   *First*, *contra* Krause.Br.38-41, Judge Rosenberg *did* focus on methodology by carefully evaluating the reliability of the experts' *methods as applied to the evidence*.   *See, e.g.*, MDL.Dkt.6120:180-81 (laying out roadmap for evaluating how the experts analyzed epidemiology).  The opinion's length was necessary so the court could "carefully explain each reason why the Plaintiffs' experts have utilized unreliable methodologies to reach their conclusions," which concerned five different cancers.   MDL.Dkt.6120:7. The opinion made clear that the court fully appreciated that its role was not to "make ultimate conclusions as to the persuasiveness of the

---

[24] Plaintiffs' assertion (at 36-38) that the district court "wrongly conflated" the two *McClain* categories is just a variation of this argument. Plaintiffs contend that the court improperly considered evidence relevant to the threshold *McClain* question—*i.e.*, evidence that ranitidine is not generally accepted as carcinogenic—in deciding reliability.   But that evidence bears on both questions.  The lack of general acceptance for the proposition that ranitidine use can cause cancer places this case in *McClain* Category 2, and also weighs in favor of finding the experts' opinions unreliable.

67

proffered evidence," but to "assess 'whether the reasoning or methodology underlying the [expert] testimony is scientifically valid.'" MDL.Dkt.6120:21,23 (quoting *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003), and *Chapman*, 766 F.3d at 1306).

*Second*, Plaintiffs are incorrect that district courts must don methodology-only blinkers during Rule 702 analyses. To the contrary, courts are "not precluded from looking at conclusions." *Allison*, 184 F.3d at 1315. "[C]onclusions and methodology are not entirely distinct from one another," and courts should analyze whether "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The scientific community's lack of acceptance of an expert's conclusion *may* signal that the methodology used to reach that opinion is unreliable.

In taking account of this fact, the court did not rely on "'its own understanding' of the science," Krause.Br.1 (citation omitted), evaluate the "persuasiveness of competing scientific studies," Krause.Br.7 (quoting *Quiet Tech.*, 326 F.3d at 1341), "evaluat[e] witness credibility," Krause.Br.8 (citation omitted), or "erroneously [take] sides in an ongoing

scientific debate," Krause.Br.49 (capitalization omitted). (The only "debate," if any exists, is between Plaintiffs' experts and the rest of the world.) Moreover, the court never suggested, *contra* Krause.Br.49-50, that the experts' opinions needed to be independently supported by certain studies, or that studies reaching a contrary conclusion doomed their opinions. Rather, the court rightly analyzed the experts' *methods*, including their inability to reliably account for contradictory results and their inconsistent application of methods. *See infra* pp.70-112.

*Quiet Technology*, which Plaintiffs quote repeatedly (*see* Krause.Br.7,9n.3,29,40,50&n.22,64,71), held that a jury was capable of evaluating the inputs to an expert's analysis where the expert's "methods and results were discernible and rooted in real science." 326 F.3d at 1346. By contrast, where (as here) the expert's purported methodology is "substantively unsound" and results-oriented, the court acts within its discretion by excluding the expert's opinions.[25] *Id.*

---

[25] Plaintiffs also rely heavily (at, *e.g.*, Krause.Br.4,29,45n.20,50,71,72) on *Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11 (1st Cir. 2011), but it is distinguishable for the same reason. There, the First Circuit held that the proponent of expert evidence must show that "the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." *Id.* at 15 (citation omitted). The circuit held the proponent met that standard because the expert's

Nor did the district court require Plaintiffs to proffer an epidemiological study including "the magic word 'causation.'" Krause.Br.51. To the contrary, the court agreed that the Bradford Hill methodology allows experts to derive causal conclusions, when warranted by the evidence, from genuine statistical associations reported in studies. MDL.Dkt.6120:168. But the court concluded that, on the specific facts here, Plaintiffs' experts' application of that methodology was unreliable and, unsurprisingly, yielded conclusions no one else has endorsed. MDL.Dkt.6120:180; *supra* pp.12-18. It was proper for the district court to "scrutinize [these] anomalous conclusions." *Allison*, 184 F.3d at 1316 (citing *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)).

### b. The experts did not reliably apply scientific methodologies

Plaintiffs presented five general-causation experts who opined on epidemiology. As relevant to Plaintiffs' arguments on appeal, the district court focused its epidemiology analysis on the opinions of two

---

"opinion was based on a reliable methodology and substantial evidence that he carefully explained." *Id.* at 22-23. That is not true here, for the many reasons Judge Rosenberg explained.

epidemiologists, Drs. McTiernan and Moorman, and on the dose-related opinion of Dr. Salmon, a toxicologist. Three non-epidemiologist experts, Drs. Salmon, Le, and Michaels, purported to rely on epidemiological evidence.[26] But apart from Dr. Salmon's dose-related opinions (addressed below, *infra* pp.101-09), Plaintiffs do not present arguments specific to these non-epidemiologist experts. Nor do Plaintiffs contest the district court's conclusion that there is "no meaningful difference" between these experts' opinions and those of Drs. McTiernan and Moorman. Krause.Br.74n.32 (quoting MDL.Dkt.6120:297). Thus, the appeal rises and falls with the court's exclusion of Drs. McTiernan and Moorman and Dr. Salmon's dose-related opinions. If the Court agrees that the district court properly excluded those experts' opinions, it need not reach Plaintiffs' other experts.[27]

---

[26] Although the court focused its analysis on Drs. McTiernan, Moorman, and Salmon, it also made specific findings as to Drs. Le (pharmacist) and Michaels (pathologist). *See* MDL.Dkt.6120:136-37,140,152,156-58,297-98,309-10,309n.160,329 (Le); MDL.Dkt.6120:157-58,297-98,309-10,309n.160 (Michaels).

The court set aside the fact that Drs. Salmon, Le, and Michaels may not be qualified to opine on epidemiology and focused instead on whether their methodologies were reliable. MDL.Dkt.6120:297&n.151.

[27] In a footnote (at 78 n.33), Plaintiffs also purport to challenge the court's exclusion of Drs. Panigrahy (pathologist) and Melnick (toxicologist). This

The epidemiologists purported to use weight-of-the-evidence/Bradford Hill methodologies to review and weigh the existing epidemiological evidence. Krause.Br.16-18. As the district court recognized, "as a general matter a Bradford Hill analysis and a weight-of-the-evidence approach are standard practice in epidemiology and can be reliable methodologies." MDL.Dkt.6120:252. Even so, each litigation-specific application of these methodologies "is distinct and should be analyzed for reliability." *Zoloft*, 858 F.3d at 795. "[T]he techniques used to implement" these methodologies must be both "reliable" and "reliably applied." *Id.* at 796; *see also Onglyza*, 93 F.4th at 347. Where the opinion "is connected to existing data only by the *ipse dixit* of the expert," it makes no difference that the expert purports to apply a generally acceptable methodology. *Joiner*, 522 U.S. at 146.

"For a Bradford Hill analysis or a weight-of-the-evidence approach to be reliable, 'there must be a scientific method of weighting that is used

---

argument is not sufficiently developed to be preserved. *See Keister v. Bell*, 879 F.3d 1282, 1287 n.2 (11th Cir. 2018). In any event, these experts did not present reliable opinions based on primary evidence; the court provided numerous independent reasons for their exclusion. *See, e.g.*, MDL.Dkt.6120:123,158 (Panigrahy); MDL.Dkt.6120:123,322-23,323n.166 (Melnick).

and explained.'" MDL.Dkt.6120:253 (citation omitted). And "[i]n discussing the conclusions produced by such techniques … an expert must explain" both "how conclusions are drawn" and "how the criteria are weighed relative to one another." *Zoloft*, 858 F.3d at 796. Courts must carefully review an expert's weighing to ensure that the expert "truly" applied the relevant methodology, "rather than a mere conclusion-oriented selection process." *Id.* (citation omitted). MDL courts regularly exclude medical-causation opinions that employ inconsistent and conclusion-driven weighing methodologies, and those rulings are routinely affirmed on appeal. *See id.* at 800; *Onglyza*, 93 F.4th at 348 (expert's "cherry-picking and inconsistent consideration of the Bradford Hill factors" warranted exclusion); *Lipitor*, 892 F.3d at 642 (court appropriately excluded expert for "unreliably appl[ying] the Bradford Hill methodology").

Here, the district court properly concluded that Plaintiffs' experts unreliably applied the weight-of-the-evidence and Bradford Hill methodologies. As the court held, Plaintiffs' experts' molding of epidemiological studies to manufacture an association between ranitidine use and cancer was an exercise in cherry-picking. The court's

determination that these flawed methodologies lacked "widespread acceptance," MDL.Dkt.6120:180, and thus rendered the experts' opinions unreliable was "certainly within the broad discretion afforded to the district court." *Amorgianos*, 303 F.3d at 269. Specifically, and as explained below, the experts unreliably (i) rejected analyses designed to account for bias and confounding, *i.e.*, "comparisons between ranitidine users and the users of similar medications"; (ii) "relie[d] upon statistically insignificant findings"—except when those findings were negative; and (iii) "weigh[ed] dietary and occupational studies equal to or more strongly than ranitidine studies." MDL.Dkt.6120:180,198-99,201-02,227,243.

**i.** **Bias and confounding.** The district court appropriately concluded that Plaintiffs' experts employed an "outcome-driven methodology" when they rejected the analyses to account for bias and confounding that were reported in the very studies they were weighing. MDL.Dkt.6120:198. "Before any inferences about causation are drawn from a study," the potential for bias and confounding "must be examined." Reference Manual 572. Bias is a "systematic error" resulting from "the design or conduct of a study, data collection, or data analysis." *Id.* at 583.

"Confounding arises when a factor not accounted for by a study wholly or partially explains an apparent association." MDL.Dkt.6120:166. Where another factor "confounds the relationship being examined in the study," the study "may reach incorrect conclusions about causation." Reference Manual 574.

As the district court explained, most (8 out of 10) of the ranitidine epidemiological studies before the court reported data from "active comparators"—*i.e.*, they compared the cancer risk of ranitidine users to that of users of similar medications (H2-blockers) rather than the general population.[28] MDL.Dkt.6120:182; MDL.Dkt.5736:110. Consistent with established epidemiological principles, the study authors reported that they chose this design to account for confounding and bias. *E.g.*, MDL.Dkt.6120:182-83 (discussing Nørgaard). Of particular concern here is "confounding by indication"—the fact that users of H2-blockers have a higher incidence of cancer *because* the underlying conditions for which they take H2-blockers are themselves associated with higher rates of

---

[28] McDowell and Kim S did not use an active-comparator analysis. *Supra* pp.15-17; MDL.Dkt.6120:187-88; MDL.Dkt.6187-18 (McDowell); MDL.Dkt.6187-11 (Kim S).

cancer. *See* MDL.Dkt.6185-28:2 (Adami); *see also, e.g.*, MDL.Dkt.6187-29:8 (Yoon); MDL.Dkt.6187-7:10 (Iwagami).

Thus, the active-comparator analyses accounted for the fact that persons who use H2-blockers are more likely than the general population to develop cancer because of lifestyle factors (*e.g.*, smoking), physical characteristics (*e.g.*, obesity), or symptoms (*e.g.*, ulcers, reflux) that led them to seek that treatment. MDL.Dkt.6120:182; *see also, e.g.*, MDL.Dkt.6187-20:7 (Nørgaard). The studies' results confirmed that phenomenon. As the district court found, when ranitidine users were compared to users of other H2-blockers, the analyses were "uniformly unhelpful for the Plaintiffs"; they found a *lower* relative risk of cancer than when the comparison was to non-users of acid suppressants, and no study found a statistically significant increased risk of cancer when using active comparators. MDL.Dkt.6120:183-88; *supra* pp.12-15.

Some active-comparator analyses compared ranitidine users to users of proton-pump inhibitors, another acid suppressor, in addition to users of other H2-blockers. *See* MDL.Dkt.6185-28:2-3 (Adami); MDL.Dkt.6185-31:5 (Cardwell); MDL.Dkt.6187-12:2 (Kim Y); MDL.Dkt.6187-13:2-3 (Kumar); MDL.Dkt.6187-20:3 (Nørgaard). As the

district court found, because proton-pump inhibitors can treat a patient population with a different health profile, H2-blockers are more reliable comparators. MDL.Dkt.6120:8; MDL.Dkt.6179-6:213. Yet even there, all but two studies that compared ranitidine users to users of proton-pump inhibitors showed no statistically significant positive association between ranitidine use and any cancer. *See* MDL.Dkt.6120:188; MDL.Dkt.6185-31:6 (Cardwell); MDL.Dkt.6187-20:2 (Nørgaard). And one study that compared ranitidine users to users of proton-pump inhibitors found that using ranitidine "was not associated with overall cancer risk." MDL.Dkt.6187-9:4 (Kantor).

Plaintiffs' causation experts acknowledged the increased potential for bias and confounding from general-population comparisons. *See, e.g.*, MDL.Dkt.6171-9:36,107,147,208,223,237,255-56,259,284; MDL.Dkt. 6185-15:43-45; MDL.Dkt.6185-22:23-24,46. They also admitted that using active comparators is a "typical approach" in epidemiology for addressing bias and confounding. MDL.Dkt.6179-6:27; *see also, e.g.*, MDL.Dkt.6179-7:6; MDL.Dkt.6185-15:35. Indeed, outside of litigation, Dr. McTiernan used active-comparator data in her own studies assessing whether medications increase cancer risk. *See* MDL.Dkt.6185-15:39-40.

When crafting their opinions for this litigation, Plaintiffs' experts abandoned their preference for active-comparator analyses, choosing to place greater weight on analyses comparing ranitidine users to the healthier general population—even when the same study conducted both types of comparisons. Predictably, this choice generally yielded a higher comparative risk of cancer for ranitidine users. *See* MDL.Dkt.6120:188,192-99,201-02.

Plaintiffs' epidemiology experts' treatment of the Cardwell study is illustrative. Cardwell's active-comparator analysis comparing ranitidine users to users of other H2-blockers found "little evidence of difference in bladder cancer risk." MDL.Dkt.6185-31:7 (Cardwell); *supra* p.14. While Cardwell identified statistically significant associations between ranitidine use and bladder cancer when comparing ranitidine users to non-users of acid-reducing drugs (22% increased risk) and users of proton-pump inhibitors (20%), the authors did not conclude that ranitidine causes cancer. MDL.Dkt.6120:185,231; MDL.Dkt.6185-31:2,5 (Cardwell). They instead noted "the possibility of residual confounding," as their "smoking and alcohol [data] were incomplete," and recommended "further studies … to attempt to replicate" their findings.

MDL.Dkt.6185-31:8 (Cardwell); MDL.Dkt.6120:173. Plaintiffs' experts cannot "infer[] conclusions from studies and reports that the papers do not authorize." *McClain*, 401 F.3d at 1240. When Dr. McTiernan relied on Cardwell's findings, she did not even mention the lack of a statistically significant association when comparing ranitidine users to users of other H2-blockers—she relied exclusively on the reported 22% increased risk comparing ranitidine users *to non-users*. MDL.Dkt.6120:231; MDL.Dkt.6171-9:187-88,203.

Although they offered several explanations for selectively ignoring active-comparator analyses, Plaintiffs' epidemiology experts identified no reliable basis for doing so. MDL.Dkt.6120:254,282. For example, Drs. McTiernan and Moorman argued that ranitidine users are not medically similar to users of other H2-blockers, but they failed to offer any data or study to support this ipse dixit opinion. *See* MDL.Dkt.6185-22:50-51,90; MDL.Dkt.6185-15:184.

Those same experts also claimed that other H2-blockers and proton-pump inhibitors increase the risk of cancer and so cannot be valid comparators. *See* MDL.Dkt.6179-6:29; MDL.Dkt.6171-9:127,128. But Dr. McTiernan could not name a single type of cancer associated with

proton-pump-inhibitor use and testified that she does not think that any H2-blocker (besides ranitidine) increases cancer risk. *See* MDL.Dkt.6185-15:45-46. Dr. Moorman admitted that she had not fully analyzed whether other H2-blockers could cause cancer and could not say whether her view was generally accepted. MDL.Dkt.6185-22:47-48. Experts cannot "substitute[] their own *ipse dixit* for scientific proof." *McClain*, 401 F.3d at 1255.

The court appropriately found that this approach was "indicative of outcome-driven reasoning and … an unreliable methodology." MDL.Dkt.6120:188,198. As the court recognized, Plaintiffs' experts' treatment of the Wang study further illustrates their unreliable approach to active-comparator studies. Wang—published after the Rule 702 hearing but addressed in supplemental briefing and the district court's ruling—was the only study to show a statistically significant association between ranitidine and any designated cancer (liver) when comparing ranitidine users to users of other H2-blockers. MDL.Dkt.6120:171n.85,284-85,291; MDL.Dkt.6061-6:11. Although Drs. McTiernan and Moorman initially disregarded active-comparator analyses in every other ranitidine study, claiming such analyses were

weak and limited (not coincidentally because the results did not support their opinions), both cited Wang's active-comparator analysis of liver cancer as a *strength*. MDL.Dkt.6120:290-92; MDL.Dkt.6041-2:6,11; MDL.Dkt.6061-4:4.

The experts thus "disregard[ed] active comparator analyses *in a specific study* in favor of comparisons to non-users *in the very same study*" (even where the study authors themselves favored active-comparator analyses), but then changed their position as to the value of active-comparator data when the later-published Wang study yielded a result they preferred. MDL.Dkt.6120:193,198. This kind of "cherry-picking … is a quintessential example of applying methodologies … in an unreliable fashion." *Lipitor*, 892 F.3d at 634; *see also Onglyza*, 93 F.4th at 347 (same). The court properly concluded that the experts' contradictory treatment of the active-comparator data undermined the reliability of their opinions. MDL.Dkt.6120:257,282.

Plaintiffs suggest (at 64) that "there is no rule requiring … active-comparator studies … to be given more weight." The district court agreed. *See* MDL.Dkt.6120:193 ("The Court does not mean to suggest or conclude that an active comparator analysis is automatically reliable or

is the only avenue for a reliable methodology.").  Plaintiffs argue (at 65-66) that the experts had reasons for rejecting the active-comparator results in addition to the two discussed above—*e.g.*, follow-up times that were "too short," how many patients were included "with substantial Zantac use," and whether the studies "account[ed] for [over-the-counter] use."  Those issues, however, affect the studies as a whole, not just the active-comparator data—and yet the experts relied on those studies' *non*-active-comparator data.  The experts' selective reliance on certain results in these studies while ignoring active-comparator results in the same studies "casts doubt on the Plaintiffs' experts' critiques of active comparator studies on other grounds."  MDL.Dkt.6120:198-99; *see also* MDL.Dkt.6120:257-58 (as to McTiernan); MDL.Dkt.6120:282 (as to Moorman).

*Finally*, Plaintiffs contend (at 63) that the experts did not actually "disregard" active-comparator studies and that they analyzed studies like Cardwell and Wang that supported their position.  To start, Plaintiffs' claim (at 63) that the experts "cited, quoted, and analyzed every single study" is carefully worded for a reason—even though the experts *referenced* studies that employed active-comparator analyses, the

experts ignored the active-comparator results within those studies, as well as the study authors' own conclusions, and instead cherry-picked other results they viewed as more favorable for their opinions. *Supra* pp.77-82. Moreover, as Plaintiffs' own experts admit, a single study finding a positive association for a particular cancer cannot provide a reliable basis for a general-causation opinion. *See, e.g.*, MDL.Dkt.6185-22:36 (Moorman); MDL.Dkt.6102:75-76 (Le); MDL.Dkt.6102:255 (Salmon).

Plaintiffs echo their experts' unreliable methodologies in their brief. For example, they repeatedly cite (at, *e.g.*, 13, 46, 51) Cardwell's non-active-comparator result (22% increased risk of bladder cancer), without acknowledging the study's active-comparator results (no increased risk). *Supra* p.14. And while Plaintiffs reference (at 64 n.26) Cardwell's statistically significant result comparing ranitidine users with users of proton-pump inhibitors, Plaintiffs' experts provided "no reasonable basis to conclude that PPIs make for a better ranitidine comparator than H2-blockers" because, as the district court explained, "alternative H2-blockers" are "more similar to ranitidine than PPI drugs, which function differently." MDL.Dkt.6120:192n.98. Plaintiffs also ignore that all other

studies comparing bladder cancer risk in ranitidine users versus users of proton-pump inhibitors did *not* yield statistically significant results. *See* MDL.Dkt.6185-28:6 (Adami); MDL.Dkt.6187-12:2 (Kim Y); MDL.Dkt.6187-13:2 (Kumar). As for Wang, Plaintiffs cannot and do not try to reconcile their experts' selective embrace of Wang's active-comparator data with their simultaneous rejection of other active-comparator data in applying their weighting method.

**ii. <u>Statistical significance.</u>** The district correctly concluded that Plaintiffs' experts' "high level of reliance upon statistically insignificant results" indicated an "unreliable methodology." MDL.Dkt.6120:256-57. A hallmark of good science is considering the possibility of "chance"—*i.e.*, that a study's findings "may be the result of chance (or random error)"— before inferring causation. Reference Manual 572-73. Statistical significance is a "main technique[]" to account for randomness; if results are "statistically significant," they are "unlikely to be the result of random error." *Id.* at 573.

The causation inquiry here is whether ranitidine use increases the risk of cancer. "An increased risk of developing a disease is typically measured" through a "risk ratio." MDL.Dkt.6120:163. If a risk ratio

reported in a study is greater than 1.0, that means "a group exposed to [ranitidine] was more likely to develop [cancer]" (a positive association); by contrast, if a risk ratio is less than 1.0, ranitidine "has a protective effect and reduces the chance of developing" cancer (a negative association). MDL.Dkt.6120:163. The statistical significance of the risk ratio is determined by the accompanying "confidence interval"—*i.e.*, "a range (interval) within which the risk likely would fall," with 95% certainty, "if the study were repeated numerous times." Reference Manual 573; MDL.Dkt.6120:164-65. If a risk ratio's confidence interval spans 1, that means that the risk ratio is not statistically significant because the results are consistent with either an increased or a decreased risk. MDL.Dkt.6120:165,200.

Statistical significance matters under Rule 702 and *Daubert*. While "[a] causal connection may exist despite the lack of significant findings," statistical significance "remains an important metric to distinguish between results supporting a true association and those resulting from mere chance" when assessing reliability. *Zoloft*, 858 F.3d at 793. An expert's heavy reliance on statistically insignificant evidence may indicate an unreliable methodology. Courts thus have "frowned on

causative conclusions bereft of statistically significant epidemiological support." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 380 (5th Cir. 2010); *see also Joiner*, 522 U.S. at 145-47 (district court had "discretion to conclude that the studies upon which the experts relied were not sufficient" where one study noted increased risk that "was not statistically significant"); *In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*, — F. Supp. 3d —, 2023 WL 8711617, at *40 (S.D.N.Y. Dec. 18, 2023) ("it is not for the courts to be the pioneers, forging new trails in scientific thinking, especially when that means departing from well-established research principles, such as … statistical significance" (citation omitted)).

As explained, no study has concluded that ranitidine use can cause cancer. *Supra* pp.12-18. And none of the ranitidine studies (other than Wang) that compared ranitidine to other H2-blockers found a statistically significant, positive *association* with any type of cancer. *Supra* pp.12-15 & n.7; MDL.Dkt.6120:201. A subset of studies reported a risk ratio over 1.0. *See, e.g.*, MDL.Dkt.6120:184-88; Krause.Br.44. But those risk ratios were not statistically significant because the confidence intervals spanned an interval both above and below 1.0, reflecting the

possibility of either increased risk or *decreased* risk. *See* MDL.Dkt.6120:201. The below chart, cited by the district court, illustrates these risk ratios and accompanying confidence intervals, grouped by designated-cancer type (the dotted line represents 1.0; the results in green are statistically significant *negative* associations):

Totality of Observational Studies: Ranitidine Use Versus Other H2RA Use

| | Study | Risk Ratio [95% CI] |
|---|---|---|
| Gastric | Iwagami (2021) | 1.09 [0.96, 1.24] |
| | Adami (2021) | 0.98 [0.84, 1.14] |
| | Kim Y (2021) | 0.43 [0.36, 0.51] |
| | Kumar (2021) | 0.55 [0.40, 0.74] |
| | Yoon (2021) | 1.06 [0.86, 1.31] |
| Esophageal | Adami (2021) | 1.09 [0.91, 1.29] |
| | Kim Y (2021) | 0.51 [0.43, 0.60] |
| Liver | Adami (2021) | 0.89 [0.72, 1.10] |
| | Kim Y (2021) | 0.39 [0.36, 0.41] |
| | Yoon (2021) | 0.85 [0.69, 1.05] |
| Bladder | Cardwell (2021) | 1.05 [0.86, 1.28] |
| | Norgaard (2021) | 1.11 [0.95, 1.29] |
| | Yoon (2021) | 1.41 [0.88, 2.24] |
| Pancreas | Adami (2021) | 0.97 [0.87, 1.10] |
| | Kim Y (2021) | 0.54 [0.49, 0.62] |

Primary Endpoints

MDL.Dkt.5736:37,112; MDL.Dkt.6120:201. As the chart demonstrates, no H2-blocker comparison found a statistically significant association between ranitidine use and any cancer, because none produced a confidence interval falling entirely above 1.0—indeed, the

only statistically significant associations were five *negative* ones (*i.e.*, showing lower risk of cancer), spanning four of the at-issue cancers.[29]

To provide one example:  Iwagami found a marginally elevated risk ratio of 1.09 for gastric cancer, with a confidence interval of 0.96 to 1.24. *See* MDL.Dkt.6120:164; MDL.Dkt.6187-7:7 (Iwagami).  Because the confidence interval spans 1.0, the 1.09 risk ratio is not statistically significant.

The importance of statistical significance in considering the reliability of clinical data is a bedrock principle of epidemiology. Plaintiffs' epidemiology experts nevertheless gave considerable weight to risk estimates above 1.0 without regard to statistical significance, while simultaneously dismissing statistically insignificant risk estimates below 1.0 (and even statistically significant risk estimates below 1.0).  As the district court explained, Dr. McTiernan "routinely, and almost exclusively, relies upon statistically insignificant findings, provided those

---

[29] The chart does not include McDowell or Kim S (which did not include active-comparator analyses, *supra* n.28), Kantor (which compared ranitidine users only to users of proton-pump inhibitors, *supra* pp.77,92), or Wang, which post-dated the chart.  Wang reported a statistically significant result for liver cancer. *Supra* n.7.  But the three other studies with active-comparator analyses for liver cancer found a *negative* association, including one that was statistically significant.

findings" show an increased risk of cancer.  MDL.Dkt.6120:243; *see also* MDL.Dkt.6120:256 (collecting 15 studies in which Dr. McTiernan "relies upon statistically insignificant results").  Dr. McTiernan opined, contrary to accepted scientific methodology, that any number above 1.0 shows an increased risk and is a "positive association," regardless of the size of the increased risk or whether it is statistically significant.  MDL.Dkt.6171-9:30,109-10; MDL.Dkt.6120:246-47.  Dr. Moorman, too, purported to find positive associations between ranitidine and several types of cancer using statistically insignificant results.  *See, e.g.*, MDL.Dkt.6179-6:129-30,144,162,183,188.

The experts' inconsistent reliance on statistically insignificant data is scientifically unsound—and contradicts their scientific views outside this litigation.  While serving as an expert in another products-liability MDL, Dr. McTiernan declined to rely on studies with no statistically significant risk ratios.  MDL.Dkt.6120:245; MDL.Dkt.6188-38:11,41.  She also has authored peer-reviewed studies characterizing data by their statistical significance and requiring statistically significant data to find an association.  MDL.Dkt.6120:245-46; MDL.Dkt.6185-15:77-79,80-83.  Outside the courtroom, Dr. Moorman likewise regularly relies on

statistically significant results to determine association and characterizes relative risks as either statistically significant or insignificant. *See, e.g.*, MDL.Dkt.6185-22:56-57,59-60. The experts' departure from the statistical principles they apply outside of litigation signals unreliable, results-driven methods. *See Kumho Tire*, 526 U.S. at 152 (experts must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

The court was well within its discretion to conclude that the experts' selective reliance on statistically insignificant results as key inputs to their Bradford Hill analyses reflected an "unreliable methodology" and weighed in favor of exclusion. *See* MDL.Dkt.6120:256-57 (as to McTiernan). Other circuits have held that district courts do not abuse their discretion in excluding an expert's opinion for "unreliably appl[ying] the Bradford Hill methodology" because the expert "deviated from th[e] norm" of demanding "a statistically significant association." *Lipitor*, 892 F.3d at 642; *see also Zoloft*, 858 F.3d at 799-800 (expert's opinion was "too far-reaching, sometimes understating the importance of statistical significance" without adequate explanation). So too here.

Plaintiffs' counterarguments are not persuasive. Plaintiffs (at 56-60) argue that the court *required* the experts to rely only on statistically significant results. But the court stated explicitly that "lack of significance is not dispositive on the question of admissibility," and should not "control whether an epidemiological analysis is sufficiently reliable." MDL.Dkt.6120:200 (citation omitted). It was proper, however, for the court to consider the experts' overreliance on statistically insignificant results when evaluating their methodologies, as well as the experts' *inconsistency* with respect to statistical significance, which strongly suggests that their opinions were results-oriented. *See Lipitor*, 892 F.3d at 634-35; *Onglyza*, 93 F.4th at 347-48.

Plaintiffs argue (at 60) that "there was at least one statistically significant result" for each designated cancer. Statistical significance "is not, however, some all-purpose salve, nor is it a get-out-of-*Daubert*-free card." *Lipitor*, 892 F.3d at 641. Moreover, a closer look reveals that Plaintiffs are referring to non-active-comparator or inapposite data, on which their experts relied in an unreliable way, for the reasons the district court found:

- Adami (gastric, esophageal, liver, and pancreatic cancers) and Cardwell (bladder cancer) found no statistically significant association when ranitidine users were compared to users of other H2-blockers. MDL.Dkt.6185-28:6 (Adami); MDL.Dkt.6185-31:7 (Cardwell).

- Kantor (liver and bladder cancers) found no statistically significant association when ranitidine users were compared to users of proton-pump inhibitors. MDL.Dkt.6187-9:4 (Kantor).

- McDowell (pancreatic cancer) only compared ranitidine use to non-use, though even then it did not find a dose-response relationship because the risk ratio lowered as ranitidine users took larger doses of ranitidine. MDL.Dkt.6187-18:4-5 (McDowell).

- Liu (gastric cancer) cannot support a primary methodology because, as the district court found, it did not attempt to estimate the risks of ranitidine use, offered no conclusions as to ranitidine, contained no dose-response data for ranitidine, and had only limited ranitidine data. *See* MDL.Dkt.6120:241; MDL.Dkt.6187-15:2 (Liu).

- Habel likewise cannot reliably support Plaintiffs' experts' opinions, as it was designed to measure the risk of a different drug, did not reach any conclusions as to ranitidine, and commingled results for different cancers, rendering impossible cancer-specific risk estimates. *See* MDL.Dkt.6120:236-38,242-43; MDL.Dkt.6187-5:2,4 (Habel). For some of these reasons, even Dr. Moorman reasoned that the study results should be "given little weight." MDL.Dkt.6179-6:80.[30]

Finally, Plaintiffs criticize the court's characterization of studies showing no statistically significant association as "evidence" that "there is no link between ranitidine consumption and cancer" because "the absence of evidence is not evidence of absence." Krause.Br.60-61 (quoting MDL.Dkt.6120:177). But the absence of evidence after sufficient inquiry is at least *some* indication that the evidence does not exist. Plaintiffs bore the burden of showing the reliability of their experts' opinions, and the experts' "downplaying the possibility that [insignificant results] support

---

[30] Plaintiffs also cite (at 60) Wang, but the experts' reliance on Wang is unreliable for the reasons already discussed. *See supra* pp.80-81.

*no* association," without proper explanation, signals unreliable methodology. *Zoloft*, 858 F.3d at 799.

    **iii.** **Non-ranitidine studies.** Because the ranitidine-specific studies did not reliably support Plaintiffs' experts' opinions, the experts attempted to support their opinions with a different set of studies— (1) dietary studies of NDMA-containing foods, and (2) occupational studies of inhaled exposure to NDMA in rubber factories. *See* MDL.Dkt.6120:202-16. Plaintiffs now deemphasize these food and rubber studies on appeal (calling them "NDMA studies" and devoting just over a page to their defense, *see* Krause.Br.67-68), but they were the linchpin of Plaintiffs' (and their experts') arguments below. The court recognized that the experts "place[d] high reliance" on these studies "to the exclusion of most ranitidine epidemiology." MDL.Dkt.6120:220n.119,179; *see also* MDL.Dkt.6120:6. Drs. Moorman and McTiernan conceded that their opinions rested not on ranitidine-specific data alone but "on all of the evidence related to NDMA exposure." MDL.Dkt.6185-22:64 (Moorman); *see also* MDL.Dkt.6185-15:148 (McTiernan) (similar).

The court did not abuse its discretion in concluding that "any expert's reliance" on the dietary and occupational studies "to form a general causation opinion on ranitidine amounts to an unreliable methodology." MDL.Dkt.6120:227; *see also* MDL.Dkt.6120:260 (McTiernan); MDL.Dkt.6120:282 (Moorman). Plaintiffs must offer primary evidence that *ranitidine* causes cancer. The *ranitidine* epidemiology is the evidence most relevant to the general-causation question because it accounts for any increased risk associated with the real-world ingestion of ranitidine (and any NDMA it may or may not contain). As the court understood, the ranitidine studies accounted for both "how much NDMA was in ranitidine" and "how long people consumed ranitidine"—questions that the dietary and occupational studies could not answer. MDL.Dkt.6120:222.

Plaintiffs' experts failed to bridge the multiple analytical gaps needed to extrapolate from the dietary and occupational studies to the relevant causation inquiry. *See Joiner*, 522 U.S. at 146. Whether these food and rubber studies are relevant here depends on several variables Plaintiffs' experts left unaddressed: *e.g.*, whether the level of NDMA exposure in these studies is comparable to the level of NDMA exposure

from real-world ranitidine use, how long a person must use ranitidine to produce an increased cancer risk, and how much NDMA was in ranitidine products at any particular time over the decades in which they were sold. MDL.Dkt.6120:221-23. These "analytical leap[s]," the court found, make it methodologically unreliable to compare ranitidine use with the lifetime exposure to and consumption of NDMA in the dietary and occupational studies. MDL.Dkt.6120:217,224-27.

Even on their own terms, the dietary and occupational studies suffer from inherent flaws that prevent any reliable extrapolation. Start with the dietary studies. Both Drs. McTiernan and Moorman acknowledged that those studies are inherently subject to inaccuracies because participants may not accurately recall their diet over a lifetime. MDL.Dkt.6120:209-10 (citing Dr. McTiernan's testimony); MDL.Dkt.6179-6:131 (recognizing that inconsistent findings were due in part to "the challenges of assessing diet in epidemiologic studies"). Dr. McTiernan testified in this case and another MDL that dietary studies are inherently unreliable. MDL.Dkt.6120:210; MDL.Dkt.6185-15:128 (Zantac deposition); MDL.Dkt.6185-17:8 (talc litigation testimony).

Moreover, the dietary studies suffer from a high potential for confounding because the same foods that contain NDMA, such as processed meats, contain known carcinogens. MDL.Dkt.6120:217; *see also* MDL.Dkt.6179-6:54 (Moorman acknowledging that "other components of processed meats could contribute to cancer risk"). The studies thus could not distinguish between any increased cancer risk that may be caused by NDMA and that caused by the known carcinogens in these foods. As a result, the studies draw no conclusions about NDMA's relationship to cancer, but rather limit their conclusions to the relationship between *foods containing NDMA* and cancer. MDL.Dkt.6120:206-07,216-17.[31]

The occupational studies on rubber production are even farther afield. As the studies acknowledge, rubber workers are exposed to numerous different substances besides NDMA—many of which (unlike

---

[31] *See also, e.g.*, Eduardo De Stefani et al., *Dietary Nitrosamines, Heterocyclic Amines, and Risk of Gastric Cancer: A Case-Control Study in Uruguay*, 30 Nutrition & Cancer 158, 161 (1998) (cited by Dr. McTiernan, *see* MDL.Dkt.6171-9:58,296, and Dr. Moorman, *see* MDL.Dkt.6179-6:54-55) ("case-control study suggests that red meat intake and chemicals resulting from its cooking are associated with a significant increase in the risk of gastric cancer in the Uruguayan population").

NDMA) are known human carcinogens. MDL.Dkt.6187-6:2 (Hidajat). Indeed, working in the rubber industry is itself considered a known human carcinogen. MDL.Dkt.6120:215; IARC Classifications, *supra* n.5 (listing "Rubber manufacturing industry" as a Group 1 agent). Further, the studies do not analyze the oral ingestion of medicine, but instead inhalation and absorption of rubber dust and fumes emitted in production. MDL.Dkt.6120:218; *see also* MDL.Dkt.6187-6:9-10 (Hidajat). Drs. McTiernan and Moorman did not attempt to explain if or how inhalation and absorption are analogous to ingestion, *see* MDL.Dkt.6120:219, which is necessary to determine the "magnitude of ultimate exposures" as well as "health outcomes," Reference Manual 518.

As the district court found, to apply the occupational studies' findings to ranitidine use requires a "staggering" number of assumptions and estimates. MDL.Dkt.6120:217. For example, the Hidajat study (on which Plaintiffs' experts and the court focused) reached conclusions limited to "the exposure-response association between occupational exposures to rubber dust, rubber fumes and nitrosamines with cancer mortality." MDL.Dkt.6187-6:9 (Hidajat). Even on that question, Hidajat drew conclusions about NDMA only by (a) estimating the predicted level

of NDMA exposure for workers in each factory department; (b) assuming that workers in 1967 continued to work in the same department, with the same level of NDMA exposure, until they retired at age 70; and (c) ignoring the possibility of potential exposure to carcinogens from other sources or the participants' predispositions for cancer. MDL.Dkt.6120:217-18; MDL.Dkt.6187-6:3,9 (Hidajat). None of Plaintiffs' causation experts even tried to (or could) bridge these yawning analytical gaps.

Plaintiffs (at 67) incorrectly contend that the court "held that relying on NDMA studies was *per se* unreliable." That is untrue. As discussed, *see supra* pp.95-96, the court first explained that the occupational and dietary studies were about different substances under different circumstances, so these studies could not reliably establish that ranitidine consumption could cause cancer in humans without the experts offering reliable opinions bridging the multiple analytical gaps. MDL.Dkt.6120:202-27. The court then analyzed how each expert specifically used these studies in the context of their methodology and made targeted determinations of reliability. *See, e.g.,*

MDL.Dkt.6120:227-28 (discussing Dr. McTiernan's reliance on these studies).

## 2. No Expert Provided Reliable Primary Evidence of Dose-Response Relationship

The second form of primary evidence is "dose-response relationship," which reflects how a "change in amount, intensity, or duration of exposure to an agent is associated with a change—either an increase or decrease—in risk of disease." *McClain*, 401 F.3d at 1241-42 (citation omitted). This relationship is the "hallmark of basic toxicology," and "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." *Id.* at 1242 (citations omitted). An "expert who avoids or neglects this principle … without justification casts suspicion on the reliability of his methodology." *Id.*

An important corollary to the dose-response relationship is "threshold[]" dose—the minimum amount of a substance "below which even repeated, long-term exposure would not cause an effect in any individual." *Id.* (citation omitted). To prove general causation, experts must identify a threshold at which the substance can cause the disease—*i.e.*, the level of exposure at which a dose-response relationship begins. It

is insufficient to say "any level is too much" or that there is no threshold because "a toxic agent generally will not cause disease in every person exposed." *Id.* at 1241 (citation omitted). Chronic low-dose exposures may not cause any harm, while almost any agent can cause disease at some high level of exposure. *See id.* at 1242; *Chapman*, 766 F.3d at 1307. The principle is important here, given that daily exposure to NDMA—through food, water, and air—is neither avoidable nor unsafe. *See* MDL.Dkt.6188-15:2; MDL.Dkt.6188-13:2; *supra* p.62.

The court did not abuse its discretion in concluding that none of Plaintiffs' experts reliably analyzed dose-response relationship.

a. ***Dr. Salmon.*** Plaintiffs primarily relied on Dr. Salmon to establish dose-response relationship and threshold dose. MDL.Dkt.6120:300; *see also, e.g.*, MDL.Dkt.6241:77-81; MDL.Dkt.6243:46. Dr. Salmon offered the "most extensive" opinions on these subjects. MDL.Dkt.6120:300. On appeal, Plaintiffs do not mention Dr. Salmon's opinions in their dose-response argument (at 45-49), perhaps because their abandonment of Dr. Najafi's testing opinions has eviscerated a substantial part of Dr. Salmon's dose-related opinions, as discussed below.

Dr. Salmon largely based his dose-response conclusions on animal studies and the dietary and occupational studies. MDL.Dkt.6120:302; *see also* MDL.Dkt.6185-5:109-38. To determine the threshold dose at which ranitidine allegedly causes cancer, Dr. Salmon estimated the "total amount of NDMA" that subjects in the dietary and occupational studies "consumed over the course of their lifetimes." MDL.Dkt.6120:303; MDL.Dkt.6185-5:226-28. Then, using (1) *maximum* NDMA levels found by FDA's and Defendants' testing, and (2) average NDMA levels found by Plaintiffs' expert Dr. Najafi, Dr. Salmon estimated the years of daily ranitidine consumption that would yield an NDMA amount comparable to the amount claimed to lead to an increased risk of cancer in the dietary and occupational studies. MDL.Dkt.6120:303-04; MDL.Dkt.6185-5:228.

Dr. Salmon used FDA's and Defendants' testing data as one alternative calculation, *see* Krause.Br.75, but at the Rule 702 hearing Plaintiffs cited only Dr. Salmon's calculations using Dr. Najafi's numbers as their threshold-dose position. MDL.Dkt.6242:21-25. Plaintiffs have abandoned Dr. Najafi's testing results on appeal. Plaintiffs therefore are forced to pivot to Dr. Salmon's alternative threshold-dose opinion based on FDA's and Defendants' testing, which was that it would take 10.08

years of use to develop a measurable increased risk of gastric cancer, 12.88 years for esophageal cancer, 27.40 years for bladder and pancreatic cancer, and 47.25 years for liver cancer, were a person to consume 300mg of ranitidine every day. MDL.Dkt.6120:305; *see* MDL.Dkt.6185-5:228. Presumably most Plaintiffs did not consume ranitidine for such periods of time, which is why Plaintiffs did not invoke these figures below (or on appeal).

The court did not abuse its discretion in finding Dr. Salmon's opinions unreliable for several reasons. *First*, consistent with many other decisions, the court properly held that Plaintiffs' experts, including Dr. Salmon, did not reliably extrapolate from non-ranitidine animal studies. MDL.Dkt.6120:325-330; s*ee, e.g., Joiner*, 522 U.S. at 144-45 (district court did not abuse discretion in rejecting experts' reliance on animal studies "so dissimilar to the facts presented" in the case); *Rider*, 295 F.3d at 1201-02 (similar). Contrary to Plaintiffs' suggestion (at 75-76), the court acknowledged that animal studies can be useful secondary evidence of causation, "but only if the experts reliably extrapolate from the animal data," which Dr. Salmon did not. MDL.Dkt.6120:324. Plaintiffs do not even attempt to challenge that conclusion on appeal.

*Second*, for the reasons noted above, *supra* pp.94-100, the court did not abuse its discretion in holding that Dr. Salmon could not reliably provide dose-response or threshold-dose opinions for ranitidine based on the dietary and occupational studies. MDL.Dkt.6120:307. While Plaintiffs (at 74-75) downplay Dr. Salmon's reliance on these studies, they were crucial inputs into the amount of NDMA he estimated necessary to cause cancer. *See, e.g.*, MDL.Dkt.6185-5:132-34,226-28. As Dr. Salmon acknowledged, MDL.Dkt.6185-26:54; MDL.Dkt.6120:306n.155, no scientist has used or accepted his methodology, which extrapolated the allegedly carcinogenic level of NDMA exposure based on food consumption and rubber exposure in specific populations to estimate the threshold dose for a different substance (ranitidine) in a different population. MDL.Dkt.6185-5:51,63,223; *supra* pp.94-100.

Further, as the court found, Dr. Salmon's selective use of data to support a dose-response relationship (while ignoring data showing "no dose-response or a negative dose-response relationship") revealed his "results-driven methodology." MDL.Dkt.6120:309; *see* MDL.Dkt.6185-26:48,57; *Lipitor*, 892 F.3d at 634; *Onglyza*, 93 F.4th at 347-48; *supra*

pp.72-74.  Plaintiffs suggest (at 76) that Dr. Salmon chose inputs using "WHO methods," but Dr. Salmon did not explain how he followed this methodology.  MDL.Dkt.6185-5:226.  Although Plaintiffs assert (at 76-77) alleged flaws in the court's reasoning, they do not engage with the crux of the court's analysis:  that Dr. Salmon cherry-picked data helpful to his opinion but omitted data cutting against it.  MDL.Dkt.6120:308.

*Third*, the court found Dr. Salmon's opinion unreliable because he used FDA's "maximum" testing results without explaining why those figures, rather than averages, were appropriate.  MDL.Dkt.6120:307-08n.158; MDL.Dkt.6152-15:224.  The analysis using FDA's average figures, even in the context of Dr. Salmon's unreliable methods, shows vastly different results.  *See* MDL.Dkt.6152-15:214; MDL.Dkt.6120:307-08n.158 (30 years of use for an alleged increased risk of gastric cancer, 39 years for esophageal cancer, 82 years for bladder and pancreatic cancer, and 141 years for liver cancer).  Plaintiffs do not address this obvious methodological flaw on appeal.

*Finally*, *contra* Krause.Br.77-78, the court did not abuse its discretion in concluding that Dr. Salmon's reliance on Cardwell and Wang to find a dose-response relationship was flawed.  Cardwell reported

an increased risk of bladder cancer after three years of 300mg/day ranitidine usage when compared to the general population. MDL.Dkt.6185-31:7. Wang reported an increased risk of liver cancer starting after one year of 300mg/day ranitidine usage but found no dose-response relationship for other cancers. *See* MDL.Dkt.6061-6:14.

Dr. Salmon ignored statistical significance and confounding when selecting data from Cardwell and Wang, even though he agrees with the importance of those scientific concepts. *See* MDL.Dkt.6185-26:21-22. Dr. Salmon ignored Cardwell's H2-blocker active-comparator analysis, which found no statistically significant dose-response relationship for bladder cancer. *See* MDL.Dkt.6185-5:189; MDL.Dkt.6185-31:7; *supra* p.14. And Dr. Salmon rejected Wang's own conclusion that there was no statistically significant dose-response relationship between ranitidine and gastric cancer, instead basing his dose-response opinion on an alleged "statistically significant *trend* for dose response in those data." *See* MDL.Dkt.6102:250,258 (emphasis added).

**b.** ***Other experts.*** Despite championing Dr. Salmon below, Plaintiffs now mention Drs. McTiernan and Moorman in an effort to assemble reliable opinions concerning dose-response relationship. The

court did not abuse its discretion in concluding that these experts, too, employed unreliable methodologies on this subject. *Supra* pp.29-30.

Drs. McTiernan and Moorman invoked the dietary, occupational, and animal studies about NDMA already discussed. *E.g.*, MDL.Dkt.6171-9:256-58 (McTiernan); MDL.Dkt.6179-6:50 (Moorman). Dr. McTiernan relied on statistically insignificant data to derive her dose-response opinion, without explanation of why that was reliable. *Supra* pp.88-90. And the experts' evaluations of Cardwell and Wang were inconsistent with their analyses of the other studies, undermining the reliability of their methodologies. *See Zoloft*, 858 F.3d at 798; *supra* pp.72-74. Crucially, no expert identified a non-zero threshold dose, as this Court requires.[32] *McClain*, 401 F.3d at 1241-42.

**c.   *Plaintiffs' counter-arguments.*** Reprising their experts' "any dose" opinions, Plaintiffs insist (at 47-49) that because NDMA is potentially carcinogenic, they were not required to identify a threshold dose. But inherent in the principle that "all substances have the potential to be harmful at high enough doses … is the fact that, for the

---

[32] To the extent Drs. McTiernan and Moorman opine on a certain amount of exposure that causes cancer that could be labeled a threshold dose, those opinions are derived using the same flawed methodologies.

vast majority of substances, there are threshold doses below which no individual will respond and doses above which nearly everyone responds." *Abilify*, 299 F. Supp. 3d at 1307 (citations omitted).

Ranitidine is no different. NDMA is regularly consumed through food, and FDA has established a safe daily exposure guideline for medications. *Supra* pp.9-10,101. If there is a dose-response relationship supported by reliable science, the minimum level (or range) of ranitidine consumption that triggers the injury being claimed should be discernible. The experts' failure to identify any threshold dose undermines their dose-response opinions and "casts suspicion" on their methodologies. *McClain*, 401 F.3d at 1242.

Plaintiffs' argument (at 47) that their experts do not need to identify a threshold dose because threshold dose relates only to specific causation is misguided. They cite no authority for this assertion, which blatantly contradicts *Chapman*. Identifying a threshold dose is part of establishing the dose-response relationship in the general-causation inquiry. *Chapman*, 766 F.3d at 1307 (affirming exclusion and noting "neither the [plaintiffs'] general-causation experts 'nor the articles on

which they rely determine how much Fixodent must be used for how long to increase the risk of a copper-deficiency" (citation omitted)).

Finally, Plaintiffs (at 47-48) lean on the Cardwell and Wang studies, arguing that those studies provide evidence of dose-response. But as explained, *supra* pp.78-81, the court did not abuse its discretion in concluding that Plaintiffs' experts' analyses of these studies were not reliable.

### 3. No Expert Reliably Analyzed the Background Risk of Developing Any of the Designated Cancers

The final category of primary evidence is background risk—*i.e.*, "the risk a plaintiff and other members of the general public have of suffering the disease or injury that [the] plaintiff alleges *without* exposure to the drug or chemical in question." *McClain*, 401 F.3d at 1243. Background risk includes "all those causes of a disease, whether known or unknown, excluding the drug or chemical in question." *Id.* Any "reliable methodology should take into account the background risk," and the absence of it is a "substantial weakness" in a general-causation opinion. *Chapman*, 766 F.3d at 1307-08 (citations omitted). To be clear, background risk and epidemiology are not mutually exclusive forms of

evidence, as epidemiology studies aim to discern whether exposure increases the risk of disease or injury relative to the background risk.

As the earlier discussion of confounding variables and bias makes clear, *supra* pp.74-84, Plaintiffs' experts did not reliably analyze background risk. In their Rule 702 oppositions, Plaintiffs did not even argue that they did. *See* MDL.Dkts.5947-4,5947-5,6170; MDL.Dkt.6242:207. Plaintiffs suggested that Drs. McTiernan and Moorman considered background risk only in response to the court's questioning at the Rule 702 hearing. MDL.Dkt.6242:207; *see also* Krause.Br.41-42 (arguing that the experts relied on "ranitidine-user-versus-non-user comparisons … which capture" background risk). Neither expert, however, specifically analyzed background risk. To the contrary, the experts *ignored* background risk by favoring non-user comparisons over active-comparator analyses, even while the study authors concluded that the non-user comparisons did not adequately control for the incidence of cancer experienced by users of H2-blockers. *See supra* pp.74-84. This failure is "a serious methodological deficiency" that undermines the reliability of the experts' opinions. *Chapman*, 766 F.3d at 1307 (citation omitted).

Plaintiffs argue (at 42-43) that Brand Defendants waived arguments based on the experts' failure to assess background risk, but Plaintiffs mistake the burden of proof. Plaintiffs had to demonstrate under Rule 702 that their experts' opinions were reliable and admissible, including that they appropriately accounted for background risk. *See Frazier*, 387 F.3d at 1260. And, as just discussed, Brand Defendants' arguments about the unreliability of Plaintiffs' experts' epidemiology opinions squarely focused on their failure to account for the background risk of cancer among ranitidine users.

*   *   *

The district court faithfully applied this Court's primary methodology requirement. Plaintiffs claim (at 39-40) that their experts "checked all three of the primary-methodology boxes" and that the court was thus barred from "examin[ing] the studies underlying each of the primary methodologies" and could not "deem[] that evidence unreliable."

But the Rule 702 inquiry is *not* a box-checking exercise. A court must assess whether "the expert's opinion reflects *a reliable application* of the principles and methods" the expert employs, which necessarily includes an assessment of the underlying studies on which an expert

relies.  Fed. R. Evid. 702(d) (emphasis added); *see Joiner*, 522 U.S. at 146-47; *Amorgianos*, 303 F.3d at 269.  Multiple courts overseeing products-liability MDLs have conducted the same rigorous analysis, examining in detail the studies on which experts relied in rendering causation opinions.  *Supra* pp.54-57.  That is what the court properly did here.

**D.    No Expert Satisfied Rule 702's Reliability Requirement**

As Plaintiffs concede, the court's conclusions discussed above applied to all five of Plaintiffs' experts purporting to offer epidemiological opinions:  Drs. McTiernan, Moorman, Michaels, Le, and Salmon.  *See* Krause.Br.74n.32; MDL.Dkt.6120:297.  Plaintiffs also challenge (at 68-74) other bases for the court's ruling specific to Drs. McTiernan and Moorman.  Brand Defendants briefly address those grounds here.[33]

**Dr. McTiernan.**  The court additionally excluded Dr. McTiernan's opinions for failing to explain her methodology and thus preventing the court from analyzing "whether it can be … tested." *Daubert*, 509 U.S. at 593; MDL.Dkt.6120:251.

---

[33] Brand Defendants have already addressed above Plaintiffs' arguments (at 74-78) regarding Dr. Salmon's dose-response opinions.  *See supra* pp.101-09.

To ensure reliability, courts must analyze "[t]he specific way an expert conducts" Bradford Hill and weight-of-the-evidence analyses. *Zoloft*, 858 F.3d at 796; *supra* pp.72-74. Plaintiffs contend that Judge Rosenberg "did not … *understand*" Dr. McTiernan's opinions, Krause.Br.70, but as the district court found, Dr. McTiernan did not explain how she weighed studies as inputs in her Bradford Hill analysis, and "her discussion of the [Bradford Hill] factors is general, brief, and lacking in specificity." MDL.Dkt.6120:244,251-52; *see, e.g.*, MDL.Dkt.6171-9:237. In her deposition too, "Dr. McTiernan routinely evaded germane, fair questions that would have clarified how Dr. McTiernan conducts her analysis." MDL.Dkt.6120:244. That evasiveness forced the court to "guess the grounds" for Dr. McTiernan's opinions, and in doing so the court found multiple additional reasons for exclusion. MDL.Dkt.6120:253-54; *infra* pp.114-16.

**Dr. Moorman.** The court determined that Dr. Moorman used "a conclusion-oriented process to select the inputs … into her Bradford Hill analysis," which weighed "strongly" in favor of exclusion. MDL.Dkt.6120:279-81. For example, Dr. Moorman applied her stated criteria for weighing the studies inconsistently across the dietary studies

(that favored her view) and the ranitidine studies (that did not). MDL.Dkt.6120:280-81; MDL.Dkt.6120:266-74 (collecting examples of inconsistencies). Dr. Moorman disregarded study authors' conclusions that did not support her opinion. MDL.Dkt.6120:280; *see, e.g.*, MDL.Dkt.6179-6:200 (discussing Liu but omitting authors' statements about possible reverse causation). And Dr. Moorman selected data that supported her opinion but ignored data in the same studies that contradicted it. MDL.Dkt.6120:280; *see, e.g.*, MDL.Dkt.6179-6:89 (discussing Cardwell).

Plaintiffs again argue that the court was not permitted to evaluate "competing scientific theories." Krause.Br.71 (citation omitted). But the court did not do that; instead, the court correctly considered whether Dr. Moorman's "assessment" and "weighing" of the relevant evidence was "based on methods of science." *Zoloft*, 858 F.3d at 796 (citation omitted). The court had ample reason to conclude it was not.

**Both Drs. McTiernan and Moorman.** The court found several additional grounds for exclusion common to Drs. McTiernan and Moorman. The court determined that each expert's application of the Bradford Hill and weight-of-the-evidence methodologies was not

generally accepted. MDL.Dkt.6120:254,282. The court reasoned—and Plaintiffs have never contested—that no other scientist has "disregarded ranitidine active-comparator analyses" and "ranitidine epidemiology" to favor "dietary epidemiology" and "occupational studies." MDL.Dkt.6120:254 (McTiernan); *see also* MDL.Dkt.6120:282 (Moorman). Plaintiffs cannot overcome this glaring problem merely by incanting (at 71-72) "Bradford Hill" and "weight-of-the-evidence." *See Zoloft*, 858 F.3d at 795-96, 798; *supra* pp.72-74.

Moreover, the court concluded that the experts' reasons for disregarding the ranitidine epidemiology studies are themselves methodologically suspect. MDL.Dkt.6120:262-64,283. For example, the experts criticized the follow-up times—*i.e.*, the amount of time that a person exposed to ranitidine was followed to determine whether they developed cancer—in the ranitidine studies (ranging from 2.4-14 years) as too short to account for "the full latency period of cancer development." MDL.Dkt.5947-5:67; MDL.Dkt.6120:167,262. Yet the experts "based their opinions on dietary epidemiology with follow-up times comparable to, or even less than, ranitidine epidemiology." MDL.Dkt.6120:263; *compare, e.g.*, MDL.Dkt.6179-6:103 (Moorman assigning dietary study

with 8.7 years of follow-up time "moderate weight"), *with* MDL.Dkt.6187-20:3-4 (Nørgaard) (median follow-up time 11-14 years).

Plaintiffs respond (at 72-73) that the experts properly credited studies with short follow-up times that found an *increased* risk while rejecting studies with short follow-up times finding *no* increased risk because the former is evidence that a substance causes cancer. But this ignores a crucial problem: "why the follow-up times in [the dietary studies] were sufficient to detect an association with cancer, but the follow-up times in ranitidine studies were not." MDL.Dkt.6120:263. Moreover, Plaintiffs do not address the glaring inconsistency between this argument and their contention (at 47-48) that ranitidine use can cause cancer "between 0 and 3 years" or "between 0 and 1 year." *See also* MDL.Dkt.6120:263-64; *supra* pp.105-06.

## E. The Court Correctly Granted Summary Judgment Due to Plaintiffs' Failure To Present General-Causation Evidence

Since Plaintiffs failed to proffer reliable expert testimony establishing general causation, the court properly granted summary judgment. All of Plaintiffs' claims turn on the assertion that ranitidine

use can cause cancer. *Mirena*, 982 F.3d at 124 (every State requires general-causation evidence in products-liability cases). And in every jurisdiction, expert testimony is required to show general causation in complex cases like this. *Ongylza*, 93 F.4th at 348-49.

Thus, to avoid summary judgment on all claims, including those (such as the innovator-liability claims) the court dismissed for other reasons, Plaintiffs "were *required* to have [admissible] *Daubert*-qualified, general … -causation-expert testimony." *Chapman*, 766 F.3d at 1316; *see also, e.g.*, *In re Deepwater Horizon BELO Cases*, 2022 WL 104243, at *3 (11th Cir. Jan. 11 2022) (per curiam); *Zoloft*, 858 F.3d at 800; *Incretin-Based Therapies*, 2022 WL 898595 at *2. Because Plaintiffs lack such evidence, this Court should affirm final judgment for Defendants in all of the designated-cancer cases without reaching any of Plaintiffs' alternative, subsidiary arguments.

## III. THE DISTRICT COURT CORRECTLY APPLIED ITS RULE 702 ORDER TO ALL CASES

Plaintiffs' due-process argument depends on a false premise: that the district court denied Plaintiffs "who filed claims *after* the district court's *Daubert* order" an "opportunity to contest general causation with their own experts and record." Krause.Br.78. That is incorrect. As

discussed below, the district court gave Plaintiffs the precise process they asked for: a show-cause order through which any Plaintiff could seek to introduce his or her own expert evidence on general causation. MDL.Dkt.6444. No Plaintiff submitted new evidence or expressed a desire to do so. Far from denying Plaintiffs an "opportunity to present another expert," Krause.Br.79, the court's show-cause process provided that opportunity and, in so doing, confirmed that no Plaintiff intended to present another expert. The court thus properly entered summary judgment in each Plaintiff's individual case.

As an initial matter, Plaintiffs cannot challenge the district court's show-cause process because they *requested* that process. *See United States v. Love*, 449 F.3d 1154, 1157 (11th Cir. 2006) (per curiam). The district court, after issuing its Rule 702 and summary-judgment orders, instructed the parties to brief "the operative effect" of those orders on newly filed cases alleging designated cancers. MDL.Dkt.6230:1. Plaintiffs' leadership counsel responded that the court could enter summary judgment in cases filed on or after August 1, 2022 (the date Plaintiffs' leadership counsel filed responses to the Rule 702 motions) after giving those plaintiffs "a chance to be heard" through a "show-cause

process." MDL.Dkt.6234:3-6. Brand Defendants agreed, disputing only the proper cut-off date for the show-cause process, which they argued should apply to cases filed on or after December 6, 2022 (the date of the Rule 702 Order). MDL.Dkt.6235:7. There was no dispute that the court should "seek briefing on why it should not dismiss" newly filed cases, "giving each of those Plaintiffs an opportunity to respond." MDL.Dkt.6234:5.

The district court agreed, and gave Plaintiffs everything their leadership had asked for and more. The court created "an order to show cause process *as Plaintiffs' leadership requested*," but made that process available to *all* Plaintiffs, "regardless of the date the case was first filed." MDL.Dkt.6444:8,13 (emphasis added). It ordered Plaintiffs' leadership to respond to the show-cause order, "after conferral with individual Plaintiffs who wish to respond." MDL.Dkt.6444:16. It also authorized all individual Plaintiffs to "file a motion for leave to file a response" two and a half weeks after the due date for the leadership response if they wished "to file a response … that differ[ed] from the response filed by Plaintiffs' Leadership." MDL.Dkt.6444:16. And the court specifically anticipated that Plaintiffs might seek "to relitigate general

causation … through a request for additional discovery or through a proffer of additional evidence." MDL.Dkt.6444:15. Because Plaintiffs "invited" the district court to adopt that show-cause process, they may not challenge it on appeal. *Love*, 449 F.3d at 1157.

That aside, it is disingenuous—and wrong—for Plaintiffs to claim that the district court "barr[ed] any plaintiff from proffering his own expert." Krause.Br.81. To the contrary, the court's show-cause order expressly allowed Plaintiffs to request the opportunity to "proffer[] the expert witness of [their] choice" or to "present their evidence and arguments on the claim." Krause.Br.80 (quoting *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971)); *see* MDL.Dkt.6444:15. But no Plaintiff did so. Plaintiffs' leadership did not identify a single Plaintiff who sought to individually litigate general causation, request additional discovery, or submit additional expert evidence. *See generally* MDL.Dkt.6540. And no individual Plaintiff moved to file a response to the show-cause order.

Plaintiffs' silence in response to the show-cause order more than justified the district court's decision to enter summary judgment in all pending cases. It is well-settled that "a court may rely on its prior

decisions as persuasive, and demand good reasons to change its mind." *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 65-66 (3d Cir. 2023). Contrary to Plaintiffs' arguments about what "MDL judges usually do," Krause.Br.83 (emphasis omitted), MDL courts "regularly employ[]" the same process the district court used here—in which the court will "enter an order with respect to one party and then provide that it will be automatically extended to other parties if they do not come forward and show cause why it should not be applicable." *Home Depot*, 59 F.4th at 66 (citing cases).

For example, in *Lipitor*, the MDL court granted the defendants' Rule 702 motions, then "issued a series of four show cause orders asking whether any plaintiff in the MDL could submit evidence (expert or otherwise) that would enable her claim to survive summary judgment given the court's prior rulings." 892 F.3d at 630. When "no plaintiff produced adequate evidence of specific causation in response to the court's show cause orders," the court "enter[ed] summary judgment across all cases in the MDL." *Id.* at 647. The Fourth Circuit affirmed. *Id.* at 647-49. The district court followed that approach here, as have many other MDL courts. *E.g.*, *In re Acetaminophen – ASD-ADHD Prods.*

*Liab. Litig.*, 2024 WL 180834 (S.D.N.Y. Jan. 17, 2024); *In re Eliquis Prods. Liab. Litig.*, No. 17-md-2754 (S.D.N.Y.), ECF Nos. 45 (May 9, 2017), 120 (Oct. 13, 2017), 124 (Oct. 26, 2017), 169 (Feb. 2, 2018) (submitted at MDL.Dkts.6235-1,6235-2,6235-3,6235-4); *In re Mirena IUD Prods. Liab. Litig.*, No. 13-md-2434 (S.D.N.Y. Nov. 14, 2016), ECF No. 3279 (cited at MDL.Dkt.6230-1).

That common practice does not offend due process. *Lipitor*, 892 F.3d at 647-49. Courts have long recognized that show-cause orders satisfy due-process requirements. *E.g.*, *Ungar v. Sarafite*, 376 U.S. 575, 590 (1964); *Louisville & Nashville R.R. v. Schmidt*, 177 U.S. 230, 237-39 (1900); *In re McLean*, 794 F.3d 1313, 1324 (11th Cir. 2015). That is particularly true here, where the district court expressly allowed Plaintiffs the opportunity to argue that they should be able "to relitigate general causation … through a request for additional discovery or through a proffer of additional evidence," MDL.Dkt.6444:15, and no Plaintiff did so. As the Supreme Court has held, a plaintiff who participates in a show-cause process cannot later contend "that due process of law was not administered to it because it was unheard in

respect to matters concerning which it made no claim." *Schmidt*, 177 U.S. at 238-39.

For all these reasons, Plaintiffs' arguments (at 80-83) regarding preclusion, law of the case, merger, and the like are distractions. The district court did not rely on issue-preclusion or law-of-the-case principles to grant summary judgment, nor did the court purport to "merge" the cases. Krause.Br.83 (quoting *Home Depot*, 59 F.4th at 62). Instead, the court gave Plaintiffs a full opportunity to show cause, and entered summary judgment only after no Plaintiff submitted or asked to submit additional evidence. That decision was proper, and this Court should affirm.

## IV. PLAINTIFFS' CLAIMS ARE PREEMPTED BY FEDERAL LAW

### A. Plaintiffs Abandoned Preemption Arguments as to Brand Defendants

If this Court affirms the Rule 702 Order, it need not address Plaintiffs' attempt to challenge the district court's rulings dismissing their design-defect and failure-to-warn-through-FDA claims against Brand Defendants based on preemption. In any event, Plaintiffs have not properly raised any challenge to those rulings.

An appellant abandons an issue when the opening brief "raises it in a perfunctory manner without supporting arguments and authority." *Sapuppo*, 739 F.3d at 681; *see also Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989); *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1352 n.4 (11th Cir. 2018); Fed. R. App. P. 28(a)(8)(A).

Plaintiffs fail to offer *any* argument addressing the substance of the court's preemption orders. *See* Krause.Br.27. Instead, Plaintiffs assert— without citation or elaboration—that the "parallel misbranding argument" in Plaintiffs' "Generic-Only Appellants' opening brief" applies with "full force" to "other Defendants." Krause.Br.27. But that brief addresses the orders that dismissed as preempted claims against Generic Defendants. *See* Dkt.104:6,CA11#23-13283 (explaining the Generic-Only Plaintiffs' "appeals target just one category of Defendant"). Accordingly, the brief makes only perfunctory reference to the orders that ruled on the claims against Brand Defendants, which followed distinct analyses. Chandler.Br.34n.11,53 (citing MDL.Dkts.2532,3715).

Adopting by reference arguments made in an appeal to which Brand Defendants are not parties does not preserve a challenge to the dismissal of claims against Brand Defendants. *Cf. Four Seasons Hotels*

*& Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1167 n.4 (11th Cir. 2004) (rejecting "incorporati[on] by reference" of arguments "without explaining which ones may have merit and where the district judge may have erred" as violating the Federal Rules of Appellate Procedure, including Rule 28).

Moreover, Plaintiffs' conclusory argument is insufficient because Brand and Generic Defendants were not similarly situated with regard to FDA regulations and because, unlike the Brands, all claims against Generic Defendants were dismissed on preemption grounds. By failing to meaningfully address the orders dismissing claims against Brand Defendants as preempted, Plaintiffs abandoned any challenge to the dismissal of these claims. This Court can and should reject Plaintiffs' preemption arguments on this ground alone.

## B. Plaintiffs' Design-Defect and Failure-To-Warn-Through-FDA Claims Are Preempted by Federal Law

If the Court reaches the merits of preemption, it should affirm the dismissal of Plaintiffs' design-defect and failure-to-warn-through-FDA claims. Under the Supremacy Clause, Plaintiffs may not bring state-law claims that conflict with federal law. *See Mink*, 860 F.3d at 1327-28. The FDCA, moreover, assigns exclusive enforcement authority of the statute's

requirements to the federal government and impliedly preempts private enforcement like Plaintiffs' failure-to-warn-through-FDA claims. *See* 21 U.S.C. § 337(a); *Buckman*, 531 U.S. at 348-53.

> ### 1. The District Court Correctly Held That the MPIC's Post-Approval Design-Defect Claims Conflicted with Federal Law

a. Federal law preempts state-law obligations when "it is impossible for a private party to comply with both state and federal requirements." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) (citation omitted). In the pharmaceutical context, the Supreme Court has applied "impossibility preemption" where a defendant cannot unilaterally comply with a state-law duty without FDA's prior approval: "[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Id.* at 623-24. *Bartlett* and *Mensing* "have left consumers of both generic and brand-name prescription drugs with few avenues for relief." *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 925 (6th Cir. 2014).

Plaintiffs concede that Brand Defendants could not unilaterally "redesign" Zantac without FDA's prior approval. MDL.Dkt.2532:19; Chandler.Br.53. That is because "[o]nce a drug—*whether generic or brand-name*—is approved, the manufacturer is prohibited from making *any major changes* to the 'qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.'" *Bartlett*, 570 U.S. at 477 (emphases added) (quoting 21 C.F.R. § 314.70(b)(2)(i)).[34] Changes to the design and formulation of an approved drug are "major changes" that cannot be made unilaterally by an NDA-holder. 21 C.F.R. § 314.70(b)(2)(i); *see also id.* § 314.70(h) (prohibiting manufacturers from

---

[34] Although *Bartlett* involved a generic manufacturer, its holding and rationale apply equally to brand manufacturers. 570 U.S. at 490. Courts thus routinely dismiss as preempted design-defect claims against brand manufacturers. *See, e.g., Gustavsen v. Alcon Labs., Inc.*, 903 F.3d 1, 9-10, 14 (1st Cir. 2018); *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 298 (6th Cir. 2015); *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 185-86 (S.D.N.Y. 2016); *Brazil v. Janssen Rsch. & Dev. LLC*, 196 F. Supp. 3d 1351, 1364 (N.D. Ga. 2016); *Barcal v. EMD Serono, Inc.*, 2016 WL 1086028, at *4 (N.D. Ala. Mar. 21, 2016). *Yates* also found preempted a "pre-approval" design-defect claim that alleged the manufacturer should have proposed a different formulation to FDA before seeking approval. 808 F.3d at 299-300. No pre-approval claim is presented here.

altering an FDA-approved active ingredient without participating in new-drug-approval process).

The MPIC alleged that Defendants "could have designed ranitidine-containing products to make them less dangerous" and "could have employed safer alternative designs and formulations." MDL.Dkt.887:111-12,121. The district court correctly concluded these allegations are impliedly preempted "because the drug's manufacturer cannot independently and lawfully change a drug formulation that the FDA has approved." MDL.Dkt.2532:24. Plaintiffs' design-defect claims against Brand Defendants were thus subject to dismissal based on impossibility preemption. MDL.Dkt.2532:10,24-25.

b. Plaintiffs cannot save their design-defect claims from preemption by alleging that Zantac was "misbranded" under federal law and, therefore, that Brand Defendants should have stopped selling Zantac to avoid liability under both federal and state law. Krause.Br.27; Chandler.Br.34-36. Although they have not fully explained it, in their *Chandler* brief, Plaintiffs appear to assert that Zantac was "misbranded" under 21 U.S.C. § 352(j) because it causes cancer and therefore is "dangerous to health when used" as indicated on its label.

Chandler.Br.13,35. Plaintiffs assert that ranitidine was therefore "illegal to sell" under both federal and state laws. Chandler.Br.35-36.

Plaintiffs' "misbranding" argument is nothing more than a restatement of the "stop selling" argument that the Supreme Court rejected in *Mensing* and *Bartlett*. In *Mensing*, the plaintiffs raised the same argument that impossibility preemption could be avoided because the federal "misbrand[ing]" rules required manufacturers to propose "stronger warning labels to the agency if they believed such warnings were needed." 564 U.S. at 616 (citation omitted). But the Supreme Court found it unnecessary to resolve whether the manufacturers were obligated to seek a change in their labeling under the federal "misbranding" law because it found "pre-emption *even assuming such a duty existed.*" 564 U.S. at 617 (emphasis added). If Plaintiffs' "misbranding" argument were correct, *Mensing* would have come out the other way. *See* MDL.Dkt.2512:23-24. Indeed, the Supreme Court in *Bartlett* outright rejected the "stop-selling" rationale as "incompatible" with the Court's "pre-emption jurisprudence." 570 U.S. at 488.

To avoid this clear-cut repudiation of their arguments, Plaintiffs mistakenly rely on footnotes 3 and 4 of *Bartlett*. In footnote 3, the Court

emphasized that "leaving aside the *rare* case in which state or federal law actually requires a product to be pulled from the market—our pre-emption cases presume that a manufacturer's ability to stop selling does not turn impossibility into possibility." 570 U.S. at 487 n.3 (emphasis added). Although Plaintiffs argue that this is the "rare case" where federal law required the manufacturer to stop selling the product, FDA did not impose such a requirement: it instead requested *voluntary* withdrawal of Zantac. MDL.Dkt.6120:10. FDA neither found Zantac "misbranded" nor suspended the NDA under 21 U.S.C. § 355(e). Thus, Plaintiffs' misbranding theory would require a jury to second-guess FDA's exercise of discretion under the FDCA.

In footnote 4 of *Bartlett*, the Supreme Court in passing acknowledged FDA's hypothesis, as amicus curiae, that a "pure" design-defect claim might not be preempted if the claim required proof "that the manufacturer knew or should have known of new and scientifically significant evidence that rendered the drug misbranded under federal law."[35] U.S. Amicus Brief, *Mutual Pharm. Co. v. Bartlett*, 2013 WL

---

[35] The district court called footnote 4 "dicta," MDL.Dkt.3715:26, but it is less than that: dicta express a (non-binding) opinion on an issue, whereas footnote 4 expresses no opinion at all.

314460, at *22 (U.S. Jan. 22, 2013); *see Bartlett*, 570 U.S. at 487 n.4. But neither FDA's amicus brief nor the Court ever asserted that any State would recognize such a claim; on the contrary, FDA's brief acknowledged that "[i]t does not appear" that such a claim "has been accepted in the States to any significant degree." 2013 WL 314460, at *20. The Court in *Bartlett* went on to explain that "the state-law duty in [*Mensing*] to amend [the product's] label could just as easily have been phrased as a duty not to sell the drug without adequate warnings." 570 U.S. at 489 n.5.

Such a claim remains purely theoretical and does not pertain to any of the design-defect claims Plaintiffs actually pleaded. *See Darvocet*, 756 F.3d at 930 (*Bartlett* footnote 4 does not apply where "Plaintiffs fail to identify specific wrongful marketing claims from the states at issue that parallel, *i.e.,* have elements identical to, a federal misbranding claim under 21 U.S.C. § 352(j)"). In any event, that footnote "certainly did not overrule or modify *Mensing*," nor does it cut a gaping hole in the law of impossibility preemption of design-defect claims. MDL.Dkt.3715:26.

### 2. The District Court Correctly Held That Plaintiffs' Failure-To-Warn-Through-FDA Claims Were Preempted

In the AMPIC, Plaintiffs asserted claims for "Failure to Warn Consumers Through the FDA," *i.e.*, that Brand Defendants failed to notify FDA of ranitidine's alleged risks and thus failed to warn consumers through FDA. MDL.Dkt.2759:284-316. Applying binding precedent, the district court properly dismissed those claims as preempted. MDL.Dkt.3715:37-49. Plaintiffs' attempt to distinguish this precedent fails.

The FDCA requires that all enforcement proceedings "shall be by and in the name of the United States." 21 U.S.C. § 337(a). In *Buckman*, the Supreme Court held that, by enacting § 337(a), Congress impliedly preempted private lawsuits seeking to enforce the FDCA and its implementing regulations. 531 U.S. at 352-53. FDA requirements must be "enforced exclusively by the Federal Government." *Id.* at 352.

This Court addressed this issue in *Mink*, holding that federal law preempts private "failure to warn" claims based on a defendant's alleged failure to provide sufficient information to FDA. 860 F.3d at 1327-30. The plaintiff in *Mink* claimed that the manufacturers of his hip

replacement system failed to "adequately investigate adverse events and complaints and failed to properly report these issues to the FDA." *Id.* at 1323-24, 1330. This Court rejected that claim as an impermissible effort to privately enforce the FDCA in violation of § 337(a). *Id.* at 1330. Here, the district court correctly recognized that, under a straightforward reading of *Buckman* and *Mink*, Plaintiffs' claims are preempted. *See* MDL.Dkt.3715:43-47.

Plaintiffs argue that their failure-to-warn-through-FDA claims should not have been dismissed because they reflect parallel state-law duties requiring Defendants to report to FDA. Chandler.Br.57. That is incorrect. First, as in *Mink*, Plaintiffs' claims are based on alleged failure to submit annual reports and adverse event reports to FDA as required by *federal* regulations. *See* MDL.Dkt.2759:107-09,288-91 (citing 21 C.F.R. §§ 314.80, 314.81(b)(2)). Second, Plaintiffs' assertion that state law required Defendants to report to FDA does not distinguish their claims from the preempted claims in *Mink*. There, this Court found that "Florida law recognizes the common law duty of failure to warn as a basis for a negligence claim," but nonetheless held that plaintiff's failure-to-warn-through-FDA claim was preempted because his "theory of liability

[was] based on a duty to file a report with the FDA." *Mink*, 860 F.3d at 1329-30. Because *Mink* squarely forecloses Plaintiffs' argument, this Court should reject their reliance on contrary Ninth Circuit precedent recognizing a narrow pathway to assert state-law claims that impose a duty to warn through FDA. Chandler.Br.56 (citing *Stengel v. Medtronic Inc.*, 704 F.3d 1224 (9th Cir. 2013) (en banc)).

In addition, Plaintiffs' failure-to-warn-through-FDA theory relies on an attenuated causation theory premised on speculation about how FDA would have responded to hypothetical reports. Instead of claiming that Brand Defendants should have warned consumers or prescribing physicians directly, Plaintiffs suggest that submitting information to FDA would have enabled researchers to conduct unspecified studies, which Plaintiffs claim would have led FDA to seek Zantac's voluntary recall earlier. MDL.Dkt.2759:289-90. This theory of liability flouts fundamental causation principles and depends on uncertain and discretionary FDA actions that have no place in the implied-preemption analysis. *See Mensing*, 564 U.S. at 623 ("To consider in our pre-emption analysis the contingencies inherent in these cases—in which the Manufacturers' ability to comply with state law depended on uncertain

federal agency and third-party decisions—would be inconsistent with … the Supremacy Clause.").[36]

## V. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' "INNOVATOR LIABILITY" CLAIMS

### A. Innovator-Liability Claims in All Jurisdictions Other Than California and Massachusetts Fail on the Merits

If the Court affirms the district court's Rule 702 Order, it need not address the court's holding that innovator-liability claims are not viable in thirty-five of the thirty-seven jurisdictions where Plaintiffs brought them, because those claims would fail in any event for lack of evidence of general causation. But if the Court reaches the question, it should affirm the district court's dismissal of those claims.

#### 1. The Court Should Not Certify the Innovator-Liability Question

Plaintiffs' request to certify the innovator-liability issue to the high courts of thirty-two jurisdictions fails for two independent reasons. First,

---

[36] Plaintiffs' tenuous causation theory distinguishes this case from the failure-to-warn-through-FDA claim in *Stengel*, which implicated unique features of FDA's oversight of medical devices that made the alleged causal chain less attenuated. In the medical-device context, FDA publishes adverse-event reports in a public database. The *Stengel* plaintiff alleged that the physician who implanted the device would not have done so if the adverse-event reports had been available in that database. That causal theory is inapplicable here. *See* 704 F.3d at 1234 (Watford, J., concurring).

Plaintiffs cannot request certification on appeal after urging the district court to decide the state-law issues itself.  Second, certification to so many courts would be inappropriate.

Plaintiffs had multiple opportunities to ask the district court to certify the innovator-liability question to any State court, but they opted to have the court decide the issue under each jurisdiction's law.[37] Plaintiffs could have requested certification nearly four years ago when opposing Brand Defendants' motion to dismiss, but they argued instead that the court was "obliged to conduct an *Erie* prediction for each undecided state by carefully examining that state's general foreseeability law and applying it to the context here."  MDL.Dkt.1973:15; *see also* MDL.Dkt.1973:11.[38]  The court subsequently ordered the parties to

---

[37] All but five of the 32 jurisdictions permit their highest court to accept a certified question from a federal district court, as well as a federal court of appeals.  *See* Krause.Br.94-96 (citing applicable rules).  In those five jurisdictions where Plaintiffs could not have obtained certification below (District of Columbia, Mississippi, New York, Pennsylvania, and Wisconsin), certification is unwarranted because of the substantial delay it would cause. *See infra* pp.139-40.

[38] Plaintiffs' opposition stated that "[w]hen available, certification of questions to the appropriate state supreme court to obtain definitive rulings is encouraged," MDL.Dkt.1973:14&n.4, but Plaintiffs did not request certification, and the brief did not mention certification outside of this footnote.

submit supplemental briefs addressing each State's law, MDL.Dkt.2228, and Plaintiffs obliged with a "survey of the legal principles applicable in each of the remaining 35 jurisdictions to inform the *Erie* analysis," MDL.Dkt.2307:25 (citation omitted). Plaintiffs' supplemental brief did not even hint at the possibility of certification.

Plaintiffs should not be permitted to try their luck in state court after urging the district court to decide state-law issues and failing to obtain a favorable ruling. Several courts of appeals have held that "[a] party should not be allowed 'a second chance at victory' through certification by the appeals court after an adverse district court ruling." *Thompson v. Paul*, 547 F.3d 1055, 1065 (9th Cir. 2008) (quoting *In re Complaint of McLinn*, 744 F.2d 677, 681 (9th Cir. 1984)). Otherwise, "the initial federal court decision will be nothing but a gamble." *Perkins v. Clark Equip. Co.*, 823 F.2d 207, 210 (8th Cir. 1987); *see also State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 194 (6th Cir. 2015). The Court should not reward Plaintiffs' gamble by granting them a fresh chance at arguing their position in state supreme courts.

None of this Court's past certification decisions gave a party a second chance in a state supreme court after the party consciously chose

to have the district court decide a state-law issue. To be sure, in *Whiteside v. GEICO Indemnity Co.*, 977 F.3d 1014 (11th Cir. 2020), and *Cordero v. Transamerica Annuity Service Corp.*, 34 F.4th 994 (11th Cir. 2022) (per curiam), this Court certified questions where plaintiffs had delayed in requesting certification—until after a jury verdict in *Whiteside*, and until the appellate reply brief in *Cordero*—and noted that certification "turns much more on federalism concerns than on timeliness concerns." *Whiteside*, 977 F.3d at 1018. But the issue here is not a mere lack of "timeliness." *Id.* Instead, Plaintiffs chose at the outset of this MDL, as a matter of litigation strategy, to have the district court resolve whether an innovator-liability theory could state a claim under state law. Plaintiffs were clearly aware of the possibility of certification, *see supra* n.38, but nonetheless argued that the court was "obliged to conduct an *Erie* prediction for each undecided state." MDL.Dkt.1973:15.

By contrast, the parties who obtained certification in *Whiteside* and *Cordero* did not set out to have the district court decide issues they knew lacked direct answers under state law. The *Cordero* plaintiff did not even cite the case that this Court found created uncertainty (in the plaintiff's favor) in his district court briefing. *Compare Cordero*, 34 F.4th at 1000

138

(citing *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496 (N.Y. 2002)), *with* Resp. in Opp'n to Defs.' Mot. To Dismiss, 2020 WL 4746251 (S.D. Fla. June 29, 2020). These were cases where the lack of clarity in state law emerged as the issue was litigated, and this Court certified the issues to resolve the uncertainty. But here, Plaintiffs' claimed uncertainty surrounding the innovator-liability theory has been apparent from the beginning.

Even if Plaintiffs had not forfeited their opportunity to seek certification, a shotgun certification to *thirty-two* state supreme courts would be unwarranted. In deciding whether to certify a question, this Court considers the "practical limitations of the certification process," *Hammonds v. Comm'r, Dep't of Corrs.*, 822 F.3d 1201, 1208 (11th Cir. 2016) (per curiam) (citation omitted), including the probability of "significant delay," *Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 275 (5th Cir. 1976). It would take *years* for the parties to brief and argue the innovator-liability issue before thirty-two different courts, and for each of those courts to reach a final decision. The district court overseeing another MDL that included innovator-liability claims under the laws of twenty-two States denied similar certification motions for

that reason.  *See, e.g.*, *In re: Darvocet, Darvon & Propoxyphene Prods.*
*Liab. Litig.*, No. 2:11-md-2226 (E.D. Ky. Apr. 24, 2012), ECF No. 1723.
The delay would be all the more intolerable here, where the litigation has
already been pending for approximately five years.

> **2.    The District Court Correctly Concluded That No
>         Jurisdictions  Other  Than  California  and
>         Massachusetts Recognized or Would Recognize
>         Innovator Liability**

The district court correctly concluded that the innovator-liability
theory is not viable in any States other than California and
Massachusetts.  Plaintiffs contend that the court's conclusion was tainted
by the principle that Plaintiffs dub "*Erie* conservatism," and for the three
States whose high courts cannot accept certified questions from this
Court (Illinois, Missouri, and North Carolina), ask the Court to vacate
and remand for a new analysis.   Krause.Br.96,100.    According to
Plaintiffs (at 100), *Erie* conservatism teaches that "federal courts should
predict a state supreme court would *reject* liability whenever no clear
precedent affirmatively supports liability."   Plaintiffs (at 100) contend
that this "illicit federal common law rule of decision" was the critical
factor in the district court's holding that every jurisdiction other than
California and Massachusetts does not recognize innovator liability.

But the court did not apply any such presumption. Indeed, Plaintiffs cannot cite any statement of that principle in the decision below. At most, they offer the court's remark that its ruling "comports with the principles of comity and federalism," Krause.Br.99 (quoting MDL.Dkt.2516:14-15), which Plaintiffs interpret to mean that "*refusing to expand liability* comports with comity and federalism," Krause.Br.99. But the court simply followed this Court's guidance in *Guarino*, noting that comity and federalism "counsel federal courts to 'proceed gingerly when venturing into uncharted waters of state substantive law.'" MDL.Dkt.2516:14 (quoting *Guarino*, 719 F.3d at 1251-53). That is hardly evidence of an improper presumption against liability.

The district court was right to "proceed gingerly," and not to "manufacture" new innovator-liability claims "out of whole cloth." *Guarino*, 719 F.3d at 1251. This Court has often stated "that 'substantive innovation' in state law is something that ought to be left to state courts" and that a federal court making an *Erie* prediction must take state law as it stands. *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1335 (11th Cir. 2021) (quoting *Rhynes v. Branick Mfg. Corp.*, 629 F.2d 409, 410 (5th Cir. 1980)); *see also Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d

1146, 1154 (11th Cir. 2011) ("It is not the function of federal courts to expand state tort doctrine in novel directions absent state authority suggesting the propriety of doing so."); *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1289 (11th Cir. 2015); *Rhynes*, 629 F.2d at 410.

As it stands, all States adhere to the "traditional common law tort principles under which a manufacturer is liable for injuries caused by its own product," not those of its competitors. *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1285 (10th Cir. 2013). Unless and until a state supreme court carves out an exception to those principles so that users of generic drugs may sue brand-name manufacturers, as the high courts of California and Massachusetts have done, a federal court must proceed with extreme caution before concluding that innovator-liability claims are cognizable in that jurisdiction.

That reasoning applies to Illinois, despite Plaintiffs' argument (at 102-05) to the contrary. The district court's decision to dismiss innovator-liability claims under Illinois law does not betray an improper presumption against liability. Instead, the court reviewed Illinois caselaw and, reaching the same conclusion as the Sixth Circuit, held that Illinois would adhere to the traditional tort requirement that plaintiffs

must "identify the supplier of the product and establish a causal connection between the injury and the product." *York v. Lunkes*, 545 N.E.2d 478, 480 (Ill. App. Ct. 1989); *see Darvocet*, 756 F.3d at 944. That prediction was borne out when the state court overseeing coordinated Zantac proceedings in Illinois granted summary judgment to the defendants on innovator-liability claims, holding that no defendant owes a duty to a plaintiff who did not use its products. *See* Order, *Gross v. GlaxoSmithKline LLC*, No. 2023-L-469 (Cook Cnty. Cir. Ct. June 3, 2024); Order, *Williams v. GlaxoSmithKline LLC*, No. 2023-L-4599 (Cook Cnty. Cir. Ct. May 17, 2024).

This Court's refusal to recognize innovator liability under Florida law in *Guarino* requires the same result under Illinois law. The district court below rightly found support for its *Erie* prediction in the Illinois Supreme Court's rejection of "market share liability," through which plaintiffs who were injured by a drug, but cannot identify the particular manufacturer of the drug they ingested, attempt to hold each manufacturer liable in proportion to its market share. *Smith v. Eli Lilly & Co.*, 560 N.E.2d 324 (Ill. 1990); MDL.Dkt.2516:35-38. In *Guarino*, the Florida Supreme Court had actually *adopted* market-share liability, but

allowed a defendant to "exculpate itself from liability by proving by a preponderance of the evidence that it did not produce or market the type of [drug] taken by the [plaintiff]." *Conley v. Boyle Drug Co.*, 570 So.2d 275, 286 (Fla. 1990). *Guarino* found that decision "cut … against" innovator liability because it "affirmatively provides for no liability when we know with certitude that a given manufacturer did not produce the allegedly dangerous product." 719 F.3d at 1251. If that escape hatch from market-share liability is evidence that the Florida Supreme Court would reject innovator liability, then *Smith*'s wholesale rejection of market-share liability is even stronger evidence the Illinois Supreme Court would also reject innovator liability.

The district court also correctly gave significant weight to "the overwhelming national consensus" that "a brand-name manufacturer cannot be liable for injuries caused by the ingestion of the generic form of a product." MDL.Dkt.2516:12 (quoting *Guarino*, 719 F.3d at 1253). As the court noted, this Court will "generally presume that [state] courts would adopt the majority view on a legal issue in the absence of indications to the contrary." MDL.Dkt.2516:15 (quoting *Bobo v. Tenn. Valley Auth.*, 855 F.3d 1294, 1304 (11th Cir. 2017)). Plaintiffs (at 89-91)

counter that subsequent state-supreme-court decisions—two that rejected the innovator-liability theory, and two that endorsed it—have undermined the "overwhelming national consensus" on which *Guarino* and the district court relied. But that state-supreme-court-only approach to identifying the majority rule directly contradicts *Guarino*, which relied on a "mountain" of federal authority rejecting innovator liability. 719 F.3d at 1253. Of the eleven decisions rejecting innovator liability *Guarino* cited, all but two came from federal courts. *See id.* at 1251, 1252-53. The only state-supreme-court decision that *Guarino* cited *adopted* innovator liability, yet the Court nonetheless placed the decision in the minority. *See id.* at 1253 (citing *Wyeth, Inc. v. Weeks*, 2013 WL 135753 (Ala. Jan. 11, 2013), *aff'd on reh'g*, 159 So.3d 649 (Ala. 2014), *superseded by statute*, Ala. Code § 6-5-530(a)).

Plaintiffs also suggest (at 106) that the overwhelming consensus on which *Guarino* relied is outdated because "[n]early all" of the cited cases were decided "before federal courts realized that generic manufacturers could not change drug warnings" under federal law and thus that all failure-to-warn claims against generic manufacturers are preempted. *See Bartlett*, 570 U.S. 472; *Mensing*, 564 U.S. 604. But *Guarino* itself

affirmed the dismissal of failure-to-warn claims against a generic manufacturer for precisely that reason, yet went on to reject innovator liability against the brand-name manufacturer. *See* 719 F.3d at 1248-49 (applying *Mensing*).

Nothing has happened since *Guarino* to unsettle the broad national consensus rejecting innovator liability. Only state supreme courts in California and Massachusetts have adopted at least some form of innovator liability. But the high courts of West Virginia and Iowa (as well as the Alabama legislature) rejected the theory post-*Guarino*, as have four federal courts of appeals and—belying Plaintiffs' claim (at 92) that "state courts have not had the 'opportunity' to develop their law"— many lower state courts.[39] "[E]ven after *Mensing* and *Bartlett*, the overwhelming weight of federal precedent favors no liability against the

---

[39] For post-*Guarino* federal appellate and lower state court decisions rejecting innovator liability, *see, e.g.*, *Schrock*, 727 F.3d at 1281-84; *Lashley v. Pfizer, Inc.*, 750 F.3d 470, 470-78 (5th Cir. 2014) (per curiam); *Moretti v. Wyeth, Inc.*, 579 F. Appx. 563, 564-65 (9th Cir. 2014); *Darvocet*, 756 F.3d at 936-39, 940-54; Order at 2, *In Re: Zantac Litig.*, No. 1364 (Pa. Ct. Comm. Pleas May 9, 2023); *Stirling v. Novartis Pharm. Corp.*, 2019 WL 6456186, at *4-7 (Idaho Dist. Ct. Sept. 25, 2019); *Preston v. Janssen Pharms., Inc.*, 2018 WL 5017045, at *2-3 (N.Y. Sup. Ct. Oct. 12, 2018); *PLIVA, Inc. v. Dement*, 780 S.E.2d 735, 743 (Ga. Ct. App. 2015); *Anselmo v. Sanofi-Aventis, Inc. USA*, 2014 WL 8849464, at *1-3 (Kan. Dist. Ct. Oct. 13, 2014).

brand-name manufacturer…." *McNair v. Johnson & Johnson*, 694 F. Appx. 115, 120 (4th Cir. 2017); *see also Scorecard: Innovator Liability in Generic Drug Cases*, Drug & Device Law (Nov. 12, 2009), https://tinyurl.com/2p8x3xbc (collecting cases through 2022).

While state supreme courts are free to innovate in common-law cases, federal courts applying state law under *Erie* have a different mandate. Federal courts must apply state law as it exists, which means that—in all thirty-five jurisdictions at issue here—a company cannot be liable for injuries caused by its competitors' products. That the high courts of California and Massachusetts have departed from that view does not change the law in other States. The district court correctly declined Plaintiffs' invitation to assume the common-law powers of state supreme courts, and appropriately concluded that the innovator-liability theory is not viable in any States other than California and Massachusetts.

## B. The District Court Correctly Dismissed Innovator-Liability Claims Brought in California and Massachusetts for Lack of Personal Jurisdiction

The district court also correctly held that it lacked specific personal jurisdiction over Brand Defendants with respect to the innovator-liability

claims under the laws of California and Massachusetts, the only two States that recognize innovator liability, because the claims do not "relate to" Brand Defendants' contacts with those States.  MDL.Dkt.2516:17-21.

A court has specific jurisdiction over an out-of-state defendant only when the plaintiff's claims "'arise out of or relate to the defendant's contacts' with the forum." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (citation omitted).[40]  The assertion of specific jurisdiction is "founded" on "an idea of reciprocity between a defendant and a State."  *Id.* at 360.  "When (but only when) a company 'exercises the privilege of conducting activities within a state'—thus 'enjoy[ing] the benefits and protections of [its] laws'—the State may hold the company to account for related misconduct."  *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).

There is no basis for specific jurisdiction over Brand Defendants in California and Massachusetts because none of Brand Defendants' activities in those States relate to the generic products at issue in Plaintiffs' innovator-liability claims.  It was generic manufacturers, not

---

[40] Plaintiffs do not rely on the "arise out of" portion of the standard, which requires a causal relationship with the defendant's forum contacts that is indisputably not present here.  *See Ford*, 592 U.S. at 362.

Brand Defendants, that marketed and sold generic ranitidine in California and Massachusetts, thus "enjoying the benefits and protections" of the laws of those States. Brand Defendants did not "benefit[ ]" from those sales; on the contrary, generic ranitidine *competed* with Brand Defendants' products.

Brand Defendants' marketing activities in California and Massachusetts concerned *their own* Zantac products, not generic ranitidine. Brand Defendants' only actions that arguably "relate to" the generic products are the labeling decisions for Zantac, which, as Plaintiffs explain (at 87-88), affected the contents of the generic label by operation of federal law. Labeling decisions are, as the district court explained, the "core conduct that constitutes the rationale for holding brand-name manufacturers liable for claims brought by consumers of generic bioequivalent products." MDL.Dkt.3719:28. Because Brand Defendants' labeling decisions are the only activities that implicate them in claims concerning generic products, it follows that Brand Defendants cannot be subject to specific jurisdiction for innovator-liability claims in California or Massachusetts, where Plaintiffs do not allege any labeling decisions were made.

Plaintiffs (at 111) are wrong that this reasoning effectively reimposes the requirement of but-for causation that *Ford* rejected. The problem with Plaintiffs' specific-jurisdiction theory is not that Brand Defendants' marketing of Zantac in California and Massachusetts did not *cause* Plaintiffs' alleged injuries from generic ranitidine; the problem is that Brand Defendants' promotion of their own products *has nothing to do with* generic products sold by their competitors and thus Plaintiffs' claims do not "relate to" Brand Defendants' forum contacts under *Ford*. 592 U.S. at 359.[41]

The contrast with *Ford* could hardly be starker. *Ford* held that a company's promotion of *its own* products in a forum "relates to" any claim alleging injuries caused by those products, even if a particular plaintiff acquired his product in another jurisdiction. *Ford* allowed plaintiffs injured in Montana and Minnesota by their second-hand Ford vehicles to sue Ford in those States—even though Ford made the initial sales of those vehicles elsewhere—because "Ford did substantial business in

---

[41] For this reason, the MDL court's reasoning is consistent with this Court's observation that, under *Ford*, "the nonresident's contact with the forum need not give rise to the plaintiff's claim." *Del Valle v. Trivago GmbH*, 56 F.4th 1265, 1276 (11th Cir. 2022), *cert. denied*, 144 S. Ct. 90 (2023).

[those] State[s]" by serving a market for "*the very vehicles* that the plaintiffs allege malfunctioned and injured them in those States." *Id.* at 355, 365 (emphasis added).

The policy justifications that supported personal jurisdiction in *Ford* do not exist here. Asserting personal jurisdiction over Ford treated the company "fairly" because Ford "enjoy[ed] the benefits and protection" of the laws of Montana and Minnesota when it marketed its vehicles, and that "assistance to Ford's in-state business" created a "reciprocal obligation[]" that "the car models Ford so extensively markets in Montana and Minnesota be safe for their citizens to use there." *Id.* at 367-68 (citation omitted). Here, there is no "benefit[]" to brand-name manufacturers from the sale of generic drugs in the forum State, let alone one that can support a "reciprocal obligation[]" to defend claims concerning those generic products. *Id.* (citation omitted).

Plaintiffs assert (at 111) that when "Brand Defendants marketed, sold, and vouched for the label for branded Zantac in California; they knew full well that they were similarly vouching for the label for generic ranitidine sold in California." But Brand Defendants were selling and promoting their own products, not anyone else's. Brand Defendants

could reasonably foresee that generic ranitidine products would be sold in California and Massachusetts. But "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980). Plaintiffs must identify some "conduct and connection with the forum state" such that Brand Defendants could "reasonably anticipate being haled into court" in California and Massachusetts to defend claims concerning their competitors' generic products. *Id.* at 297. Plaintiffs cannot make that showing because the only actions by Brand Defendants that "related to" generic products were their labeling decisions made elsewhere.

Plaintiffs cite three California district court decisions that asserted specific jurisdiction over innovator-liability claims, but those decisions misunderstood the innovator-liability theory. The decisions emerged out of litigation regarding the brand-name drug Singulair and its generic equivalents, and each adopted the analysis of *Whaley v. Merck & Co.*, 2022 WL 1153151 (S.D. Cal. Apr. 12, 2022). *Whaley* held that Merck's "advertis[ing], market[ing], and s[elling]" of Singulair in California were "relevant even when they are not an effort to promote or sell generic montelukast" because "Plaintiffs' theory targets Singulair, not generic

montelukast." *Id.* at *7. But the *Whaley* court was wrong that innovator-liability claims target the brand-name drug. As Plaintiffs themselves put it, innovator liability imposes on brand-name manufacturers a duty of care "to a consumer of a *generic* version of the drug based on the inadequate warnings crafted by the brand-name manufacturer, and copied onto the *generic* label." Krause.Br.94 (emphases added).

The district court's dismissal of innovator-liability claims arising under California and Massachusetts law does not mean, as Plaintiffs suggest (at 112), that specific jurisdiction is absent in ordinary misrepresentation and failure-to-warn cases filed in the State of a plaintiff's injury. In typical cases like those, the defendant itself will have sold or promoted the product in the forum State, which is an adequate basis for specific jurisdiction under *Ford*. Innovator liability is unique in that it holds a defendant responsible for *other companies'* products that the defendant never sold, marketed, or advertised anywhere. That unique feature of innovator liability, which has led so many courts to reject the theory on the merits, also creates unique difficulties for plaintiffs trying to establish specific jurisdiction. Those difficulties will

not recur for the type of traditional product-liability claims analyzed in *Ford*.[42]

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgments.

July 25, 2024

Respectfully submitted,

*/s/ Amy Mason Saharia*

PAUL ALESSIO MEZZINA
JOSHUA N. MITCHELL
KING & SPALDING, LLP
   *1700 Pennsylvania Avenue,*
   *N.W., Suite 900*
   *Washington, DC 20006*
   *(202) 626-8972*

*Counsel for Boehringer Ingelheim*
*Pharmaceuticals, Inc., Boehringer*
*Ingelheim Corporation, and*
*Boehringer Ingelheim USA*
*Corporation*

JOSEPH G. PETROSINELLI
AMY MASON SAHARIA
ANNE E. SHOWALTER
LIBBY A. BAIRD
WILLIAMS & CONNOLLY LLP
   *680 Maine Avenue, S.W.*
   *Washington, DC 20024*
   *(202) 434-5000*
   *asaharia@wc.com*

*Counsel for Pfizer Inc.*

---

[42] The district court did not purport in its summary-judgment order to issue a merits ruling on claims previously dismissed for lack of personal jurisdiction, so there is no need for this Court to vacate the judgment with respect to innovator-liability claims filed in California and Massachusetts. *See* Krause.Br.114-15.

Madison Kitchens
King & Spalding, LLP
   *1180 Peachtree Street, N.E.*
   *Suite 1600*
   *Atlanta, GA 30309*
   *(404) 572-2712*

Matthew V.H. Noller
King & Spalding, LLP
   *50 California Street, Suite 3300*
   *San Francisco, CA 94111*
   *(415) 318-1200*

*Counsel for Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Corporation, and Boehringer Ingelheim USA Corporation*

Jay P. Lefkowitz
Kirkland & Ellis, LLP
   *601 Lexington Avenue*
   *New York, NY 10022*
   *(212) 446-4800*

Cole Carter
Kirkland & Ellis, LLP
   *333 West Wolf Point Plaza*
   *Chicago, IL 60654*
   *(312) 862-1951*

*Counsel for GlaxoSmithKline LLC, GlaxoSmithKline Holdings (Americas) Inc., and GlaxoSmithKline PLC*

ILANA H. EISENSTEIN
RACHEL A.H. HORTON
M. DAVID JOSEFOVITS
DLA PIPER LLP (US)
   *1650 Market Street, Suite 5000*
   *Philadelphia, PA 19103*
   *(215) 656-3300*

SAMANTHA L. CHAIFETZ
DLA PIPER LLP (US)
   *500 Eighth Street, N.W.*
   *Washington, DC 20004*
   *(202) 799-4082*

DANIEL S. PARISER
SALLY L. PEI
ARNOLD & PORTER
KAYE SCHOLER LLP
   *601 Massachusetts Avenue,*
   *N.W.*
   *Washington, DC 20001*
   *(202) 942-5000*

*Counsel for Sanofi-Aventis U.S.*
*LLC, Sanofi US Services, Inc.,*
*and Chattem, Inc.*

STEVEN REITENOUR
BOWMAN & BROOKE LLP
   *150 South 5th Street, #3000*
   *Minneapolis, MN 55402*
   *(612) 672-3244*

*Counsel for Patheon*
*Manufacturing Services LLC*

**CERTIFICATE OF COMPLIANCE
WITH TYPEFACE AND WORD-COUNT LIMITATIONS**

I hereby certify that:

This document complies with the expanded word limit in this Court's order, *see* Dkt.355-1:3,CA11#21-12618, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 27,967 words.

This document complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in size 14 Century Schoolbook font.

*/s/ Amy Mason Saharia*
Amy Mason Saharia

July 25, 2024

# CERTIFICATE OF SERVICE

I, Amy Mason Saharia, counsel for Defendant-Appellee Pfizer Inc. and a member of the Bar of this Court, certify that, on July 25, 2024, a copy of this Brief for Brand Defendants-Appellees was filed electronically through the appellate CM/ECF system with the Clerk of the Court, and that copies were sent, by third-party commercial carrier for delivery overnight, to the Clerk of the Court.

I further certify that all parties required to be served have been served.

*/s/ Amy Mason Saharia*
Amy Mason Saharia

July 25, 2024